**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>Discount Warehouses, LP,<br><br>Debtor. | Case No. 26-31510-mar<br>Chapter 11<br><br><br>Hon. Mark A. Randon |

# OBJECTION OF CHURCHILL MRA FUNDING I LLC TO ENTRY OF FINAL ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL WITHOUT ADEQUATE PROTECTION PAYMENTS

Churchill MRA Funding I LLC ("Churchill" or the "Lender"), by and through its undersigned counsel, hereby objects to the entry of a final order to authorize the Debtor's use of cash collateral without providing adequate protection payments.

## BACKGROUND

1. This is a single asset real estate case. The Debtor operates Clio Gardens Apartments, a residential apartment building located at 6914 Clio Court, Flint, Michigan (the "Property"). Churchill holds a duly perfected first-priority mortgage and an assignment of rents security interest encumbering the Property and related rents.[1] The Debtor acknowledges that it owes Churchill $2,838,905.25 (the

[1] The mortgage and other support documents (the "Loan Documents") are attached to Churchill's *Objection to Debtor's Chapter 11 First Day Motion to Use Cash Collateral Filed by Debtor In Possession Discount Warehouses, LP* [Doc 15] (the "Objection").

"Indebtedness") which is the approximate amount due to Churchill as of the June 26, 2026 (the “Petition Date”) exclusive of attorneys’ fees and costs.

2. Prior to the Petition Date, the Debtor defaulted under the Loan Documents by, among other things, failing to make required monthly interest payments of each for the months of February and March 2026, and by failing to pay property taxes assessed against the Property since 2024 in the amount of $17,758.32.

3. Since the time of the Default, the Debtor has not made any payments to Churchill for interest payments due in April through June 2026.

4. On April 13, 2026, Churchill commenced a foreclosure action in the Genesee County Circuit Court, State of Michigan, against the Debtor (Case No. 26-62110-CB), together with a motion to appoint a receiver which was pending on the Petition Date.

5. On June 30, 2026, the Debtor filed its Chapter 11 First Day Motion to Use Cash Collateral Filed by Debtor In Possession Discount Warehouses, LP [Doc 6] (the “Motion”), the Court held a hearing on July 6, 2026 and approved the Debtor’s use of cash collateral on an interim basis over Churchill’s objection to such relief. Churchill consented to the entry of the *Order Allowing Interim Use of Cash Collateral and Setting a Final Hearing on the Debtor's Motion to Use Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection Pursuant to 11 U.S.C. § 361* (the “Interim Order”) as to form and preserved its objections.

6. According to the Motion and the Debtor's "Monthly Budget" attached to the Motion (the "Budget") the Debtor seeks court approval on a final basis to use cash collateral to fund monthly operating expenses estimated at $23,310 per month and seeking authorization to use up to $26,000 per month, with no periodic cash payments to Churchill as adequate protection. In exchange, the Debtor has only offered adequate protection in the form of a purported equity cushion and replacement liens. Meanwhile, accruing monthly interest on the Indebtedness is at least $12,000.

7. The Budget is a generic budget that does not specify the month or year of the Budget and whether this is the expected monthly budget each and every month while the case is pending making it unclear whether the Budget reflects the actual and necessary expenditures that the Debtor must make in order to preserve and operate the Property.

## AUTHORITY

8. In a single asset real estate case, Churchill's assignment of rents security interest constitutes a distinct personal property interest, and the post-petition rents generated by the Property are cash collateral subject to Churchill's pre-petition security agreement. 11 U.S.C. §§ 101(11), 363(a), 363(c)(2).

9. A secured creditor who holds both a mortgage and an assignment of rents interest "possesses two distinct security interests, i.e., a mortgage on the

apartment project and a perfected security interest in rents, and each of these interests must be adequately protected." *In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558, 566 (B.A.P. 6th Cir. 2010) (citing *Stearns Bldg.*, 165 F.3d 28, 1998 WL 661071, at *3-4, and *Travelers Ins. Co. v. River Oaks Ltd. P'ship (In re River Oaks Ltd. P'ship*), 166 B.R. 94 at 97 (E.D. Mich. 1994).

10. A debtor may not use cash collateral unless each entity with an interest in that collateral consents or the Court, after notice and a hearing, authorizes such use. 11 U.S.C. § 363(c)(2). Churchill does not consent to the use of its cash collateral without adequate protection payments.

11. When a secured creditor objects to the use of cash collateral, the debtor bears the burden of proof on the issue of adequate protection. 11 U.S.C. § 363(p)(1). The debtor must demonstrate that the secured creditor's position is not likely to deteriorate during the bankruptcy and that the proposed protections adequately preserve the creditor's interest as it existed on the petition date. *In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008). Adequate protection is required to ensure that the use of cash collateral does not result in a decrease in the value of the secured creditor's interest in the collateral. 11 U.S.C. § 363(e). Adequate protection may take the form of periodic cash payments, additional or replacement liens, or other relief that will result in the creditor realizing the indubitable equivalent of its interest. 11 U.S.C. § 361(1), (2), (3).

## ARGUMENT

12. The Debtor has failed to demonstrate that Churchill is adequately protected. In particular, the Debtor has not demonstrated that a sufficient equity cushion exists to excuse the Debtor from providing Churchill with adequate protection in the form of periodic cash payments.

13. In his Declaration [Doc 14] in support of the Motion, the Debtor's principal and responsible person, Barry Cohen, attested to the value of the Property as $5.2 million, citing an appraisal that is over two years old and that was not filed with the Court as an exhibit in support of the Motion. Moreover, Mr. Cohen has not demonstrated that he possesses the qualifications necessary to corroborate an appraisal conducted more than two years ago.

14. Because the Debtor has not submitted the appraisal as an exhibit, and the Debtor rests its assertion of value solely on a declaration, the record contains no admissible or reliable evidence of the Property's current value. The Debtor's unsubstantiated assertion cannot satisfy the statutory burden of proving adequate protection on account of a sufficient equity cushion. See *In re Martin*, 761 F.2d 472, 477 (8th Cir. 1985) which found that while the debtors contended the valuation of their crops exceeded the secured creditor's claim, no documentary evidence was provided to the court therefore, the debtor's asserted valuation was not substantiated.

15. Moreover, reliance on a stale appraisal that has not been submitted to the Court constitutes an improper basis for determining adequate protection. See *In re Welcome Grp. 2, LLC*, No. 2:23-bk-53043, 2026 Bankr. LEXIS 620, at *36 (Bankr. S.D. Ohio Mar. 13, 2026) which held a valuation could not be reached solely on testimony of the debtor's representative. Also see *In re Jacobs*, No. 19-12591-j11, 2021 Bankr. LEXIS 1406, at *23 (Bankr. D.N.M. May 24, 2021) which recognized that an appraisal conducted post-petition but 17 months prior to a secured creditor's stay relief motion was not a reliable indication of value due to the age of the appraisal.

16. Valuation of collateral is temporal and must be made within the context of circumstances existing at the relevant point in time. *In re Madera Farms P'ship*, 66 B.R. 100 at 103 (B.A.P. 9th Cir. 1986). An appraisal that relies on stale market data fails to account for changes in market conditions, property condition, physical depreciation, tenant occupancy, rental income trends, or shifts in the local real estate market.

17. There is risk that Churchill's collateral is actively declining in value. The Debtor has failed to pay property taxes assessed against the Property since 2024 in the amount of $17,758.32, creating a growing tax lien that could prime Churchill's first-priority mortgage. The Debtor has not provided evidence that the Property has been adequately maintained during the period of default, and the Debtor's own

records reflect limited and inconsistent renovation expenditures (despite suddenly requiring $5,000 monthly of Churchill's cash collateral to conduct renovations post-petition). Without current evidence of the Property's condition, occupancy levels, and rental income trends, the Court cannot determine whether Churchill's collateral is stable, appreciating, or depreciating. Where, as here, a debtor offers no reliable evidence that its collateral is maintaining value, the risk of depreciation weighs heavily in favor of requiring periodic cash payments as adequate protection rather than a mere replacement lien on an asset of uncertain and potentially declining value.

18. Churchill has requested the records necessary to independently evaluate the Debtor's attested value. While the Debtor has provided some of those records, it has failed to produce all records necessary to verify the Debtor's attested value. More particularly, despite Churchill's repeated requests, the Debtor has not produced the following records necessary to substantiate the value of the Property: a detailed list of improvements made in the prior two (2) years, copies of current leases,[2] two years of rent rolls (the Debtor only provided a May 2026 report), tax returns, and other

---

[2] As of the filing of this Objection, the Debtor has provided multiple emails containing copies of what purport to be current leases. However, since today's date is the deadline for Churchill to file a further objection to the Motion, Churchill has not had the opportunity to inspect the documents. Notwithstanding, the Debtor's response to Churchill's document request necessary to complete a current appraisal is still incomplete.

items necessary for Churchill to conduct a valuation of the Property to verify the attested value.

19. In the absence of an equity cushion, a post-petition replacement lien is not adequate protection for a secured creditor whose security interest is comprised of a mortgage and an assignment of rents. *Buttermilk Towne Center* at 566. Churchill's pre-petition assignment of rents security interest already encumbers post-petition rents generated by the Property. Granting Churchill a post-petition lien on property that Churchill already has a lien on – as a replacement for the pre-petition rents it is being denied – does not constitute the indubitable equivalent of Churchill's interest. 11 U.S.C. § 361(3).

20. Churchill also objects to the Debtor's use of cash collateral based on the Budget as proposed by the Debtor. In addition to the lack of specificity as to the applicable budget period, the Budget contains several deficiencies and the Debtor has added items to the Budget that were not ordinary operating expenses of the Debtor prepetition. Additionally, Churchill has requested, but the Debtor has not yet provided records such as receipts, contracts or invoices to support the existence or need for each proposed expenditure identified in the Budget namely, monthly costs for payroll at $3,500, landscaping at $1,400, renovation costs at $5,000, apartment turnover costs at $1,500 and building supplies at $2,000.

21. Notably, the Debtor's proposed cash collateral budget includes a line item for payroll of $3,500 per month, which equates to $42,000 annually. According to the records the Debtor has produced to date, payroll was not a prepetition expense of the Debtor. The closest prepetition analogue appears to be the Debtor's management fees, but the figures do not align: the Debtor's year-to-date profit and loss statement through June 2026 reflects only $1,504 in management fees paid in 2026, and in 2025 management fees totaled just $11,219.50. **Exhibit 1**, 2025 and 2026 P&L Statements. Despite Churchill's request for information, the Debtor has not identified who is on payroll, in what capacity those individuals serve the Property, or what services they provide. Additionally, the Debtor has not produced a management agreement or any documentation explaining the basis for or recipients of the proposed payroll expenditure. Churchill and the Court cannot evaluate whether the proposed payroll expenditures are reasonable, necessary, or legitimately related to the operation of the Property without full disclosure of all employees, contractors, and any management company to be funded from Churchill's cash collateral.

22. The Budget proposes to pay for "building renovations" but prepetition, the Debtor collected rents from tenants of the Property and did not apply those receipts to service the Churchill debt, nor according to the Debtor's records, did the Debtor use those pre-petition rent receipts to make the asserted improvements to the

Property. The Debtor’s profit and loss statements only reflect $14,868.47 in renovation expenses were expended in 2026 through June. However, a review of the Debtor’s Chase bank account records shows contractor payments that do not appear to account for the full amount of these reported renovation costs. This discrepancy raises questions about whether the Debtor’s financial records accurately reflect the Debtor’s true operating expenses.

23. The Court should require enhanced protections – including periodic cash payments – to ensure that Churchill's interest is not further eroded during the pendency of this case.

24. The Debtor’s pre-petition conduct, taken as a whole, demonstrates a pattern of mismanagement and lack of transparency that should weigh against authorizing continued use of Churchill’s cash collateral without meaningful adequate protection. For example, the Debtor’s bank records reveal the misuse of Churchill’s cash collateral prepetition. In particular, at least $284,810 was transferred from the Debtor’s operating account to two external accounts between May 2025 and May 2026 (the June 2025 statement was not provided). **Exhibit 2**, Summary of Bank Transfers to Unknown Accounts. The recipient accounts appear to be held at Chase Bank and end in account numbers 6363 and 6652. The Debtor has not identified the holders of these accounts, the purpose of the transfers, or whether these accounts belong to the Debtor, its principal, or third parties. If the

accounts belong to the Debtor, the corresponding bank records have not been produced. The diversion of $284,810 in rental income – which constitutes Churchill's cash collateral – to unidentified accounts raises serious questions about the Debtor's ability to manage cash collateral and further undermines the Debtor's burden of demonstrating adequate protection.

25. Churchill further objects to the Debtor's prepetition payment of $10,000 from the Debtor's operating account to the Debtor's bankruptcy counsel. The funds in the Debtor's operating account derived from the Debtor's rental receipts and therefore constitute cash collateral subject to Churchill's security interest. Courts have generally disallowed the use of a mortgagee's cash collateral to fund the administrative costs of a bankruptcy proceeding, including attorney fees. See *River Oaks at* 97–98 (rejecting the use of cash collateral to pay expert witness fees where the secured creditor held an assignment of rents). "[R]ents generated from a rental building, i.e. cash collateral, may be used for the operation and maintenance of such building" but that does not "mean that using such cash collateral to operate and maintain the property necessarily constitutes adequate protection under § 363." *Id.* at 97 "[R]ental income, constituting cash collateral, may not be used for expenses not related to the operation and maintenance of the building generating the rents, except as may be permitted pursuant to 11 U.S.C. § 506." *Id.* at 98. See *In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558, 565 (B.A.P. 6th Cir. 2010)

which agreed with *River Oaks* that a debtor's diversion of the net rents from [the lender], for payment of administrative expenses" will "diminish a secured creditor's interest in the assignment of rents portion of its perfected security interest." *Buttermilk Towne Ctr.* also cited to and agreed with the unpublished opinion of *In re Stearns Bldg.*, 165 F.3d 28, 1998 WL 661071, at *2 which ordered the disgorgement of the debtor's attorney retainer that was paid out of cash collateral. The payment of $10,000 in cash collateral to fund the Debtor's legal fees constitutes an unauthorized use of Churchill's collateral and should be addressed by the Court and should not be allowed.

## V. RELIEF REQUESTED

WHEREFORE, Churchill MRA Funding I LLC respectfully requests that the Court:

a. Deny entry of the proposed final order authorizing the Debtor to use cash collateral without adequate protection payments to Churchill;

b. In the alternative, condition any authorization for the use of cash collateral on payment of monthly adequate protection payments to Churchill in an amount to be determined following an evidentiary hearing;

c. Order the Debtor to provide a 13-week cash flow or more detailed budget supporting the Debtor's request for authority to use cash collateral and to produce all financial records that Churchill has requested, in advance of any final hearing on the Motion, with sufficient time to permit Churchill to retain an independent appraiser and prepare a response;

d. Schedule an evidentiary hearing at which Churchill may cross-examine the Debtor’s witnesses on the issue of the Property’s current value and the adequate protection of Churchill’s interest;

e. Order the Debtor’s bankruptcy counsel to disgorge the $10,000 pre-petition retainer, and return such funds to the Debtor’s operating account as cash collateral subject to Churchill’s security interest;

f. Require the Debtor to provide Churchill with monthly accountings including a budget reconciliation of projected to actual income and expenses and detailing all cash collateral receipts and disbursements, together with copies of all supporting records and bank statements for the Debtor's operating account(s), within ten (10) days after the close of each calendar month; and

g. Grant Churchill such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

By: /s/ Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
Ethan Holtz (P71884)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Telephone: (248) 351-3000
kclayson@taftlaw.com
eholtz@taftlaw.com

Dated: July 20, 2026

*Counsel to Creditor, Churchill MRA Funding I LLC*