**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Case No. 26-31510-mar<br>Chapter 11 |
| Discount Warehouses, LP, | |
| Debtor. | Hon. Mark A. Randon |

**OBJECTION OF CHURCHILL MRA FUNDING, LLC TO DEBTOR'S MOTION FOR ENTRY OF FINAL ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING SECURED BY LIENS ON PROPERTY OF THE ESTATE, (II) GRANTING SUPER PRIORITY CLAIMS, AND (III) GRANTING CERTAIN RELATED RELIEF**

Churchill MRA Funding, LLC ("Churchill"), by and through its undersigned counsel, hereby objects to the *Motion of Discount Warehouses LP* (the "Debtor") *for Entry of Final Order (I) Authorizing Debtor to Obtain Post-Petition Financing Secured by Liens on Property of the Estate, (II) Granting Super Priority Claims Pursuant to Sections 364(c)(1) and 364(d) of the Bankruptcy Code, and (III) Granting Certain Related Relief* (Doc 63) (the "Motion"), and in support thereof states as follows:

**PRELIMINARY STATEMENT**

Churchill holds a first-priority mortgage lien on the Debtor's sole asset — an 84-unit apartment complex known as Clio Gardens Apartments, located at 6914 Clio Court, Flint, Michigan 48504 (the "Property"). Churchill's lien arises from a loan originated in April 2021 in the initial amount of $2,876,881.00 and

secured by a mortgage on the Property. As of June 26, 2026 (the "Petition Date") Churchill's secured claim is approximately $3,002,045.43 not including attorney's fees and costs and the calculation of post-petition interest chargeable under the terms of the loan.

Through the Motion, the Debtor seeks authority to borrow up to $1,655,000 at 12.5% interest from 364 Capital, LLC (the "DIP Lender"), secured by a super-priority priming lien on all of the Debtor's real and personal property. The proposed financing specifically seeks a first-priority priming lien under Section 364(d) of the Bankruptcy Code that would prime Churchill's existing mortgage.

Churchill objects to the Motion because the Debtor has failed to satisfy its burden under 11 U.S.C. § 364(d)(1). Specifically: (A) the Debtor has not demonstrated that it is unable to obtain credit on more favorable terms; and (B) the Debtor has not shown that Churchill's interest in the Property is adequately protected in the event the priming lien is granted.

## BACKGROUND

### A. Churchill's Secured Claim

In April 2021, the Debtor obtained a loan from A&S Capital in the initial amount of $2,876,881.00, secured by a mortgage against the Property. Churchill is the assignee of the April 2021 loan. As of the date hereof, Churchill's secured claim totals $3,002,045.43, with interest and costs continuing to accrue post-petition. Churchill's claim grows each day this case remains pending, and, the

Debtor was in default under the loan terms since at least February 2026, therefore Churchill's claim has been increasing since well before the Petition Date.

**B. The Debtor's Pre-Petition Defaults and Foreclosure**

Prior to the filing of this case, Churchill commenced a foreclosure action against the Debtor in Genesee County Circuit Court (Case No. 26-62110-CB) along with a motion to appoint a receiver. The Debtor itself acknowledges that the renovation process "did not move as quickly as it had anticipated," blaming factors including constrained supply chains and price increases in the aftermath of the COVID-19 pandemic. Notably, the Debtor borrowed the funds at issue in April 2021 – over a year after the March 2020 business shutdowns COVID-19 pandemic began.

**C. The Property Valuation and Liquidation Analysis**

The Debtor claims that, once completed and stabilized, the Property would be worth approximately $6,500,000.00, and that in its "as-is" condition, the Property is valued at approximately $5,200,000.00. However, the Debtor's appraisal is over 2 years old and, in its Motion, the Debtor has acknowledged that it is in the process of obtaining an updated appraisal.

Following the Petition Date, Churchill obtained its own independent appraisal, which indicates the Property has an as-is market value of approximately $3,400,000. **Exhibit A** (the "Appraisal"). The market value set forth in the Appraisal assumes approximately $1,900,000 in renovation costs and that the renovation can be accomplished within six (6) months. The Appraisal

further provides a liquidation value of $2,900,000. The net realizable value ("NRV") — which, per the Appraisal, adjusts the liquidation value for the likely selling costs necessary to dispose of the Property — is $2,730,000. **Exhibit A**, p. 75. The NRV deducts only a sales commission projected at 4% and legal costs of $25,000, and assumes credit for rental income during the marketing period and any operating expenses will be paid. These numbers leave virtually no equity cushion to protect Churchill from the risk attendant to a priming lien.

Churchill's appraisal further assumes that the Property would require approximately $1,900,000 in renovation costs — to be accomplished within six (6) months — to achieve the stabilized value the Debtor claims — yet the Debtor is seeking to borrow only $1,655,000 through the DIP Facility. Moreover, the Debtor has not submitted any construction plans or timeline regarding the intended renovation plans to indicate the Debtor's expected renovation timeline. This shortfall of approximately $245,000 in renovation proceeds raises serious questions about whether the proposed DIP Financing is even sufficient to accomplish the renovations that the Debtor claims will increase the value of the Property, let alone, the timeframe necessary to accomplish those renovations.

**D. Inadequate Monthly Cash Flow**

The Debtor's own declarant, Barry Cohen, admits that the Property currently can only house 25-30 residents out of 84 units. The Property is currently generating approximately $20,000 per month in net operating income — before any debt service. The proposed DIP Financing at 12.5% interest on $1,655,000

would produce annual interest charges of approximately $206,875, or roughly $17,240 per month. The Debtor's current income of $20,000 per month barely covers the interest on the DIP Loan alone, leaving virtually nothing to service Churchill's existing claim or to fund the very renovations that the DIP Loan is purportedly intended to finance. Indeed, the Debtor's proposed DIP Loan budget does not contain any line item for any debt service to the DIP Lender or Churchill.

## LEGAL ARGUMENT

### A. The Applicable Legal Standard

Under 11 U.S.C. § 364(d)(1), the Court may authorize credit secured by a priming lien only if (A) the debtor is unable to obtain such credit otherwise, and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such priming lien is proposed to be granted. The debtor bears the burden of proof on the issue of adequate protection.

Granting post-petition financing on a priming basis is "extraordinary and is allowed only as a last resort." *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010). The court must exercise particular caution in considering adequate protection in the face of a proposed priming lien: "Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." *In re First South Savings Association*, 820 F.2d 700, 710 (5th Cir. 1987).

"The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide security for a new, post-petition lender. When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied." *In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) (Denying the debtor's motion to obtained secured credit where the debtor's proposed renovations would not sufficiently increase the value necessary to provide adequate protection to prior lienholders.)

**B. The Debtor Has Not Demonstrated an Inability to Obtain Financing on More Favorable Terms**

Under 11 U.S.C. § 364(d)(1)(A), the Debtor bears the burden of demonstrating that it is "unable to obtain such credit otherwise." The Debtor's showing on this point is woefully inadequate.

The Motion states only that "[t]he Debtor has been unable to obtain funding on terms that are more favorable than offered by the DIP Lender." The Motion further states that "[t]he Debtor solicited alternative financing proposals prior to the Petition Date" but "was unable to procure unsecured financing." These are bare, conclusory assertions unsupported by any meaningful evidence.

The Declaration of Barry Cohen adds only that he "searched diligently for financing, and contacted over 24 lenders" and "was not able to obtain needed

financing on more favorable terms than offered by 364 Capital, LLC." But the Declaration fails to identify:

- Which lenders were contacted;
- When they were contacted;
- What terms were offered (or whether any offers were received at all);
- The specific reasons any alternative financing was rejected;
- Whether any lenders were willing to provide financing on a non-priming basis;
- Whether the Debtor explored any alternative financing structures (e.g., financing with Churchill's consent, equity contributions from partners, or subordinated financing).

As the court observed in *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987), the debtor "failed to establish its inability to obtain other, more favorable credit" where "there was no evidence that Debtor had applied for, or sought, loans from institutions other than [two lenders], or that the [proposed lender's] commitment was the most favorable credit available." The same is true here. Mr. Cohen's vague assertion that he "contacted over 24 lenders" is devoid of any corroborating detail or documentation. There is no evidence of written loan applications, term sheets received and rejected, correspondence with potential lenders, or any other documentation that would allow this Court to evaluate whether the Debtor engaged in a meaningful search for financing.

Moreover, the proposed DIP Financing itself carries onerous terms — 12.5% interest, a minimum of 180 days' interest due regardless of repayment date, interest accruing at 12.50% per annum and a minimum 180 days of interest due to the DIP Lender regardless of repayment date — and a first-priority

priming lien on all of the Debtor's assets. Without evidence of the terms offered by the other lenders purportedly contacted, this Court cannot determine whether terms presented in the Motion represent the best available financing or merely the financing most convenient to the Debtor.

### C. The Debtor Has Failed to Prove Adequate Protection of Churchill's Interest

Even if the Debtor could satisfy § 364(d)(1)(A), the Motion must still be denied because the Debtor has failed to demonstrate adequate protection of Churchill's lien interest under § 364(d)(1)(B).

#### 1. There Is No Meaningful Equity Cushion

The Debtor's primary adequate protection argument is that Churchill is protected by the value of the Property. The Motion asserts, without any supporting analysis, that "[b]ased on the value of the Project, both at completion and in its current state, Churchill is adequately protected, even after its prepetition liens are primed" and that "Churchill is not entitled to any additional form of adequate protection."

This conclusory assertion does not survive scrutiny. The numbers tell the story:

| Deduction from Estimated Value | Amount |
|---|---|
| Churchill's current secured claim | $3,002,045.43 |
| Proposed DIP Loan (priming lien) | $1,655,000.00 |
| Total liens to be satisfied before Churchill | $4,657,045.43 |

| | |
|---|---|
| As-is appraised value (Churchill’s appraisal) | $3,400,000.00 |
| Liquidation value (Churchill's appraisal) | $2,900,000.00 |
| Less selling costs<br>(4% commission + $25,000 legal) | ( $161,000.00) |
| Net Realizable Value | $2,730,000.00 |
| Equity deficit | ($1,927,045.43) |

If the DIP Financing is approved with a priming lien, the combined liens against the Property ($4,657,045.43) would exceed the net realizable value ($2,730,000) by nearly $2 million. This is not an equity cushion — it is an equity deficit. Churchill would be rendered significantly under-secured from the moment the DIP Loan is funded.

“[C]ase law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection,” while “an equity cushion under 11% is insufficient to constitute adequate protection.” *In re Packard Square* LLC, 574 B.R. 107, 123 (Bankr. E.D. Mich. 2017) (quoting *Drake v. Franklin Equip. Co.*, 416 B.R. 483, 528-29 (Bankr. E.D. Va. 2009), Here, there is no equity cushion at all.

**2. The Debtor’s “Stabilized Value” Projections Are Speculative and Unreliable**

The Debtor’s claim that the Property will be worth $6,500,000 “once completed and stabilized” is precisely the sort of speculative projection that courts have consistently rejected as a basis for adequate protection. Additionally, this assertion is based on a 2024 appraisal, and the Property has not been

completed or stabilized making the viability of a $6.5 million valuation even more speculative.

"In general, courts have denied financing that included a priming lien where adequate protection relied on increased value in highly speculative circumstances, where time periods for value increase were tight, or where a debtor faced red tape or other hurdles." *In re Vander Vegt*, 499 B.R. 631, 638 (Bankr. N.D. Iowa 2013).

"Congress did not contemplate that a secured creditor could find its position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects." *In In re Den-Mark Construction, Inc.*, 406 B.R. 683, 702 (E.D.N.C. 2009) (quoting *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 567 (3rd Cir. 1994).

Similarly, in *In re Strug-Division LLC*, 380 B.R. 505, 512, 515 (Bankr. N.D. Ill. 2008), the debtors argued that renovation of an apartment complex would result in an increase in value exceeding debt, and that this equity cushion would protect the secured creditor even if its loans were primed. The court denied the priming lien, holding that the debtors could not provide the secured creditor with the indubitable equivalent of its present interests where "the 'equity cushion' would be small and therefore the risk of being primed would be entirely on [the secured creditor]." The *Strug-Division* case is directly on point: it involved an

apartment complex renovation, relied-upon future value increases, and a thin projected equity cushion — precisely the situation here.

The Third Circuit in *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 566 (3d Cir. 1994), held that the bankruptcy court was "wrong in finding that [the secured creditor] derived adequate protection from the increased value of [a real-estate development] project through [the debtor's] contemplated continuing construction," because "the evidence [did] not establish that the property ha[d] increased in value to compensate [the secured creditor] for the loss of its priority."

The Debtor's case for future value is even weaker than those rejected in *Packard Square*, *Strug-Division*, and *Swedeland* for several reasons:

- The renovation budget is insufficient. Churchill's appraisal indicates that the Property requires approximately $1,900,000 in renovation costs — to be accomplished within six (6) months — to achieve stabilized value. The Debtor is borrowing only $1,655,000 — a shortfall of $245,000. The Debtor has offered no explanation for how the renovations will be completed with inadequate funding.
- The Debtor has a track record of failure. The Debtor acknowledges that the renovation process "did not move as quickly as it had anticipated." Churchill was forced to commence foreclosure proceedings and move for appointment of a receiver before the Petition Date. This is not a debtor whose projections of timely completion inspire confidence.
- Per diem interest erodes any potential cushion. With Churchill's claim accruing interest and costs, and the DIP Loan accruing interest at 12.5% (approximately $17,240 per month), the total carrying costs approach $55,460 per month. Every month of delay further erodes whatever slim margin might theoretically exist.

- Monthly cash flow is inadequate. The Property generates approximately $20,000 per month in net operating income — barely enough to cover the DIP Loan interest alone, and insufficient to service Churchill's growing claim simultaneously.

### 3. The Proposed Adequate Protection Is Non-Existent

The Motion baldly states that "Churchill is adequately protected, even after its prepetition liens are primed by the new liens granted to the DIP Lender in connection with the DIP Financing" and concludes that "Churchill is not entitled to any additional form of adequate protection."

The Debtor does not offer Churchill:

- Any periodic cash payments;
- Any replacement or additional liens;
- Any equity contribution from the Debtor's partners;
- Any interest payments on Churchill's secured claim;
- Any milestone-based protections or conversion rights; or
- Any meaningful monitoring or reporting obligations.

Sections 361(1) and 361(2) do not apply where the debtor is not offering cash payments or replacement liens as adequate protection. Under § 361(3), the Debtor must provide, as adequate protection, the "indubitable equivalent" of the secured creditor's interest in the property — meaning adequate protection must both compensate the secured creditor for the present value of that interest and insure the safety of that interest. The Debtor has offered nothing — not even an attempt at adequate protection — making this Motion entirely deficient.

### 4. The Proposed DIP Financing Merely Shifts Risk to Churchill

The practical effect of the proposed DIP Financing is to shift the entire risk of the Debtor's renovation project onto Churchill. If the renovations are completed on time and on budget (something the Debtor has failed to accomplish to date), the DIP Lender is repaid in full from its priming lien position. If the renovations fail, are delayed, or run over budget, Churchill bears the loss — its lien having been primed and its claim accruing interest and costs. Such relief would improperly shift the substantial risk to Churchill and therefore should be denied. see *In re Windsor Hotel*, L.L.C., 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003).

Moreover, the Debtor is required to meet the requirements of 11 U.S.C. 362(d)(3) by September 24, 2026 by either making interest-only payments at the non-default rate of interest or filing a plan that has a "reasonable possibility of being confirmed within a reasonable time." However, from the current posture of the case and the Debtor's current financial performance and the proposed DIP Financing terms

**C. The Proposed Order Improperly Establishes Procedures for Relief from the Automatic Stay in Favor of the DIP Lender**

The Cover Sheet further discloses that the Proposed Order contains "Provisions that establish a procedure or conditions for relief from the automatic stay," located at Page 10, Paragraph 17 of the Proposed Order.

The inclusion of automatic stay relief provisions in the Proposed Order is objectionable because it creates a self-executing termination trigger. As proposed

in the Motion, the DIP Lender is already receiving extraordinary protections under the Proposed Order — a first-priority priming lien on all of the Debtor's assets, a super-priority administrative expense claim, and liens on avoidance action proceeds. The addition of a self-executing automatic stay termination trigger gives the DIP Lender even more leverage and further shifts risk onto Churchill and other existing creditors.

To the extent that the Court is inclined to grant the Motion, the Court should require that any automatic stay relief provisions be stricken from the Proposed Order, or at minimum, should require that the DIP Lender seek relief from the automatic stay through the standard procedures set forth in § 362(d), with full notice and an opportunity for hearing.

**D. The Cumulative Effect of the Proposed Order's Provisions Is to Shift All Risk to Churchill**

When viewed in combination, the Proposed Order's provisions paint a stark picture. The DIP Lender would receive:

- A first-priority priming lien on all of the Debtor's real and personal property, senior to Churchill's mortgage (Page 9, Paragraph 10);
- A super-priority administrative expense claim under § 364(c)(1), senior to all other administrative claims (the DIP Loan shall be entitled to "superpriority administrative expense claim status... with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtor or its estate" );
- Self-executing automatic stay relief (Page 10, Paragraph 17);

Meanwhile, Churchill — the holder of the first mortgage on the Debtor's sole asset — would receive nothing in the way of adequate protection. The Motion states only that "Churchill is adequately protected, even after its prepetition liens are primed by the new liens granted to the DIP Lender in connection with the DIP Financing" and concludes that "Churchill is not entitled to any additional form of adequate protection."

The DIP Lender is fully insulated: it holds the senior lien, the top-priority administrative claim, liens on avoidance actions, a § 506(c) waiver, and automatic stay relief. If the renovations succeed, the DIP Lender is repaid in full. If the renovations fail, Churchill bears the entire loss — its mortgage having been primed, its surcharge rights waived, and any subsequent trustee bound to these terms. Consistent with the holding in *In re Windsor Hotel, L.L.C.* at 314, where the practical effect of a priming lien is not to enable a viable restructuring, but merely to shift the risk of loss from the post-petition lender onto the existing lienholder, authorization to prime a first priority secured creditor should be denied.

## CONCLUSION

For the foregoing reasons, Churchill MRA Funding, LLC respectfully requests that this Court deny the Debtor's Motion in its entirety, or in the alternative, that this Court (a) decline to enter any order approving post-petition financing that would grant a priming lien on Churchill's collateral; and (b) strike

from the Proposed Order the provisions establishing self-executing automatic stay relief procedures for the DIP Lender.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: September 23, 2026

By: /s/ Kimberly Ross Clayson

Kimberly Ross Clayson (P69804)
Ethan Holtz (P71884)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Telephone: (248) 351-3000
kclayson@taftlaw.com
eholtz@taftlaw.com

*Counsel to Creditor, Churchill MRA Funding I LLC*

**EXHIBIT A**
Appraisal

Integra Realty Resources
Detroit

**Appraisal of Real Property**

**Clio Woods Apartments**
Multifamily Property
6914 Clio Road
Flint, Genesee County, Michigan 48504

**Prepared For:**
Taft Law

**Date of the Report:**
September 22, 2026

**Report Format:**
Appraisal Report

**IRR - Detroit**
File Number: 142-2026-0927

# Subject Photographs





**Clio Woods Apartments**
6914 Clio Road
Flint, Michigan

# Aerial Photograph



Integra Realty Resources
Detroit

400 West Maple Road
Suite 100
Birmingham, MI 48009-3351

T 248.540.0040
F 248.540.8239
www.irr.com

September 22, 2026

Kimberly Ross Clayson
Partner
Taft Law
27777 Franklin Road, Suite 2500
Southfield, MI 48034

SUBJECT: Market Value Appraisal
Clio Woods Apartments
6914 Clio Road
Flint, Genesee County, Michigan 48504
IRR - Detroit File No. 142-2026-0927

Dear Ms. Clayson:

Integra Realty Resources – Detroit is pleased to submit the accompanying appraisal of the referenced property. The purpose of the appraisal is to develop the following opinions of value:

- The market value as is of the fee simple interest in the subject property as of the effective date of the appraisal, September 11, 2026
- The liquidation value of the fee simple interest in the subject property as of the effective date of the appraisal, September 11, 2026
- The net realizable value of the fee simple interest in the subject property as of the effective date of the appraisal, September 11, 2026

The client is Churchill MRA Funding I, LLC represented by Taft Law Firm. The intended users are Churchill MRA Funding I, LLC and Taft Law Firm. The intended use of the report is for litigation support. No other party or parties may use or rely on the information, opinions, and conclusions contained in this report.

The subject is an existing multifamily property containing 84 dwelling units. The improvements were constructed in 1971 and are 27% leased as of the effective appraisal date. The site area is 5.550 acres or 241,758 square feet.

The subject is in the midst of an extensive renovation with a reported $1,525,728 invested thus far with the remaining balance of costs estimated to be $1,655,000. We are adding a 10% contingency resulting in a total remaining renovation of $1,820,000 rounded. According to Barry Cohen, a representative of the owner, building 6914, containing 20 units, has been renovated and is fully occupied. Building 6918 is nearly complete with 13 units occupied or ready for occupancy. Building 6910 is the furthest from completion with all of the lower level of this building at the rough stage; all plumbing and electrical have been installed but the units require drywall and finish construction. Mr. Cohen indicates that the project requires an additional 90 days to complete, however based on our inspection and scope of renovation remaining to be completed, we are projecting a six month completion period.

Mr. Cohen indicated that the property has been contacted by six local housing agencies to place residences, thus he anticipates a quick lease-up once the project is completed. The housing agencies provide residents with individual Section 8 vouchers wherein the tenant pays 30% of their monthly income towards rent with the agency providing the balance. As requested by the client, we are valuing the subject as of a current date. Thus, we are assuming the renovation is completed and the property stabilized with the appropriate stabilization costs and remaining renovation costs deducted to arrive at an as is market value.

The appraisal conforms to the Uniform Standards of Professional Appraisal Practice (USPAP), the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute, and applicable state appraisal regulations.

Standards Rule 2-2 (Content of a Real Property Appraisal Report) contained in the Uniform Standards of Professional Appraisal Practice (USPAP) requires each written real property appraisal report to be prepared as either an Appraisal Report or a Restricted Appraisal Report. This report is prepared as an Appraisal Report as defined by USPAP under Standards Rule 2-2(a), and incorporates practical explanation of the data, reasoning, and analysis that were used to develop the opinion of value.

Based on the valuation analysis in the accompanying report, and subject to the definitions, assumptions, and limiting conditions expressed in the report, the concluded opinions of value are as follows:

**Value Conclusions**

| Value Type & Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As Is | Fee Simple | September 11, 2026 | $3,400,000 |
| Liquidation Value | Fee Simple | September 11, 2026 | $2,900,000 |
| Net Realizable Value | Fee Simple | September 11, 2026 | $2,730,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. The as is market value assumes that the total renovation costs do not exceed $1,900,000 and can be completed within six months.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

If you have any questions or comments, please contact the undersigned. Thank you for the opportunity to be of service.

Respectfully submitted,

**Integra Realty Resources - Detroit**

Donald L. Selvidge, MAI
Michigan Certified General Real Estate
Appraiser #1205006537
Telephone: 248.979.9670
Email: dselvidge@irr.com

Anthony Sanna, MAI, CRE
Michigan Certified General Real Estate
Appraiser #1205001324
Telephone: 248.979.9663
Email: asanna@irr.com

# Table of Contents


**Quality Assurance** **1**

**Executive Summary** **2**
SWOT Analysis 3

**Identification of the Appraisal Problem** **4**
Subject Description 4
Sale History 5
Pending Transactions 5
Appraisal Purpose 5
Value Type Definitions 5
Appraisal Premise Definitions 6
Property Rights Definitions 7
Client and Intended User(s) 7
Intended Use 7
Applicable Requirements 7
Report Format 7
Prior Services 8
Appraiser Competency 8

**Scope of Work** **9**

**Economic Analysis** **12**
Surrounding Area Analysis 12
Services and Amenities 17
Multifamily Market Analysis 19

**Property Analysis** **26**
Land Description and Analysis 26
Improvements Description and Analysis 30
Real Estate Taxes 41
Highest and Best Use 43

**Valuation** **45**
Valuation Methodology 45
Sales Comparison Approach 46
Analysis and Adjustment of Sales 50
Property Adjustments 52
Value Indication 54
Income Capitalization Approach 55
Occupancy and Rental Rates 55
Market Rent Analysis 56
Stabilized Income and Expenses 64
Capitalization Rate Selection 70
Direct Capitalization Analysis 72
Reconciliation and Conclusion of Value 75
Exposure Time 76
Marketing Period 76

**Certification** **77**

**Assumptions and Limiting Conditions** **79**

**Addenda**
A. Appraiser Qualifications
B. IRR Quality Assurance Survey
C. Financials and Property Information
D. Comparable Data
Improved Sales
Rent Surveys
E. Engagement Letter




26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 24 of 174

# Quality Assurance

## IRR Quality Assurance Program

At IRR, delivering a quality report is a top priority. Integra has an internal Quality Assurance Program in which managers review material and pass an exam in order to attain IRR Certified Reviewer status. By policy, every Integra valuation assignment is assessed by an IRR Certified Reviewer who holds the MAI designation, or is, at a minimum, a named Director with at least ten years of valuation experience.

This quality assurance assessment consists of reading the report and providing feedback on its quality and consistency. All feedback from the IRR Certified Reviewer is then addressed internally prior to delivery. The intent of this internal assessment process is to maintain report quality.

## Designated IRR Certified Reviewer

An internal quality assurance assessment was conducted by an IRR Certified Reviewer prior to delivery of this appraisal report. This assessment should not be construed as an appraisal review as defined by USPAP.

# Executive Summary

| | | |
|---|---|---|
| Property Name | Clio Woods Apartments | |
| Address | 6914 Clio Road | |
| | Flint, Genesee County, Michigan 48504 | |
| Property Type | Multifamily - Garden/Low Rise | |
| Owner of Record | Discount Warehouses LP | |
| Tax ID | 46-26-101-054 | |
| Legal Description | UNPLATTED PART OF N 1/2 OF NW 1/4 OF SEC 26, T8N, R6E. | |
| Land Area | 5.550 acres; 241,758 SF | |
| Number of Units | 84 | |
| Gross Building Area | 101,480 SF | |
| Rentable Floor Area | 94,060 SF | |
| Percent Leased | 27% | |
| Year Built; Year Renovated | 1971; 1989, 2026-27 | |
| Zoning Designation | TN-2, Traditional Neighborhood - Medium Density | |
| Highest and Best Use - As if Vacant | Holding for eventual multifamily use | |
| Highest and Best Use - As Improved | Continued multifamily use | |
| Exposure Time; Marketing Period | 6 - 12 months; 6 - 12 months | |
| Date of the Report | September 22, 2026 | |
| As Is Market Value Indications | | |
| Cost Approach | Not Used | |
| Sales Comparison Approach | $3,220,000 | ($38,333/Unit) |
| Income Capitalization Approach | $3,500,000 | ($41,667/Unit) |
| Market Value Conclusion | $3,400,000 | ($40,476/Unit) |

## Value Conclusions

| Value Type & Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As Is | Fee Simple | September 11, 2026 | $3,400,000 |
| Liquidation Value | Fee Simple | September 11, 2026 | $2,900,000 |
| Net Realizable Value | Fee Simple | September 11, 2026 | $2,730,000 |

The values reported above are subject to the definitions, assumptions, and limiting conditions set forth in the accompanying report of which this summary is a part. No party other than Churchill MRA Funding I, LLC and Taft Law Firm may use or rely on the information, opinions, and conclusions contained in the report. It is assumed that the users of the report have read the entire report, including all of the definitions, assumptions, and limiting conditions contained therein.

## Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. The as is market value assumes that the total renovation costs do not exceed $1,900,000 and can be completed within six months.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

## SWOT Analysis

The analyses presented in this report consider the internal strengths and weaknesses of the subject property, as well as opportunities and external threats. The overall valuation influences are summarized in the following table.

### Valuation Influences

**Strengths**

- After renovation; the subject will be in above average condition with a good mix of one- to -three bed units
- Tenant pays electric and gas
- Units includes dishwashers and in-unit laundry hook-ups
- Although there are various concerns facing the U.S. economy (see Threats), local real estate continues to perform through these on-going market cycles. Commercial real estate in this region continues to benefit from solid market fundamentals, continued demand for properties by investors and users, positive income returns, and adequate access to mortgage financing.

**Weaknesses**

- Market area is experiencing a decline in population and households with below average income levels
- Owner pays for water/sewer/trash
- Subject is in fair/poor condition as is and requires $1.9MM in renovation costs (which includes a 15% contigency)
- Ongoing inflation and evolving monetary policy have created greater uncertainty regarding the direction of interest rates. While the economy has remained strong, continued higher borrowing costs could impact investment activity. This could temper value growth across various segments of the commercial real estate market.

**Opportunities**

- Complete renovation
- Implement a utility reimbursement to capture water/sewer/trash charges

**Threats**

- Threats facing the U.S. economy include persistent inflation, rising government debt, a slowing labor market including significant job cuts by prominent companies, and reduced purchasing power for consumers, thus creating uncertainty for businesses and commerce. These factors have created an increased risk of a recession that could affect real estate demand in the future. Furthermore, ongoing geo-political tensions between the U.S. and foreign countries is affecting global economic stability.

# Identification of the Appraisal Problem

## Subject Description

The subject is an existing multifamily property containing 84 dwelling units. The improvements were constructed in 1971 and are 27% leased as of the effective appraisal date. The site area is 5.550 acres or 241,758 square feet. A legal description of the property is provided in the following table.

| Property Identification | |
|---|---|
| Property Name | Clio Woods Apartments |
| Address | 6914 Clio Road<br>Flint, Michigan 48504 |
| Tax ID | 46-26-101-054 |
| Owner of Record | Discount Warehouses LP |
| Legal Description | UNPLATTED PART OF N 1/2 OF NW 1/4 OF SEC 26, T8N, R6E. COM AT A PT ON WLY LINE OF SD SEC, S 0 DEG 12 MIN W, 396 FT FROM NW COR OF SD SEC; TH ELY = WITH NLY LINE OF SD SEC, 303.07 FT FOR POB; TH S 0 DEG 17 MIN W, 915.81 FT; TH ELY = WITH NLY LINE OF SD SEC, 264 FT; TH N 0 DEG 17 MIN E, 915.17 FT; TH WLY = WITH NLY LINE OF SD SEC, 264 FT TO POB |
| Census Tract Number | 0001.00 |

Legal Description Source: Municipal Records

The subject is in the midst of an extensive renovation with a reported $1,525,728 invested thus far with the remaining balance of costs estimated to be $1,655,000. We are adding a 10% contingency resulting in a total remaining renovation of $1,820,000 rounded. According to Barry Cohen, a representative of the owner, building 6914, containing 20 units, has been renovated and is fully occupied. Building 6918 is nearly complete with 13 units occupied or ready for occupancy. Building 6910 is the furthest from completion with all of the lower level of this building at the rough stage; all plumbing and electrical have been installed but the units require drywall and finish construction. Mr. Cohen indicates that the project requires an additional 90 days to complete, however based on our inspection and scope of renovation remaining to be completed, we are projecting a six month completion period.

Mr. Cohen indicated that the property has been contacted by six local housing agencies to place residences, thus he anticipates a quick lease-up once the project is completed. The housing agencies provide residents with individual Section 8 vouchers wherein the tenant pays 30% of their monthly income towards rent with the agency providing the balance. As requested by the client, we are valuing the subject as of a current date. Thus, we are assuming the renovation is completed and the property stabilized with the appropriate stabilization costs and remaining renovation costs deducted to arrive at an as is market value.

## Sale History

No known sales or transfers of ownership have taken place within a three-year period prior to the effective appraisal date.

## Pending Transactions

Based on discussions with the appropriate contacts, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Appraisal Purpose

The purpose of the appraisal is to develop the following opinion(s) of value:

- The market value as is of the fee simple interest in the subject property as of the effective date of the appraisal, September 11, 2026
- The liquidation value of the fee simple interest in the subject property as of the effective date of the appraisal, September 11, 2026
- The net realizable value of the fee simple interest in the subject property as of the effective date of the appraisal, September 11, 2026

The date of the report is September 22, 2026. The appraisal is valid only as of the stated effective date or dates.

## Value Type Definitions

The definitions of the value types applicable to this assignment are summarized below.

**Market Value**

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [1]

[1] Code of Federal Regulations, Title 12, Chapter I, Part 34.42[h]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472

**Liquidation Value**
The most probable price that a specified interest in real property should bring under the following conditions:

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.[2]

The projected exposure time and marketing period is 6 to 12 months. The liquidation value assumes a 60 days marketing period which is an expedited period.

**Net Realizable Value**
Market value minus all costs related to (1) holding costs during the expected marketing period, (2) all selling costs related to disposition of the property, and (3) the cost of funds or rent loss during the anticipated marketing period. Holding costs include, but are not limited to, real estate taxes, property insurance, liability insurance, utilities, and normal repairs and maintenance. Selling costs include, but are not limited to, brokerage commissions, closing costs, title work, and surveys. [3]

## Appraisal Premise Definitions

The definitions of the appraisal premises applicable to this assignment are specified as follows.

**As Is Market Value**
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.[4]

[2] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022)
[3] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022)
[4] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022)

## Property Rights Definitions

The property rights appraised which are applicable to this assignment are defined as follows.

**Fee Simple Estate**

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[5]

## Client and Intended User(s)

The client is Churchill MRA Funding I, LLC represented by Taft Law Firm. The intended users are Churchill MRA Funding I, LLC and Taft Law Firm. No other party or parties may use or rely on the information, opinions, and conclusions contained in this report.

## Intended Use

The intended use of the appraisal is for litigation support. The appraisal is not intended for any other use.

## Applicable Requirements

This appraisal report conforms to the following requirements and regulations:

- Uniform Standards of Professional Appraisal Practice (USPAP);
- Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute;
- Applicable state appraisal regulations.

## Report Format

Standards Rule 2-2 (Content of a Real Property Appraisal Report) contained in the Uniform Standards of Professional Appraisal Practice (USPAP) requires each written real property appraisal report to be prepared as either an Appraisal Report or a Restricted Appraisal Report. This report is prepared as an Appraisal Report as defined by USPAP under Standards Rule 2-2(a), and incorporates practical explanation of the data, reasoning, and analysis used to develop the opinion of value.

[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022)


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 31 of 174

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

## Appraiser Competency

No steps were necessary to meet the competency provisions established under USPAP. The assignment participants have appraised several properties similar to the subject in physical, locational, and economic characteristics, and are familiar with market conditions and trends; therefore, appraiser competency provisions are satisfied for this assignment. Appraiser qualifications and state credentials are included in the addenda of this report.

# Scope of Work

## Introduction

The appraisal development and reporting processes require gathering and analyzing information about the assignment elements necessary to properly identify the appraisal problem. The scope of work decision includes the research and analyses necessary to develop credible assignment results, given the intended use of the appraisal. Sufficient information includes disclosure of research and analyses performed and might also include disclosure of research and analyses not performed.

To determine the appropriate scope of work for the assignment, the intended use of the appraisal, the needs of the user, the complexity of the property, and other pertinent factors were considered. The concluded scope of work is described below.

## Research and Analysis

The type and extent of the research and analysis conducted are detailed in individual sections of the report. The steps taken to verify comparable data are disclosed in the addenda of this report. Although effort has been made to confirm the arms-length nature of each sale with a party to the transaction, it is sometimes necessary to rely on secondary verification from sources deemed reliable.

## Subject Property Data Sources

The legal and physical features of the subject property, including size of the site and improvements, flood plain data, property zoning, existing easements and encumbrances, access and exposure, and condition of the improvements (as applicable) were confirmed and analyzed.

The financial data of the subject, including rent roll, stabilized budget, costs to renovate, and tax and assessment records, were analyzed. This information, as well as trends established by confirmed market indicators, is used to forecast future performance of the subject property.

## Contacts

In addition to public records and other sources cited in this appraisal, information pertaining to the subject was obtained from the following party:

**Property Contacts**

| Contact Name | Title/Role | Company |
|---|---|---|
| Barry Cohen | President | 21st Century Communities, Inc. |


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 33 of 174

## Inspection

Details regarding the property inspection conducted as part of this appraisal assignment are summarized as follows:

| Property Inspection | | |
|---|---|---|
| Party | Inspection Type | Inspection Date |
| Donald L. Selvidge, MAI | Interior and exterior | September 11, 2026 |
| Anthony Sanna, MAI, CRE | None | N/A |

The inspection was conducted in the company of Barry Cohen with 21st Century Communities, Inc. We inspected the majority of units in Building 6910, one unit in 6914, and a representative sample of units in 6918. The surrounding market area was also examined.

## Valuation Methodology

Three approaches to value are typically considered when developing a market value opinion for real property. These are the cost approach, the sales comparison approach, and the income capitalization approach. Use of the approaches in this assignment is summarized as follows:

| Approaches to Value | | |
|---|---|---|
| Approach | Applicability to Subject | Use in Assignment |
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Applicable | Utilized |

The income capitalization approach is the most reliable valuation method for the subject due to the following:

- The probable buyer of the subject would base a purchase price decision primarily on the income generating potential of the property and an anticipated rate of return.
- Sufficient market data regarding income, expenses, and rates of return is available for analysis.

The sales comparison approach is an applicable valuation method because:

- There is an active market for similar properties, and sufficient sales data is available for analysis.
- This approach directly considers the prices of alternative properties having similar utility.

The cost approach is not applicable to the assignment considering the following:

- The age of the property would limit the reliability of an accrued depreciation estimate.
- There are limited land transactions in the market area of the subject, making estimates of underlying land value subjective.
- This approach is not typically used by market participants, except for new (or proposed) or nearly new properties.

## Significant Appraisal Assistance

It is acknowledged that William J. Kurzawa made a significant professional contribution to this appraisal, consisting of conducting research on the subject and transactions involving comparable properties, under the supervision of the persons signing the report.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 35 of 174

# Economic Analysis

## Surrounding Area Analysis

The subject is located east of Clio Road, south of W. Carpenter Road in the City of Flint. Area boundaries and delineation are indicated in the following table. A map identifying the location of the property follows below.

| Boundaries & Delineation | |
|---|---|
| Boundaries | |
| Market Area | Metropolitan Detroit |
| Area Type | Suburban |
| Delineation | |
| North | Carpenter Road |
| South | Hill Road, Hemphill Road |
| East | Center Road |
| West | Clio Road |





26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 36 of 174

The City of Flint contains 34.06 square miles and is surrounded by the communities of Genesee Township to the northeast, Mt. Morris and Flushing to the northwest, Flint Township and Swartz Creek to the southwest, and Burton and Grand Blanc to the southeast. The subject is located approximately five miles northeast of downtown Flint. Flint is situated roughly 30 miles south of Saginaw, 45 miles northeast of Lansing, 55 miles north of Detroit, and 60 miles west of Port Huron.

Single-family homes in this neighborhood were primarily constructed between 1945 and 1970, and typically sell between $40,000 and $125,000, depending on overall condition and size. A significant percent of the multifamily development in Flint is intended to serve low-income residents, thus are operated with restricted rental rates, as well as rent assistance at some projects. There is a limited offering of conventional apartments in the City of Flint, thus much of the existing inventory of market-rate rental housing is located in surrounding townships and cities such as Flint Township, Mt. Morris, Clayton Township, Davison, and Flushing.

## Access and Linkages

Primary access and linkages to the market area, including highways, roadways, public transit, and airports, are summarized in the following table.

| Access & Linkages | |
|---|---|
| Vehicular Access | |
| Major Highways | I-75, I-475, I-69, US-23 |
| Primary Corridors | Linden Road, Clio Road, MLK Avenue, Saginaw Street, Dort Highway (M-54), Center Road, Genesee Road, Coldwater Road, Carpenter Road, Pasadena Avenue, Davison Road, Court Street, Atherton Road, and Bristol Road |
| Vehicular Access Rating | Average |
| Public Transit | |
| Providers | Mass Transportation Authority (MTA) |
| Transit Access Rating | Average |
| Airport(s) | |
| Name | Bishop International Airport |
| Driving Time | 9 Minutes |
| Primary Transportation Mode | Automobile |

Several expressways provide high-speed travel to the greater Flint area. Primarily traveling along Flint's western border is the I-75 Freeway, which is the primary north-south highway in the state and travels north to the Mackinac Bridge and south to the State of Florida. I-475 connects with I-75 to the north and south of Flint and provides access to the city's downtown district and western neighborhoods. The I-69 Freeway is situated along Flint's southern border and connects with Port Huron to the east, as well as Lansing and Battle Creek to the southwest. The US-23 Freeway connects Flint with Ann Arbor and Toledo, Ohio to the south. These freeways provide access to the remainder of the Michigan expressway network, as well as the nation's interstate system.

The Bishop International Airport in SE Flint is located just southwest of the City of Flint (in Flint Township). The Detroit Metropolitan-Wayne County Airport in Romulus is the largest airport in the state and is located approximately 55 miles to the south.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 37 of 174

## Demand Generators

The typical generators of demand affecting the subject property and its market are discussed and analyzed below.

### Employment and Employment Centers

The largest concentration of economic development in Genesee County occurs in and around the City of Flint, which has recently benefited from significant state and federal reinvestment. In early 2026, the Flint & Genesee Economic Alliance and the state of Michigan reached a major milestone in the development of the Advanced Manufacturing District (AMD) of Genesee County, having secured nearly 1,300 acres for large-scale industrial use.

The local market area remains a critical pivot point between Metro Detroit and the northern/western Michigan corridors. Strategic investments in 2025, including the $472,000 MI Neighborhood Grant, have focused on community revitalization and increasing residential density to reverse previous population declines.

General Motors continues to be the regional economic anchor, though its operations are evolving. In December 2025, GM initiated a five-week pause at the Flint Assembly Plant to prepare for the next generation of heavy-duty pickups and the production trials of the six-generation small block engine.

The Flint Commerce Center, located at the former Buick City site, reached a major milestone in April 2025, with its first phase becoming fully leased, signaling a successful transition of legacy industrial land into modern logistics and manufacturing space.

The healthcare sector remains the most consistent growth driver. McLaren Health Care is headquartered in Grand Blanc; it expanded its reach in August 2025 through a major partnership with Meridian Health Plan, increasing in-network access across its 12 Michigan hospitals.

New mixed-use projects in downtown Flint, supported by Revitalization and Placemaking (RAP) grants in 2026, are converting vacant historic properties into community hubs, including a new "Flint Sit-Down Strike" themed restaurant at 703 S. Grand Traverse St.

### Nearby Retail Uses

In the immediate vicinity of the subject, south along Clio Road is the North Flint Food Market with an adjacent Little Caesars Pizza restaurant.  A retail center is located at the southwest corner of Clio Road and Pierson Road and is anchored by Citi Trends, Moni’s Hibachi, and Rent-A-Center.  In addition, commercial development is concentrated along nearby roadways such as Dort Highway, Miller Road, and Center Road.  Larger concentrations of retail development is located in Burton to the southeast, Grand Blanc to the south, and Flint Township to the west.  The Genesee Valley Center located at the intersection of Miller Road and Linden Road in Flint Township is the region’s largest enclosed shopping mall.  These regional shopping districts offer numerous national retailers, restaurants, banking centers, service establishments, auto dealerships, and professional offices.  Downtown Flint contains a typical offering of high-rise office buildings, government (city and county) offices, restaurants, bars, entertainment venues, healthcare, educational facilities, and entertainment venues.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 38 of 174

## Demographics

A demographic profile of the surrounding area, including population, households, and income data, is presented in the following table. The primary market area (PMA) is identified as the area within a 3-mile radius surrounding the subject property.

**Surrounding Area Demographics**

| 2026 Estimates | 3-Mile Radius | Flint | Genesee County | State of |
|---|---|---|---|---|
| Population 2020 | 38,136 | 81,252 | 406,211 | 10,077,331 |
| Population 2026 | 36,468 | 77,627 | 400,228 | 10,154,519 |
| Population 2031 | 35,549 | 75,556 | 395,859 | 10,217,143 |
| Compound % Change 2020-2026 | -0.7% | -0.8% | -0.2% | 0.1% |
| Compound % Change 2026-2031 | -0.5% | -0.5% | -0.2% | 0.1% |
| | | | | |
| Households 2020 | 15,611 | 33,558 | 167,118 | 4,041,760 |
| Households 2026 | 15,171 | 32,456 | 166,683 | 4,110,412 |
| Households 2031 | 14,918 | 31,793 | 165,927 | 4,155,123 |
| Compound % Change 2020-2026 | -0.5% | -0.6% | 0.0% | 0.3% |
| Compound % Change 2026-2031 | -0.3% | -0.4% | -0.1% | 0.2% |
| | | | | |
| Median Household Income 2026 | $38,609 | $38,533 | $66,957 | $77,190 |
| Average Household Size | 2.4 | 2.3 | 2.4 | 2.4 |
| College Graduate % | 9% | 13% | 23% | 32% |
| Owner Occupied % | 62% | 53% | 69% | 71% |
| Renter Occupied % | 38% | 47% | 31% | 29% |
| Median Owner Occupied Housing Value | $46,826 | $55,920 | $208,508 | $269,923 |
| Median Year Structure Built | 1957 | 1955 | 1970 | 1973 |
| Average Travel Time to Work in Minutes | 27 | 25 | 29 | 26 |

Source: Claritas SPOTLIGHT

As shown above, the population within a 3-mile radius of the subject is 36,468 residents and the average household size is 2.4 persons. Population in the area has declined since the 2020 census and this trend is projected to continue over the next five years; albeit at a lower annual rate of decline. Compared to Genesee County overall, the population within a 3-mile radius is projected to decline at a faster rate. There are currently 15,171 households in the 3-mile radius and this count is also expected to decrease over the next five years.

Median household income is $38,609 in the 3-mile radius, which is similar to Flint, but lower than Genesee County and State of Michigan. Residents within a 3-mile radius have a lower level of educational attainment to those of Genesee County. The median owner-occupied home value is $46,826 in the 3-mile radius, which is lower than Flint, Genesee County and Michigan. The ratio of renter occupied housing units in the 3-mile radius (38%) is lower than Flint (47%), but higher than the county (31%) and the state (29%).

## Life Cycle

Real estate is affected by cycles involving development trends within a market area as well as market and economic forces. Trends in demand for development in a particular market are described by the Market Area Life Cycle, while market and economic trends are described by the Real Estate Cycle.

A Market Area Life Cycle typically evolves through four stages:[6]

- Growth – a period during which the market area gains public favor and acceptance
- Stability – a period of equilibrium without marked gains or losses
- Decline – a period of diminishing demand
- Revitalization – a period of renewal, redevelopment, modernization, and increasing demand

The subject's market area is in the decline stage of the Market Area Life Cycle.

The Real Estate Cycle also impacts a neighborhood. The stages of the Real Estate Cycle include:

- Expansion – Sustained growth in demand, increasing construction
- Hypersupply – Positive but falling demand, increasing vacancy
- Recession – Falling demand, increasing vacancy
- Recovery – Increasing demand, decreasing vacancy

These stages are illustrated below, along with a summary of common characteristics of each stage of the Real Estate Cycle. The neighborhood is in the recession stage of the Real Estate Cycle.




| EXPANSION | HYPERSUPPLY | RECESSION | RECOVERY |
|---|---|---|---|
| Decreasing Vacancy Rates | Increasing Vacancy Rates | Increasing Vacancy Rates | Decreasing Vacancy Rates |
| Moderate/High New Construction | Moderate/High New Construction | Moderate/Low New Construction | Low New Construction |
| High Absorption | Low/Negative Absorption | Low Absorption | Moderate Absorption |
| Moderate/High Employment Growth | Moderate/Low Employment Growth | Low/Negative Employment Growth | Low/Moderate Employment Growth |
| Med/High Rental Rate Growth | Med/Low Rental Rate Growth | Low/Neg Rental Rate Growth | Neg/Low Rental Rate Growth |

[6] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago: Appraisal Institute, 2020)

## Services and Amenities

The nearest public services, including police and fire departments, as well as public schools are summarized in the following table.

| Public Services | |
|---|---|
| Service | Provider |
| Police Department | Flint Police Department |
| Fire Department | Flint Fire Department |
| Hospital | Hurley Medical Center, Flint |
| | McLaren Hospital, Flint |
| | Henry Ford-Genesys Hospital, Grand Blanc |
| Public Schools | Flint (subject), Carmen-Ainsworth, Kearsley, Swartz Creek & Westwood Heights |
| Colleges | University of Michigan, Flint Campus |
| | Mott Community College, Flint |
| | Kettering University, Flint |

### Land Use

Adjacent land use characteristics of the area are summarized below.

| Immediate Surroundings | |
|---|---|
| North | Land/Residential/St. James Memorial Church of God |
| South | Residential and Save by Grace Ministries |
| East | Taylor Lake Manor and Slidell Senior Apartments |
| West | Residential and Retail |

### Outlook and Conclusions

In comparison to other areas in the region, the area is rated as follows:

| Surrounding Area Ratings | |
|---|---|
| Highway Access | Average |
| Demand Generators | Average |
| Convenience to Support Services | Below Average |
| Convenience to Medical Services | Average |
| Convenience to Public Transit | Average |
| Employment Stability | Below Average |
| Neighborhood Amenities | Below Average |
| Police and Fire Protection | Average |
| Barriers to Competitive Entry | Above Average |
| Price/Value Trends | Below Average |
| Property Compatibility | Average |

## Surrounding Area Map



# Multifamily Market Analysis

## Metro Area Overview

The subject is located in the Flint - MI USA metro area as defined by CoStar. Trended supply and demand statistics, including inventory levels, absorption, vacancy, and rental rates for all classes of space are presented in the ensuing table.

**All Multifamily Flint - MI USA Metro Trends**

| Period | Stock | Demand | Vacancy | Net Completions 12 Months | Under Construction Stock | Net Absorption 12 Months | Asking Rent | Rent Growth 12 Month | Price Growth | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 2016 Q2 | 19,660 | 18,579 | 5.50% | 30 | 36 | -50 | $687 | 3.56% | 6.40% | 8.78% |
| 2017 Q2 | 19,696 | 18,506 | 6.04% | 36 | 0 | -74 | $708 | 2.97% | 7.34% | 8.62% |
| 2018 Q2 | 19,685 | 18,401 | 6.52% | -11 | 0 | -106 | $736 | 4.01% | 4.24% | 8.59% |
| 2019 Q2 | 19,685 | 18,544 | 5.79% | 0 | 154 | 143 | $765 | 3.99% | 11.21% | 8.03% |
| 2020 Q2 | 19,777 | 18,655 | 5.67% | 92 | 76 | 110 | $796 | 4.02% | 8.91% | 7.60% |
| 2021 Q2 | 19,853 | 19,139 | 3.60% | 76 | 120 | 484 | $871 | 9.42% | 17.44% | 6.89% |
| 2022 Q2 | 19,973 | 18,865 | 5.55% | 120 | 128 | -272 | $954 | 9.57% | 11.94% | 6.31% |
| 2023 Q2 | 19,973 | 18,564 | 7.06% | 0 | 226 | -300 | $956 | 0.16% | -4.38% | 7.31% |
| 2024 Q2 | 20,149 | 18,698 | 7.20% | 176 | 483 | 136 | $984 | 2.87% | -3.61% | 7.81% |
| 2025 Q2 | 20,215 | 18,772 | 7.14% | 66 | 491 | 72 | $1,031 | 4.80% | 1.86% | 7.85% |
| 2026 Q2 | 20,378 | 18,684 | 8.31% | 163 | 328 | -87 | $1,056 | 2.45% | 1.76% | 7.96% |
| 2027 Q2 | 20,703 | 18,656 | 9.89% | 325 | 0 | -28 | $1,074 | 1.67% | 2.78% | 7.84% |
| 2028 Q2 | 20,716 | 18,790 | 9.30% | 13 | 0 | 135 | $1,089 | 1.47% | 2.39% | 7.76% |
| 2029 Q2 | 20,766 | 18,892 | 9.02% | 50 | 0 | 102 | $1,110 | 1.92% | 2.22% | 7.73% |
| 2030 Q2 | 20,831 | 18,990 | 8.84% | 65 | 0 | 99 | $1,133 | 2.03% | 2.25% | 7.72% |

Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

### Flint - MI USA Metro Trends and Forecasts




Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The current vacancy rate in the metro area is 8.31%; the vacancy rate has increased by 111 bps from 2024 Q2.
- Two-year Base Case forecasts project a 9.30% vacancy rate in the metro area, representing an increase of 98 bps by 2028 Q2.
- Asking rent averages $1,056/unit in the metro area, and values have increased by 7.31% from 2024 Q2.
- Two-year Base Case forecasts project a $1,089/unit asking rent in the metro area, representing an increase of 3.13% by 2028 Q2.




Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The total stock (units) has increased by 1.14% from 2024 Q2, while the demand has decreased by 0.08%.
- Between 2021 Q3 and 2026 Q2, net completions in the metro area have averaged 105 units annually, and reached a peak of 128 units in 2024 Q2.
- Between 2021 Q3 and 2026 Q2, net absorption in the metro area has averaged -90 units annually, and reached a peak of 128 units in 2024 Q2.

## Submarket Overview

The subject is located in the Northwest Flint/Flushing submarket as defined by CoStar. Trended supply and demand statistics, including inventory levels, absorption, vacancy, and rental rates for all classes of space are presented in the following table.

**All Multifamily Northwest Flint/Flushing Submarket Trends**

| Period | Stock | Demand | Vacancy | Net Completions 12 Months | Under Construction Stock | Net Absorption 12 Months | Asking Rent | Rent Growth 12 Month | Price Growth | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 2016 Q2 | 2,909 | 2,680 | 7.86% | -72 | 0 | -110 | $612 | 1.98% | 1.52% | 8.79% |
| 2017 Q2 | 2,909 | 2,719 | 6.54% | 0 | 0 | 38 | $616 | 0.58% | 6.83% | 8.66% |
| 2018 Q2 | 2,909 | 2,732 | 6.09% | 0 | 0 | 13 | $645 | 4.75% | 3.22% | 8.62% |
| 2019 Q2 | 2,909 | 2,752 | 5.38% | 0 | 0 | 21 | $678 | 5.15% | 8.46% | 8.19% |
| 2020 Q2 | 2,909 | 2,731 | 6.11% | 0 | 0 | -20 | $704 | 3.77% | 10.21% | 7.78% |
| 2021 Q2 | 2,909 | 2,773 | 4.67% | 0 | 0 | 42 | $741 | 5.24% | 16.40% | 7.11% |
| 2022 Q2 | 2,909 | 2,701 | 7.16% | 0 | 0 | -72 | $803 | 8.34% | 20.09% | 6.43% |
| 2023 Q2 | 2,909 | 2,611 | 10.24% | 0 | 0 | -89 | $827 | 3.06% | 6.73% | 7.37% |
| 2024 Q2 | 2,909 | 2,550 | 12.34% | 0 | 0 | -61 | $859 | 3.87% | -3.82% | 7.88% |
| 2025 Q2 | 2,909 | 2,580 | 11.33% | 0 | 74 | 30 | $873 | 1.61% | 2.20% | 7.92% |
| 2026 Q2 | 2,983 | 2,590 | 13.16% | 74 | 0 | 12 | $898 | 2.81% | 0.15% | 8.14% |
| 2027 Q2 | 2,982 | 2,587 | 13.26% | -1 | 0 | -4 | $911 | 1.53% | 2.50% | 8.02% |
| 2028 Q2 | 2,983 | 2,595 | 13.02% | 1 | 0 | 9 | $926 | 1.55% | 2.29% | 7.94% |
| 2029 Q2 | 2,989 | 2,592 | 13.27% | 6 | 0 | -4 | $944 | 1.99% | 2.15% | 7.91% |
| 2030 Q2 | 2,996 | 2,599 | 13.26% | 7 | 0 | 6 | $964 | 2.16% | 2.26% | 7.90% |

Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The Northwest Flint/Flushing submarket comprises 14.6% of the metro building stock and 13.9% of the metro building demand.
- The vacancy rate in the Northwest Flint/Flushing submarket is 13.16%, which is greater than the metro area's average of 8.31%.
- Northwest Flint/Flushing market rate is $898/unit which is less than the metro area's average rate of $1,056/unit.

**Northwest Flint/Flushing Submarket Trends and Forecasts**




Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The current vacancy rate in the submarket area is 13.16%; the vacancy rate has increased by 82 bps from 2024 Q2.
- Two-year Base Case forecasts project a 13.02% vacancy rate in the submarket area, representing a decrease of 14 bps by 2028 Q2.
- Asking rent averages $898/unit in the submarket area, and values have increased by 4.51% from 2024 Q2.
- Two-year Base Case forecasts project a $926/unit asking rent in the submarket area, representing an increase of 3.10% by 2028 Q2.




Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The total stock (units) has increased by 2.54% from 2024 Q2, while the demand has increased by 1.59%.
- Between 2021 Q3 and 2026 Q2, net completions in the submarket area have averaged 15 units annually, and reached a peak of 74 units in 2026 Q1.
- Between 2021 Q3 and 2026 Q2, net absorption in the submarket area has averaged -36 units annually, and reached a peak of 20 units in 2024 Q4.

**Multifamily Market Forecast Comparisons**




Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.




Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

## Multifamily Market Outlook and Conclusions

Overall the vacancy in the Flint metro market and the NW Flint/Flushing markets tracked closely through the late 2010s — the submarket was actually slightly tighter than the metro in 2018-2020 — but they increased sharply starting around 2022. From 2022 Q2 to 2024 Q2, submarket vacancy jumped from 7.16% to 12.34% while metro vacancy rose much more modestly (5.55% to 7.20%), and that gap has persisted, with the submarket currently running about 485 basis points above the metro (13.16% vs. 8.31%). Notably, this divergence was not driven by a supply wave: the submarket added essentially no new units from 2016 through 2025 (net completions of zero in most years), so the vacancy increase reflects demand erosion in the metro market rather than oversupply.

With respect to rental rates, the submarket has traded at a fairly consistent 85-89% of the metro average throughout the entire trended period and is forecast to hold at roughly that same 85% relationship through 2030. Despite carrying much higher vacancy, submarket rent growth has actually been comparable to or slightly ahead of the metro recently (2.81% vs. 2.45% over the trailing 12 months as of 2026 Q2), and CoStar's forecast has submarket rent growth modestly outpacing the metro by 2029-2030 (2.0-2.2% vs. 1.9-2.0%).

Looking forward, CoStar's forecasts show the metro's vacancy rate peaking near 9.9% in 2027 and then gradually improving to 8.8% by 2030, while the submarket's vacancy is projected to stay structurally elevated and essentially flat in the 13.0-13.3% range through 2030 — implying the current gap is expected to persist rather than close over the forecast horizon, even as rent growth in both areas remains modest and roughly comparable.

The subject, assuming completion of the renovation, will be well-positioned in the metro market and is expected to outperform the market for a number of reasons; the subject will offer 84 renovation units that include dishwashers and laundry hook-ups. Additionally, the subject offers a good mix of one-, two-, and three-bedroom units. As a result, we projected the subject's stabilized vacancy at 8.0% (assuming completion of renovation).

Barry Cohen, a representative of ownership, indicated that the property will focus on providing housing to various housing agencies in the Flint area and expects units to be filled as they receive a certificate of occupancy. Mr. Cohen indicated a 90 day completion of the renovation, however based on our inspection and remaining scope of renovation, a six month period is more reasonable. Thus, we are utilizing a six month period when determining the lost rent prior to stabilization.

# Property Analysis

## Land Description and Analysis

The following land description is based on the inspection of the property and municipal records.

| Land Description | |
|---|---|
| Land Area | 5.550 acres; 241,758 SF |
| Source of Land Area | Public Records |
| Primary Street Frontage | Clio Road |
| | *Access provide via a road owned by City of Flint* |
| Shape | Rectangular |
| Corner | No |
| Topography | Generally level and at street grade |
| Drainage | No problems reported or observed |
| Environmental Hazards | None reported or observed |
| Ground Stability | No problems reported or observed |
| Flood Area Panel Number | 26049C0178D |
| Date | September 25, 2009 |
| Zone | X |
| Description | Outside of 500-year floodplain |
| Insurance Required? | No |
| **Zoning; Other Regulations** | |
| Zoning Jurisdiction | Flint |
| Zoning Designation | TN-2 |
| Description | Traditional Neighborhood - Medium Density |
| Legally Conforming? | Appears to be legally nonconforming |
| Zoning Change Likely? | No |
| Permitted Uses | Single-family detached dwelling, two-family dwelling, care homes |
| Parking Requirement | 1.5 spaces per 1 bed and 2 spaces per 2+ bedroom |
| Rent Control | No |
| Other Land Use Regulations | None |
| **Utilities** | |
| Service | Provider |
| Water | Municipal |
| Sewer | Municipal |
| Electricity | Consumers Energy |
| Natural Gas | Consumers Energy |
| Local Phone | Various Providers |



26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 50 of 174

## Zoning

We are not experts in the interpretation of zoning ordinances. An appropriately qualified land use attorney should be engaged if a determination of compliance with zoning is required.

## Rent Control Regulations

There are no municipal use regulations or codes that control the rent charged by the landlord at the subject.

## Easements, Encroachments and Restrictions

A current title report was not provided for review. There are no apparent easements, encroachments, or restrictions that would adversely affect value. This valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

## Conclusion of Site Analysis

Overall, the physical characteristics and the availability of utilities result in a functional site, suitable for a variety of uses including those permitted by zoning. Uses permitted by zoning include single-family detached dwelling, two-family dwelling, care homes. No other restrictions on development are apparent.

## Aerial Photograph



## Land Sketch




Source: City of Flint

# Improvements Description and Analysis

## Overview

The subject is an existing multifamily property containing 84 dwelling units. The improvements were constructed in 1971 and are 27% leased as of the effective appraisal date. The site area is 5.550 acres or 241,758 square feet. The following description is based on the inspection of the property, discussions with ownership/management, and public records. Further, the following description describes the subject as if the renovation is completed.

| Improvements Description | |
|---|---|
| Name of Property | Clio Woods Apartments |
| General Property Type | Multifamily |
| Property Sub Type | Garden/Low Rise |
| Competitive Property Class | B/C |
| Occupancy Type | Multi-Tenant |
| Percent Leased | 27% |
| Number of Buildings | 3 |
| Stories | 2 |
| Construction Class | D |
| Construction Type | Wood frame |
| Construction Quality | Average |
| Condition | Above Average |
| Number of Units | 84 |
| Gross Building Area (SF) | 101,480 |
| Rentable Floor Area (SF) | 94,060 |
| Building Area Source | GBA - Municipal Recrods \| RFA - Rent Roll |
| Year Built | 1971 |
| Year Renovated | 1989, 2026-27 |
| Actual Age (Yrs.) | 55 |
| Estimated Effective Age (Yrs.) | 15 |
| Estimated Economic Life (Yrs.) | 50 |
| Remaining Economic Life (Yrs.) | 35 |
| Number of Parking Spaces | 216 |
| Source of Parking Count | Owner |
| Parking Type | 84 carport (1/unit) and 132 surface spaces |
| Parking Spaces/Unit | 2.6 |

| Construction Details | |
|---|---|
| Foundation | Concrete |
| Basement | No |
| Structural Frame | Wood |
| Corridor | Yes |
| Exterior Walls | Vinyl siding |
| Windows | Double pane thermal windows |
| Roof | Pitched shingled roofs |
| Mechanicals | |
| Electrical | Assumed adequate |
| Plumbing | Assumed adequate |
| Heating | Gas forced air |
| Air Conditioning | Central AC |
| Hot Water | Individual gas-fired hot water tanks |
| Utility Meters - Tenants | Electric, gas (heat/hot water), cable, and internet |
| Utility Meters - Central | Water, sewer, trash, and common area utilities |
| Utility Reimbursements | None |
| Elevator | None |
| Sprinklers | None |
| Other Fire Safety | Smoke detectors |
| Security | None |
| Employee Unit | None |
| Leasing Office | Yes |
| Ancillary Building | 2,704 SF maintenance garage |
| Unit Description | |
| Entry Type | Common corridor and direct entry |
| Interior Walls | Painted drywall |
| Floor Cover | Luxury vinyl tile |
| Kitchen Equipment | Stove/oven, refrigerator, dishwasher, wood cabinets, and laminate countertops |
| Laundry Facilities | Laundry hook-ups |
| Bathroom Fixtures | Sink with vanity, toilet, and combination tub/shower |
| Parking | Carport (1/unit) and surface |
| Balcony/Patio | None |
| Lighting | Flush mounted light fixtures |
| Site Improvements & Amenities | |
| Landscaping | Primarily grass cover with bushes and/or trees around building |
| Amenities | Community room with kitchen |
| Paving | Asphalt paved interior drives and parking with concrete sidewalks |


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 55 of 174

## Unit Mix

The subject's unit mix, building areas, and occupancy rate are detailed in the following table.

### Unit Mix and Occupancy

| Unit Type | Units | % of Total | Avg. Unit Size | Total SF | Occupied Units | Vacant Units | % Occupied |
|---|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 4 | 4.8% | 835 | 3,340 | 1 | 3 | 25% |
| 2 Bed/2 Bath | 56 | 66.7% | 1,065 | 59,640 | 18 | 38 | 32% |
| 3 Bed/2 Bath | 24 | 28.6% | 1,295 | 31,080 | 4 | 20 | 17% |
| TOTAL/AVG. | 84 | 100.0% | 1,120 | 94,060 | 23 | 61 | 27% |

## Unit Features and Project Amenities

Standard unit features and project amenities for this market are shown in the table below, followed by a notation of whether the features and amenities are present at the subject.

### Unit Features and Project Amenities

| Unit Features | At Subject | Project Amenities | At Subject |
|---|---|---|---|
| Patio/Balcony/Deck | | Gated Entrance | |
| Central AC | x | Security/Door Staff | |
| Window/Sleeve AC | | Common Laundry | |
| Carpeting | | Clubhouse Building | |
| Wood Floors | | Community Room | x |
| Vinyl Plank Floors (LVT/LVP) | x | Fitness Center | |
| Window Blinds/Shades | x | Playground | |
| 8' Ceiling Height | x | Rooftop Terrace | |
| Washer/Dryer Hookup | x | BBQ Grill/Picnic Area | |
| Washer/Dryer In Unit | | Covered Parking | 1/unit |
| Dishwasher | x | Garage/In Building | |
| Disposal | x | Garage/Detached | |
| Range - Electric | x | Electric Car Charging Station | |
| Refrigerator | x | Dog Run/Spa | |
| Microwave | | Extra Storage Area | |
| Stainless Steel Appliances | | Resident Lounge | |
| Laminate Counters | x | Package System/Lockers/Rm | |

## Improvements Analysis

### Quality and Condition

The improvements are of average quality construction and are in above average condition. The quality of the subject is consistent with, if not superior to competing properties. Overall, the market appeal of the subject is consistent with, if not superior to competing properties.

**Functional Utility**

The improvements appear to be adequately suited to their current use. Based on the property inspection and consideration of the foregoing, there do not appear to be any significant items of functional obsolescence.

**Renovation Costs**

IRR was provided a detailed remaining renovation budget that is included in the addendum that totals $1,655,000. We are adding a 10% contingency indicating a total renovation cost of $1,820,000 rounded.

**ADA Compliance**

Based on the property inspection and information provided, there are no apparent ADA issues. However, ADA matters are beyond the scope of expertise of the assignment participants, and further study by an appropriately qualified professional would be recommended to assess ADA compliance.

**Hazardous Substances**

An environmental assessment report was not provided for review, and environmental issues are beyond the scope of expertise of the assignment participants. No hazardous substances were observed during the inspection of the improvements; however, detection of such substances is outside the scope of expertise of the assignment participants. Qualified professionals should be consulted. Unless otherwise stated, it is assumed no hazardous conditions exist on or near the subject.

**Personal Property**

The replacement cost new for the appliances (as complete/renovated) is estimated at $1,000 per unit, thus indicating a total replacement cost of $84,000. In accordance with market practices, all FF&E are considered part of the real property.

## Conclusion of Improvements Analysis

In comparison to competitive properties in the market, the subject improvements are rated as follows:

| Improvements Ratings | |
|---|---|
| Design and Appearance | Average |
| Age/Condition | Average |
| Room Sizes and Layouts | Above Average |
| Bathrooms | Average |
| Kitchens | Average |
| Landscaping | Average |
| Covered Parking | Average |
| Unit Features | Average |
| Project Amenities | Average |



Exterior View of Subject Property



Exterior View of Subject Property



Exterior View of Subject Property



Exterior View of Subject Property



Exterior View of Subject Property



Exterior View of Subject Property



Gutters in Need of Replacement



Community Room



Carport



Parking Lot - Poor Condition



Typical unit under renovation



Typical unit under renovation


Typical unit under renovation


Typical unit under renovation


Typical unit under renovation


Typical unit under renovation


Bathroom fully renovated


Bedroom nearly completed


Kitchen nearly completed


Typical unit at studs


Typical unit at studs


Typical unit at studs


Typical unit at studs



All piping replaced with Pex


Maintenance garage


Interior drive


Unit under renovation


Unit under renovation


Typical unit at studs


Kitchen nearly renovated



Bedroom nearly renovated



Bathroom nearly renovated




HVAC



Bedroom nearly renovated



Bedroom under renovation



Bathroom under renovation


Typical unit under renovation


Typical bathroom under renovation


Typical kitchen under renovation


Signs of mold needing remediation

## Real Estate Taxes

Property taxes in the State of Michigan are typically based on an ad valorem tax system, in which the following four values are carried on the tax roll for any property which are established on December 31 of the prior year.

1. True Cash Value (TCV)
2. State Equalized Value (SEV)
3. Capped Value (CV)
4. Taxable Value (TV).

The True Cash Value (TCV) is intended to represent the municipality's opinion of "market value", however they are not always synonymous. In instances where the TCV exceeds a property's market value, the property owner should consider an appeal of the assessment. The SEV, commonly referred to as the assessed value, is theoretically equal to 50% of the local assessor's opinion of the TCV.

The SEV for any given year is set as of December 31 of the preceding year and is legally required to be similar to assessments for similar property in this same jurisdiction (city, township or village). There are no annual restrictions on the amount of any assessment increase that can be applied by the municipality.

From year to year, the annual increase to the Capped Value (CV) is subject to a constitutional provision that caps the annual assessment increase. The increase is limited to the rate of inflation in any year (based on the Consumer Price Index) or an overall constitutional limit of 5% per year, whichever is lower. This limitation on CV increases continues until a property is sold or any other form of ownership transfer (as defined by state assessing regulations), whereupon the cap provision is suspended. In the year following a transfer of ownership, the CV is automatically reset to be equal to the SEV.

Existing tax laws in Michigan were established to limit assessment increases, and the resulting tax liabilities, for property owners that maintain their ownership for an extended period. As assessed values (SEV) for this property type in Michigan have increased at a higher annual rate compared to increases applied to the TV, the delta between the SEV and the TV is often significant for properties that have not undergone a transfer of ownership in recent years. In such instances, a sale will result in a tax liability to the new owner that is higher than experienced under prior ownership.

For calculating annual real estate taxes for any property in Michigan, the TV is established as the lower of SEV or CV. For each tax year, the applicable total millage rate is applied to the TV, resulting in the annual tax burden for the current owner of any property.

Municipalities and counties are given the authority to levy property taxes at varying levels as well as there being a provision for a state-levied property tax for education purposes. Local school districts have the authority to levy, after voter approval, a non-homestead tax of up to an additional 18 mills and, in limited instances, an enhancement tax. The tax rate indicated in the following table is a summation of the levies of the various taxing bodies, including the administrative fee (if applicable).


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 65 of 174

The total 2026 rate is not available, thus we are relying on the Summer 2026 rate and Winter 2025 rate as follows.

**Projected Non-Homestead Tax Rate**

| | Real Property |
|---|---|
| Summer 2026 | 6.331820% |
| Winter 2025 | 0.676500% |
| Subtotal | 7.008320% |
| Admin Fee | 0.070083% |
| Total Tax Rate | 7.078403% |

Real estate taxes and assessments for the 2026 tax year are shown in the following table.

**Taxes and Assessments - 2026**

| | | | | Taxes and Assessments | | |
|---|---|---|---|---|---|---|
| Tax ID | True Cash Value | Assessed Value (SEV) | Capped/ Taxable Value | Tax Rate | Uncapped Taxes | Capped Taxes |
| 46-26-101-054 | $480,600 | $240,300 | $122,017 | 7.078403% | $17,009 | $8,637 |

The subject's 2026 assessment reflects a building that is primarily vacant and in need of significant renovation. Thus, we expect an increase in assessment when the renovation is completed. In determining the appropriate assessment/unit, we are relying on the following comparables.

**Tax Comparables**

| No. | Property Name | Municipality | Year Built | Number of Units | Assessed Value | Assessed Value/ Unit |
|---|---|---|---|---|---|---|
| 1 | Schafer Square | Flint | 1978 | 91 | $1,265,400 | $13,905 |
| 2 | Savory Village | Flint | 1963 | 132 | $1,033,700 | $7,831 |
| 3 | Clovertree | Flint Twp. | 1977 | 252 | $2,561,900 | $10,166 |
| 4 | Maple Tree Terrace | Mundy Twp. | 1979 | 184 | $2,435,300 | $13,235 |
| Subject | Clio Woods Apartments | Flint | 1971 | 84 | $240,300 | $2,861 |

Savory Village is the most similar to the subject. This property has been extensively renovated and offers one, two-, and three-bedroom units. Schafer Square has a strong location near Downtown Flint and offers basements and attached garages while Clovertree and Maple Tree Terrace are situated outside Flint. Based on the above, the stabilized assessment and taxes are as follows:

**Projected Stabilized Assessment and Taxes**

| | |
|---|---|
| Number of Units | 84 |
| Projected Stabilized Assessed Value/Unit | $9,000 |
| Projected Stabilized Assessment | $756,000 |
| Projected Tax Rate | 7.078403% |
| Projected Stabilized Taxes | $53,513 |
| Rounded | $54,000 |
| Per Unit | $643 |

Finally, according to Flint, there are no special assessments and there are no delinquent taxes.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 66 of 174

## Highest and Best Use

The highest and best use of a property is the reasonably probable use resulting in the highest value, and represents the use of an asset that maximizes its productivity.

### Process

Before a property can be valued, an opinion of highest and best use must be developed for the subject site, both as though vacant, and as improved or proposed. By definition, the highest and best use must be:

- Physically possible.
- Legally permissible under the zoning regulations and other restrictions that apply to the site.
- Financially feasible.
- Maximally productive, i.e., capable of producing the highest value from among the permissible, possible, and financially feasible uses.

### As Though Vacant

First, the property is evaluated as though vacant, with no improvements.

#### Physically Possible

The physical characteristics of the site do not appear to impose any unusual restrictions on development. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

#### Legally Permissible

The site is zoned TN-2, Traditional Neighborhood - Medium Density. Permitted uses include single-family detached dwelling, two-family dwelling, care homes. There are no apparent legal restrictions, such as easements or deed restrictions, effectively limiting the use of the property. Given prevailing land use patterns in the area, only multifamily use is given further consideration in determining highest and best use of the site, as though vacant.

#### Financially Feasible

Based on the accompanying analysis of the market, there is currently demand for additional multifamily development at the current time. However, it appears a newly developed multifamily use on the site would not have a value commensurate with its cost. It appears construction costs are currently outpacing value in the market; therefore, multifamily use is not considered to be financially feasible.

#### Maximally Productive

There does not appear to be any reasonably probable use of the site that would generate a higher residual land value than holding the property for future development of a multifamily use. Accordingly, holding the property for future multifamily use, based on the normal market density level permitted by zoning, is the maximally productive use of the property.

**Conclusion**

Holding the property for future development of a multifamily use is the only use which meets the four tests of highest and best use. Therefore, it is concluded to be the highest and best use of the property as though vacant.

## As Improved

The subject site is developed with 84 apartment units which is consistent with the highest and best use of the site as though vacant. Several scenarios are examined to analyze feasibility, as follows:

***Demolition:*** The value of the existing improved property exceeds the value of the site, as though vacant. Thus, demolition is not feasible.

***Conversion:*** A repurposing of the subject property is not likely to result in significantly higher rental rates or property value. Converting the subject property to an alternative use is not applicable in this case, nor is it likely.

***Expansion:*** The subject does not have any land for expansion.

***Renovation:*** The subject is in fair/poor condition and is in the midst of an extensive renovation. The renovation is judged to be feasible and will result in higher rental rates.

***Continuation:*** The use of the subject as apartments meets the four criteria for highest and best use. Based on the analysis above, a continuation of the current use is concluded to be financially feasible. There does not appear to be any alternative use that could reasonably be expected to provide a higher present value than the current use, and the value of the existing improved property exceeds the value of the site, as though vacant. For these reasons, continued multifamily use is concluded to be maximally productive and the highest and best use of the property as improved.

## Most Probable Buyer

Taking into account the size and characteristics of the property and its occupancy, the likely buyer is a local / regional investor.

# Valuation

## Valuation Methodology

Appraisers usually consider three approaches to estimating the market value of real property. These are the cost approach, sales comparison approach and the income capitalization approach.

The **cost approach** assumes that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility. This approach is particularly applicable when the improvements being appraised are relatively new and represent the highest and best use of the land or when the property has unique or specialized improvements for which there is little or no sales data from comparable properties.

The **sales comparison approach** assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with the same utility. This approach is especially appropriate when an active market provides sufficient reliable data. The sales comparison approach is less reliable in an inactive market or when estimating the value of properties for which no directly comparable sales data is available. The sales comparison approach is often relied upon for owner-user properties.

The **income capitalization approach** reflects the market's perception of a relationship between a property's potential income and its market value. This approach converts the anticipated net income from ownership of a property into a value indication through capitalization. The primary methods are direct capitalization and discounted cash flow analysis, with one or both methods applied, as appropriate. This approach is widely used in appraising income-producing properties.

Reconciliation of the various indications into a conclusion of value is based on an evaluation of the quantity and quality of available data in each approach and the applicability of each approach to the property type.

The methodology employed in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Applicable | Utilized |

## Sales Comparison Approach

The sales comparison approach develops an indication of value by comparing the subject to sales of similar properties. The steps taken to apply the sales comparison approach are:

- Identify relevant property sales;
- Research, assemble, and verify pertinent data for the most relevant sales;
- Analyze the sales for material differences in comparison to the subject;
- Reconcile the analysis of the sales into a value indication for the subject.

To apply the sales comparison approach, the research focused on transactions within the following parameters:

- Property Type: Garden/Walk-up, Townhouse, Ranch
- Location: Genesee, Saginaw Counties
- Size: Over 30 units
- Transaction Date: 2023 to current

The comparables selected are judged to be alternative investments to the subject property that would have been considered by an investor in the subject. Relying upon sales that occurred recently as the best indication of current investor attitudes and market behavior, we have selected several improved sales as most comparable and as best indicators of value for the subject.

For this analysis, price per unit is used as the appropriate unit of comparison because market participants typically compare sale prices and property values on this basis. The sales considered most relevant are summarized in the following table.

*The subject is not stabilized and requires significant renovation. In applying the sales comparison approach, we are assuming the subject is stabilized with the renovation completed and apply a deduction for the stabilization allowance and renovation costs to arrive at the as is market value.*

**Summary of Comparable Improved Sales**

| No. | Name/Address | Sale Date; Status | Yr. Blt.; # Stories; % Occ. | # Units; Rentable SF; Avg Unit SF | Effective Sale Price | $/Unit; $/SF | NOI/Unit; NOI/SF; Exp. Ratio | Cap Rate |
|---|---|---|---|---|---|---|---|---|
| 1 | Lux of Saginaw Apartments<br>2021 Grout St.<br>Saginaw<br>Saginaw County<br>MI | Sep-23<br>Closed | 1968<br>3<br>61% | 84<br>68,655<br>817 | $6,687,000 | $79,607<br>$97.40 | $7,733<br>$9.46<br>42% | 9.71% |
| 2 | Colonial Apartments<br>726 E. Main St.<br>Flushing<br>Genesee County<br>MI | Jun-26<br>Closed | 1970<br>2<br>– | 32<br>20,000<br>625 | $2,200,000 | $68,750<br>$110.00 | $4,641<br>$7.43<br>– | 6.75% |
| 3 | Residences at Grand Blanc<br>5800 Maplebrook Lane<br>Grand Blanc Township<br>Genesee County<br>MI | Aug-26<br>Closed | 1971-77<br>3<br>89% | 455<br>315,015<br>701 | $29,000,000 | $63,736<br>$92.06 | $4,781<br>$6.91<br>63% | 7.50% |
| 4 | Pinehurst Apartments<br>9087 Harper St.<br>Argentine Township<br>Genesee County<br>MI | Dec-25<br>Closed | 1977-92<br>2<br>97% | 33<br>25,732<br>780 | $2,770,000 | $83,939<br>$107.65 | $6,866<br>$8.80<br>42% | 8.18% |
| 5 | Mill Creek Apartments<br>303 Smith Street<br>Clio<br>Genesee County<br>MI | Oct-24<br>Closed | 1973<br>–<br>100% | 174<br>115,326<br>663 | $9,222,000 | $53,000<br>$79.96 | $2,940<br>$4.44<br>60% | 5.55% |
| 6 | Pine Creek Apartments<br>11650 Plaza Drive<br>Vienna Township<br>Genesee County<br>MI | Oct-24<br>Closed | 1974/78<br>3<br>100% | 232<br>153,357<br>658 | $12,349,000 | $53,228<br>$80.52 | $2,888<br>$4.37<br>58% | 5.43% |
| | **Subject**<br>Clio Woods Apartments<br>Flint, MI | | 1971<br>2<br>27% | 84<br>94,060<br>1,120 | | | $7,379<br>$6.59<br>40% | |

## Comparable Improved Sales Map





Sale 1
Lux of Saginaw Apartments



Sale 2
Colonial Apartments



Sale 3
Residences at Grand Blanc



Sale 4
Pinehurst Apartments



Sale 5
Mill Creek Apartments



Sale 6
Pine Creek Apartments

## Analysis and Adjustment of Sales

Adjustments are based on a rating of each comparable sale in relation to the subject. The adjustment process is typically applied through either quantitative or qualitative analysis, or a combination of both analyses. Quantitative adjustments are often developed as dollar or percentage amounts, and are most credible when there is sufficient data to perform a paired sales analysis.

While percentage adjustments are presented in the adjustment grid, they are based on qualitative judgment rather than empirical research, as there is not sufficient data to develop a sound quantitative estimate. Although the adjustments appear to be mathematically precise, they are merely intended to illustrate an opinion of typical market activity and perception. With the exception of market conditions, the adjustments are based on a scale, with a minor adjustment in the range of 1-5% and a substantial adjustment considered to be 20% or greater.

The rating of each comparable sale in relation to the subject is the basis for the adjustments. If the comparable is superior to the subject, its sale price is adjusted downward to reflect the subject's relative attributes; if the comparable is inferior, its price is adjusted upward.

Transactional adjustments are applied for property rights conveyed, financing, conditions of sale, expenditures made immediately after purchase, and market conditions. In addition, property adjustments include – but are not limited to – location, access/exposure, size, quality, effective age, economic and legal characteristics, and non-realty components of value. Adjustments are considered for the following factors, in the sequence shown below.

## Transactional Adjustments

### Real Property Rights Conveyed

Property rights considerations encompass a wide range of factors including, for example, deed type, deed restrictions, and whether the property is encumbered by leases.

All of the comparables represent leased fee transactions, and adjustments for property rights are not necessary.

### Financing

In analyzing the comparables, it is necessary to adjust for financing terms that differ from market terms. Typically, if the buyer retained third-party financing (other than the seller) for the purpose of purchasing the property, a cash price is presumed and no adjustment is required. However, in instances where the seller provides financing as a debt instrument, a premium may have been paid by the buyer for below-market financing terms, or a discount may have been demanded by the buyer if the financing terms were above market. The premium or discounted price must then be adjusted to a cash equivalent basis. The comparable sales represented cash-to-seller transactions and, therefore, do not require adjustment.

**Conditions of Sale**

Adverse conditions of sale can account for a significant discrepancy from the sale price actually paid, compared to that of the market. This discrepancy in price is generally attributed to the motivations of the buyer and the seller. Certain conditions of sale are considered non-market and may include the following:

- a seller acting under duress (e.g., eminent domain, foreclosure);
- buyer motivation (e.g., premium paid for assemblage, certain 1031 exchanges);
- a lack of exposure to the open market;
- an unusual tax consideration;
- a sale at legal auction.

None of the comparable sales had atypical or unusual conditions of sale. Thus, adjustments are not necessary. If sales listings were considered, they were adjusted downward for negotiations.

**Expenditures Made Immediately After Purchase**

This category considers expenditures incurred immediately after the purchase of a property. Any comparable sale that required expenditures immediately after purchase was adjusted to arrive at the effective sale price.

**Market Conditions**

A market conditions adjustment is applied when market conditions at the time of sale differ from market conditions as of the effective date of value. Adjustments can be positive when prices are rising, or negative when markets are challenged by factors such as a deterioration of the economy or adverse changes in supply and/or demand in the market area. Consideration must also be given to when the property was placed under contract, versus when the sale actually closed.

In evaluating market conditions, changes between the comparable sale date and the effective date of this appraisal may warrant adjustment; however, if market conditions have not changed, then no adjustment is required. Apartment values have increased modestly in recent years with a 2% per year adjustment applied to the effective date of the appraisal.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 75 of 174

## Property Adjustments

### Location

Factors considered in evaluating location include, but are not limited to, demographics, growth rates, surrounding uses and property values.

All of the comparables are adjusted downward for superior location.

### Effective Age/Condition

While year built can give insight into the utility of a property, the more important consideration is the level of condition and modernization of the property. The subject was constructed in 1971, has an effective age of 15 years, and is in above average condition. Comparables exhibiting newer effective ages are adjusted downward to reflect the discrepancy in remaining economic life, and vice versa.

Sales 1, 3 and 4 are similar to the subject and require no adjustment. Sales 2, 5 and 6 are older than the subject. Upward adjustments are applied.

### Unit Count

Due to economies of scale, the market exhibits an inverse relationship between unit count and price per unit such that complexes with higher unit counts sell for a lower price per unit than smaller projects, all else being equal. To account for this relationship, applicable adjustments are applied for differences in unit count.

Sale 1 is similar to the subject and requires no adjustment. Sales 2 and 4 have fewer units than the subject and require downward adjustments. Sales 3, 5 and 6 have more units than the subject and require upward adjustments.

### Average Unit Size

In determining the adjustment to be employed for average unit size, the best indicators are from properties that offer multiple selections of units with the same bed/bath count, but different size. Since these units are located within the same property, the difference in rent would be mostly attributable to unit size. Adjustments are applied by accounting for differences in unit size between the comparables and the subject, and the increment of additional rent/value that would be achieved for a larger versus smaller unit.

All of the comparables have smaller units, and upward adjustments are applied.

### Unit Features

Sale 2 is similar to the subject and requires no adjustment. Sales 1, 3, 4, 5 and 6 are inferior to the subject. Upward adjustments are applied.

### Project Amenities

Sales 1, 2 and 4 are similar to the subject and require no adjustment. Sales 3, 5 and 6 are superior to the subject. Downward adjustments are applied.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 76 of 174

## Adjustments Summary

The following table summarizes the adjustments discussed above and applied to each sale.

**Improved Sales Adjustment Grid**

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 | Comparable 4 | Comparable 5 | Comparable 6 |
|---|---|---|---|---|---|---|---|
| Property Name | Clio Woods Apartments | Lux of Saginaw Apartments | Colonial Apartments | Residences at Grand Blanc | Pinehurst Apartments | Mill Creek Apartments | Pine Creek Apartments |
| Address | 6914 Clio Road | 2021 Grout St. | 726 E. Main St. | 5800 Maplebrook Lane | 9087 Harper St. | 303 Smith Street | 11650 Plaza Drive |
| City | Flint | Saginaw | Flushing | Grand Blanc Township | Argentine Township | Clio | Vienna Township |
| County | Genesee | Saginaw | Genesee | Genesee | Genesee | Genesee | Genesee |
| State | Michigan | MI | MI | MI | MI | MI | MI |
| Sale Date | | Sep-23 | Jun-26 | Aug-26 | Dec-25 | Oct-24 | Oct-24 |
| Sale Status | | Closed | Closed | Closed | Closed | Closed | Closed |
| Sale Price | | $6,687,000 | $2,200,000 | $28,000,000 | $2,770,000 | $9,222,000 | $12,349,000 |
| Other Adjustment | | – | – | $1,000,000 | – | – | – |
| Description of Adjustment | | | | Deferred maintenance | | | |
| Effective Sale Price | | $6,687,000 | $2,200,000 | $29,000,000 | $2,770,000 | $9,222,000 | $12,349,000 |
| Gross Building Area | 101,480 | 68,655 | 36,488 | 349,786 | 30,372 | 129,600 | 188,050 |
| Rentable Floor Area | 94,060 | 68,655 | 20,000 | 315,015 | 25,732 | 115,326 | 153,357 |
| Number of Units | 84 | 84 | 32 | 455 | 33 | 174 | 232 |
| Year Built | 1971 | 1968 | 1970 | 1971-77 | 1977-92 | 1973 | 1974/78 |
| Year Renovated | 1989, 2026-27 | 2022 | – | 2022-26 | – | – | – |
| Avg SF Per Unit | 1,120 | 817 | 625 | 701 | 780 | 663 | 658 |
| **Price per Unit** | | **$79,607** | **$68,750** | **$63,736** | **$83,939** | **$53,000** | **$53,228** |
| **Transactional Adjustments** | | | | | | | |
| Property Rights | | Leased Fee | Leased Fee | Leased Fee | Fee Simple | Leased Fee | Leased Fee |
| % Adjustment | | – | – | – | – | – | – |
| Financing Terms | | Cash to seller | Cash to seller | Cash to seller | Cash to seller | Cash to seller | Cash to seller |
| % Adjustment | | – | – | – | – | – | – |
| Conditions of Sale | | Arm's-length | Arm's-length | Arm's-length | Arm's-length | Arm's-length | Arm's-length |
| % Adjustment | | – | – | – | – | – | – |
| Expenditures Made Immediately After Purchase | | | | See Above | | | |
| $ Adjustment | | – | – | – | – | – | – |
| Market Conditions | 9/11/2026 | Sep-23 | Jun-26 | Aug-26 | Dec-25 | Oct-24 | Oct-24 |
| Annual % Adjustment | 2% | 6% | – | – | 2% | 4% | 4% |
| **Cumulative Adjusted Price** | | **$84,384** | **$68,750** | **$63,736** | **$85,618** | **$55,120** | **$55,358** |
| **Property Adjustments** | | | | | | | |
| Location | | -10% | -5% | -10% | -10% | -5% | -5% |
| Effective Age/Condition | | – | 10% | – | – | 10% | 10% |
| Unit Count | | – | -5% | 15% | -5% | 10% | 10% |
| Average Unit Size | | 5% | 10% | 10% | 10% | 10% | 10% |
| Unit Features | | 3% | – | 3% | 3% | 3% | 3% |
| Project Amenities | | – | – | -3% | – | -3% | -3% |
| Economic Characteristics | | – | – | – | – | – | – |
| Net Property Adjustments ($) | | -$1,688 | $6,875 | $9,560 | -$1,712 | $13,780 | $13,839 |
| Net Property Adjustments (%) | | -2% | 10% | 15% | -2% | 25% | 25% |
| **Final Adjusted Price** | | **$82,696** | **$75,625** | **$73,297** | **$83,906** | **$68,900** | **$69,197** |

| | |
|---|---|
| **Range of Adjusted Prices** | **$68,900 - $83,906** |
| **Average** | **$75,603** |
| **Indicated Value** | **$78,000** |

## Value Indication

Prior to adjustment, the sales reflect a range of $53,000 - $83,939 per unit. After adjustment, the range is narrowed to $68,900 - $83,906 per unit, with an average of $75,603 per unit.

Sale 1 is situated north of Flint in Saginaw. This property is similar in size, vintage, and was substantially renovated prior to the sale. While this sale is the oldest sale (2023) it is give primary weight. The remaining sales are situated in the Flint MSA. Sale 2 is a 2026 sale and is given primary weight. Sale 3 is substantially larger but given weight given it is a 2026 sale. Sale 4 includes a house built in 1977 and apartments built in 1992; overall this comparable has the highest adjusted unit rate and is given secondary weight. Sales 5 and 6 were off-market transactions and set the lower end of the market. These sales are given secondary weight. Based on the preceding analysis, the value indication by the sales comparison approach follows and reflects a stabilized value. The following adjustments are applied to arrive at the as is market value:

- **Lease-up costs** – the subject will incur rent loss during lease-up which is projected at six months. The determination of the lease-up costs are at the end of the income capitalization approach.

- **Balance of Renovation Costs** – the total renovation costs remaining, including a contingency, is projected at $1,820,000.

- **Unstabilized Discount** – the subject is 27% occupied and requires substantial renovation prior to stabilization. There is considerable effort and risk required to complete the renovation and stabilize the property. Thus, we have applied an unstabilized discount to the indicated stabilized value. This is in recognition of the fact that buyers and lenders view the purchase and/or financing of unstabilized assets as riskier than the purchase and/or financing of stabilized assets. Thus, equity and mortgage rates are higher. Considering the subject's occupancy level and the extensive renovation required, an unstabilized discount of 20% is applied.

| Value Indication by Sales Comparison | |
|---|---|
| Indicated Value per Unit | $78,000 |
| Subject Units | 84 |
| Indicated Value | $6,552,000 |
| Adjustments | |
| Lease-Up Costs | -$200,000 |
| Balance of Renovation Costs | -$1,820,000 |
| Unstabilized Discount @ 10% | -$655,200 |
| Total Adjustments | -$2,675,200 |
| Indicated Value | $3,876,800 |
| Rounded | $3,900,000 |

## Income Capitalization Approach

The income capitalization approach converts anticipated economic benefits of owning real property into a value estimate through capitalization. The steps taken to apply the income capitalization approach are:

- Analyze the revenue potential of the property.
- Consider appropriate allowances for vacancy, collection loss, and operating expenses.
- Calculate net operating income by deducting vacancy, collection loss, and operating expenses from potential income.
- Apply the most appropriate capitalization method, either direct capitalization or discounted cash flow analysis, or both, to convert anticipated net income to an indication of value.

The two most common capitalization methods are direct capitalization and discounted cash flow analysis. In direct capitalization, a single year's expected income is divided by an appropriate capitalization rate to arrive at a value indication. In discounted cash flow analysis, anticipated future net income streams and a future resale value are discounted to a present value at an appropriate yield rate.

In this analysis, we use only direct capitalization because investors in this property type typically rely more on this method.

*The subject is not stabilized and requires significant renovation. In applying the income capitalization approach, we are assuming the subject is stabilized with the renovation completed and apply a deduction for the stabilization allowance and renovation costs to arrive at the as is market value.*

### Occupancy and Rental Rates

The unit mix, occupancy status, and rental rates at the subject are shown in the following tables.

**Unit Mix and Occupancy**

| Unit Type | Units | % of Total | Avg. Unit Size | Total SF | Occupied Units | Vacant Units | % Occupied |
|---|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 4 | 4.8% | 835 | 3,340 | 1 | 3 | 25% |
| 2 Bed/2 Bath | 56 | 66.7% | 1,065 | 59,640 | 18 | 38 | 32% |
| 3 Bed/2 Bath | 24 | 28.6% | 1,295 | 31,080 | 4 | 20 | 17% |
| TOTAL/AVG. | 84 | 100.0% | 1,120 | 94,060 | 23 | 61 | 27% |

## Subject Rental Rates

| Unit Type | Average Unit Size | Total Units | Asking Rent[1] Average | Asking Rent[1] Avg. $/SF | Contract Rent[2] Average | Contract Rent[2] Avg. $/SF |
|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 835 | 4 | $856 | $1.03 | $940 | $1.13 |
| 2 Bed/2 Bath | 1,065 | 56 | $1,033 | $0.97 | $1,050 | $0.99 |
| 3 Bed/2 Bath | 1,295 | 24 | $1,272 | $0.98 | $1,236 | $0.95 |
| TOTAL/AVG. | 1,120 | 84 | $1,093 | $0.98 | $1,078 | $0.98 |

1. Includes employee & model units, if any.
2. Figures are for tenant-occupied units only. Excludes any employee or model units.

## Utilities Expenses

| Tenant-Paid Utilities | Owner-Paid-Utilities |
|---|---|
| In-Unit Electric | Cold Water |
| Gas Heat | Sewer |
| Hot Water | Trash |
| Cable | Common Area Utilities |
| Broadband | |

### Market Rent Analysis

To estimate market rent, we analyze comparable rentals most relevant to the subject in terms of location, property type, building age, and quality. The comparables are summarized in the following table.

## Summary of Comparable Rentals

| No. | Property Name; Address | Survey Date | Yr Built; Stories | Unit Mix | # Units; % Occ. | Avg. Unit SF | Avg. Rent/ Month | Avg. Rent/ SF |
|---|---|---|---|---|---|---|---|---|
| 1 | Avon Park | 9/16/2026 | 1995 | | 56 | | | |
| | 1330 Avon Park Dr. | | 2 | | 95% | | | |
| | Flint | | | | | | | |
| | | | | 2 Bed/1 Bath | – | 788 | $1,185 | $1.50 |
| | | | | 2 Bed/2 Bath | – | 890 | $1,255 | $1.41 |
| | | | | 3 Bed/1.5 Bath TH | – | 1,090 | $1,420 | $1.30 |
| | Tenant-Paid Utilities: | | In-Unit Electric, Electric Cooking, Gas Heat | | | | | |
| 2 | Schafer Square Apartments | 9/16/2026 | 1978 | | 91 | | | |
| | 883 Floyd J. McCree Dr. | | 2 | | 99% | | | |
| | Flint | | | | | | | |
| | | | | 1 Bed/1 Bath DN | 18 | 697 | $950 | $1.36 |
| | | | | 1 Bed/1 Bath UP | 18 | 697 | $895 | $1.28 |
| | | | | 2 Bed/1 Bath | 1 | 1,000 | $1,275 | $1.28 |
| | | | | 2 Bed/2.5 Bath TH | 54 | 1,051 | $1,275 | $1.21 |
| | Tenant-Paid Utilities: | | In-Unit Electric, Hot Water, Gas Heat | | | | | |
| 3 | Savory Village Apartments | 9/1/2026 | 1963 | | 132 | | | |
| | 3901 Hammerberg Rd. | | 3 | | 97% | | | |
| | Flint | | | | | | | |
| | | | | 1 Bed/1 Bath | 12 | 527 | $750 | $1.42 |
| | | | | 2 Bed/1 Bath | 118 | 763 | $823 | $1.08 |
| | | | | 3 Bed/1.5 Bath | 2 | 985 | $925 | $0.94 |
| | Tenant-Paid Utilities: | | In-Unit Electric, Gas Heat | | | | | |
| 4 | Miller West Apartments | 9/1/2026 | 1964 | | 136 | | | |
| | 3100 Miller Rd. | | 2 | | 97% | | | |
| | Flint Township | | | | | | | |
| | | | | 1 Bed/1 Bath | 37 | 820 | $982 | $1.20 |
| | | | | 2 Bed/1 Bath | 12 | 900 | $1,029 | $1.14 |
| | | | | 2 Bed/1.5 Bath | 71 | 1,027 | $1,103 | $1.07 |
| | | | | 2 Bed/2 Bath | 4 | 1,163 | $1,195 | $1.03 |
| | | | | 3 Bed/2 Bath | 12 | 1,330 | $1,299 | $0.98 |
| | Tenant-Paid Utilities: | | Gas Heat, Hot Water, In-Unit Electric, Electric Cooking | | | | | |
| 5 | Morris Square Apartments | 9/1/2026 | 1988 | | 96 | | | |
| | 750 Jefferson St. | | 2 | | 95% | | | |
| | Mount Morris | | | | | | | |
| | | | | 1 Bed/1 Bath | 10 | 636 | $900 | $1.42 |
| | | | | 2 Bed/1.5 Bath | 54 | 908 | $980 | $1.08 |
| | | | | 2 Bed/2 Bath | 24 | 1,020 | $1,035 | $1.01 |
| | | | | 3 Bed/2 Bath | 8 | 1,080 | $1,090 | $1.01 |
| | Tenant-Paid Utilities: | | Trash, In-Unit Electric, Sewer, Cold Water, Hot Water, Gas Heat, Electric Cooking | | | | | |
| 6 | Pine Ridge Apartments | 9/1/2026 | 1965 / | | 44 | | | |
| | 526 Pine St. | | 3 | | 95% | | | |
| | Clio | | | | | | | |
| | | | | 1 Bed/1 Bath | 16 | 600 | $800 | $1.33 |
| | | | | 2 Bed/1 Bath | 16 | 750 | $900 | $1.20 |
| | | | | 3 Bed/1 Bath | 12 | 900 | $1,025 | $1.14 |
| | Tenant-Paid Utilities: | | In-Unit Electric | | | | | |

## Comparable Rentals Map





Rent Survey 1
Avon Park



Rent Survey 2
Schafer Square Apartments



Rent Survey 3
Savory Village Apartments



Rent Survey 4
Miller West Apartments



Rent Survey 5
Morris Square Apartments




Rent Survey 6
Pine Ridge Apartments

## Rental Analysis Factors

| Rental Analysis Factors | |
|---|---|
| Tenant Paid Utilities | Utilities costs for which tenants are responsible. See following table. Note: Comp 5 charges a flat fee of $45 regardless of unit style. |
| Unit Size | Floor area in square feet. The adjustment is $0.30/SF. |
| Location | Comps 4-6 are judged to have a superior location with a $50 downward adjustment applied. |
| Age/Condition | Comp 6 is judged to be inferior and adjusted upward. |
| DW/Microwave | No adjustments required. |
| Washer/Dryer | Comps that do not include laundry hook-ups are inferior and adjusted upward $50. |
| Project Amenities | Comps 1 and 4 are superior and adjusted downward $25. |
| Bathrooms | $25 for half-bathroom variance and $50 for a full bathroom variance. |
| Parking | Comps 1 and 2 include a one-car attached garage ($100) while the subject includes a carport ($25), thus are adjusted downward $75. Comps that do not include a carport are adjusted upward $25. |
| Basement | The 2 bedroom unit at Comp 2 includes a private unfinished basement with a $100 downward adjustment applied. |

**Utility Adjustment - 1 Bedroom**

| | Subject | No. 1 | | No. 2 | | No. 3 | | No. 4 | | No. 5 | | No. 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Heat | T | | | T | $0 | T | $0 | T | $0 | T | $0 | LL | -$20 |
| Hot Water | T | Not | | T | $0 | LL | -$10 | T | $0 | T | $0 | LL | -$10 |
| Cold Water | LL | Applicable | | LL | $0 | LL | $0 | LL | $0 | T | $30 | LL | $0 |
| Trash | LL | | | LL | $0 | LL | $0 | LL | $0 | T | $15 | LL | $0 |
| Total Adj. | | | | | $0 | | -$10 | | $0 | | $45 | | -$30 |

**Utility Adjustment - 2 Bedroom**

| | Subject | No. 1 | | No. 2 | | No. 3 | | No. 4 | | No. 5 | | No. 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Heat | T | T | $0 | T | $0 | T | $0 | T | $0 | T | $0 | LL | -$30 |
| Hot Water | T | LL | -$15 | T | $0 | LL | -$15 | T | $0 | T | $0 | LL | -$15 |
| Cold Water | LL | LL | $0 | LL | $0 | LL | $0 | LL | $0 | T | $30 | LL | $0 |
| Trash | LL | LL | $0 | LL | $0 | LL | $0 | LL | $0 | T | $15 | LL | $0 |
| Total Adj. | | | -$15 | | $0 | | -$15 | | $0 | | $45 | | -$45 |

**Utility Adjustment - 3 Bedroom**

| | Subject | No. 1 | | No. 2 | | No. 3 | | No. 4 | | No. 5 | | No. 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Heat | T | T | $0 | | | T | $0 | T | $0 | T | $0 | LL | -$40 |
| Hot Water | T | LL | -$20 | Not | | LL | -$20 | T | $0 | T | $0 | LL | -$20 |
| Cold Water | LL | LL | $0 | Applicable | | LL | $0 | LL | $0 | T | $30 | LL | $0 |
| Trash | LL | LL | $0 | | | LL | $0 | LL | $0 | T | $15 | LL | $0 |
| Total Adj. | | | -$20 | | | | -$20 | | $0 | | $45 | | -$60 |


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 84 of 174

## Analysis of Comparable Rentals

The following tables summarize the adjustments made to the comparable rentals. Separate tables are provided for different unit types.

**Rental Adjustment Grid - 1 Bed/1 Bath**

| | Subject | Comparable 2 | Comparable 3 | Comparable 4 | Comparable 5 | Comparable 6 |
|---|---|---|---|---|---|---|
| Property Name | Clio Woods Apartments | Schafer Square Apartments | Savory Village Apartments | Miller West Apartments | Morris Square Apartments | Pine Ridge Apartments |
| Address | 6914 Clio Road | 883 Floyd J. McCree Dr. | 3901 Hammerberg Rd. | 3100 Miller Rd. | 750 Jefferson St. | 526 Pine St. |
| City | Flint | Flint | Flint | Flint Township | Mount Morris | Clio |
| County | Genesee | Genesee | Genesee | Genesee | Genesee | Genesee |
| State | Michigan | MI | MI | MI | MI | MI |
| Survey Date | | Sep-26 | Sep-26 | Sep-26 | Sep-26 | Sep-26 |
| Unit Type | 1 Bed/1 Bath | 1 Bed/1 Bath UP | 1 Bed/1 Bath | 1 Bed/1 Bath | 1 Bed/1 Bath | 1 Bed/1 Bath |
| Average Unit SF | 835 | 697 | 527 | 820 | 636 | 600 |
| Average Rent/Mo | $856 | $895 | $750 | $982 | $900 | $800 |
| Rent/SF | $1.03 | $1.28 | $1.42 | $1.20 | $1.42 | $1.33 |
| **Average Rent/Month** | | **$895** | **$750** | **$982** | **$900** | **$800** |
| Utilities Adjustment | | | | | | |
| $ Adjustment | | – | -$10 | – | $45 | -$30 |
| Size Adjustment | | | | | | |
| $/SF Adjustment | $0.30 | | | | | |
| $ Adjustment | | $41 | $92 | $5 | $60 | $71 |
| **Cumulative Adjusted Rent** | | **$936** | **$832** | **$987** | **$1,005** | **$841** |
| Location | | – | – | -$50 | -$50 | -$50 |
| Age/Condition | | – | – | – | – | $100 |
| DW/Microwave | | – | – | – | – | – |
| In-Unit Laundry | | $50 | $50 | – | – | $50 |
| Project Amenities | | -$25 | – | -$25 | – | – |
| Bathrooms | | – | – | – | – | – |
| Parking | | -$75 | $25 | – | $25 | $25 |
| Net $ Adjustment | | -$50 | $75 | -$75 | -$25 | $125 |
| Net % Adjustment | | -5% | 9% | -8% | -2% | 15% |
| **Final Adjusted Price** | | **$886** | **$907** | **$912** | **$980** | **$966** |
| Overall Adjustment | | -1% | 21% | -7% | 9% | 21% |

| **Summary Indicators** | **Range** | **Average** | **Average/SF** |
|---|---|---|---|
| Comparables - Adjusted | $886 - $980 | $930 | – |
| Subject Contract Rents | $940 - $940 | $940 | $1.13 |
| Subject Asking Rent | $856 - $856 | $856 | $1.03 |
| **Concluded Market Rent** | **$900 ($1.08/SF)** | | |

**Rental Adjustment Grid - 2 Bed/2 Bath**

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 | Comparable 4 | Comparable 5 | Comparable 6 |
|---|---|---|---|---|---|---|---|
| Property Name | Clio Woods Apartments | Avon Park | Schafer Square Apartments | Savory Village Apartments | Miller West Apartments | Morris Square Apartments | Pine Ridge Apartments |
| Address | 6914 Clio Road | 1330 Avon Park Dr. | 883 Floyd J. McCree Dr. | 3901 Hammerberg Rd. | 3100 Miller Rd. | 750 Jefferson St. | 526 Pine St. |
| City | Flint | Flint | Flint | Flint | Flint Township | Mount Morris | Clio |
| County | Genesee | Genesee | Genesee | Genesee | Genesee | Genesee | Genesee |
| State | Michigan | MI | MI | MI | MI | MI | MI |
| Survey Date | | Sep-26 | Sep-26 | Sep-26 | Sep-26 | Sep-26 | Sep-26 |
| Unit Type | 2 Bed/2 Bath | 2 Bed/2 Bath | 2 Bed/1 Bath | 2 Bed/1 Bath | 2 Bed/2 Bath | 2 Bed/2 Bath | 2 Bed/1 Bath |
| Average Unit SF | 1,065 | 890 | 1,000 | 763 | 1,163 | 1,020 | 750 |
| Average Rent/Mo | $1,033 | $1,255 | $1,275 | $823 | $1,195 | $1,035 | $900 |
| Rent/SF | $0.97 | $1.41 | $1.28 | $1.08 | $1.03 | $1.01 | $1.20 |
| **Average Rent/Month** | | **$1,255** | **$1,275** | **$823** | **$1,195** | **$1,035** | **$900** |
| Utilities Adjustment | | | | | | | |
| $ Adjustment | | -$15 | – | -$15 | – | $45 | -$45 |
| Size Adjustment | | | | | | | |
| $/SF Adjustment | $0.30 | | | | | | |
| $ Adjustment | | $53 | $20 | $91 | -$29 | $14 | $95 |
| **Cumulative Adjusted Rent** | | **$1,293** | **$1,295** | **$899** | **$1,166** | **$1,094** | **$950** |
| Location | | – | – | – | -$50 | -$50 | -$50 |
| Age/Condition | | – | – | – | – | – | $100 |
| DW/Microwave | | – | – | – | – | – | – |
| In-Unit Laundry | | – | $50 | $50 | – | – | $50 |
| Project Amenities | | – | -$25 | – | -$25 | – | – |
| Bathrooms | | – | $50 | $50 | – | – | $50 |
| Parking | | -$75 | -$75 | $25 | – | $25 | $25 |
| Basement | | – | -$100 | – | – | – | – |
| Net $ Adjustment | | -$75 | -$100 | $125 | -$75 | -$25 | $175 |
| Net % Adjustment | | -6% | -8% | 14% | -6% | -2% | 18% |
| **Final Adjusted Price** | | **$1,218** | **$1,195** | **$1,024** | **$1,091** | **$1,069** | **$1,125** |
| Overall Adjustment | | -3% | -6% | 24% | -9% | 3% | 25% |

| **Summary Indicators** | **Range** | **Average** | **Average/SF** |
|---|---|---|---|
| Comparables - Adjusted | $1,024 - $1,218 | $1,120 | – |
| Subject Contract Rents | $1,050 - $1,050 | $1,050 | $0.99 |
| Subject Asking Rent | $1,033 - $1,033 | $1,033 | $0.97 |
| **Concluded Market Rent** | **$1,100 ($1.03/SF)** | | |

**Rental Adjustment Grid - 3 Bed/2 Bath**

| | Subject | Comparable 1 | Comparable 3 | Comparable 4 | Comparable 5 | Comparable 6 |
|---|---|---|---|---|---|---|
| Property Name | Clio Woods Apartments | Avon Park | Savory Village Apartments | Miller West Apartments | Morris Square Apartments | Pine Ridge Apartments |
| Address | 6914 Clio Road | 1330 Avon Park Dr. | 3901 Hammerberg Rd. | 3100 Miller Rd. | 750 Jefferson St. | 526 Pine St. |
| City | Flint | Flint | Flint | Flint Township | Mount Morris | Clio |
| County | Genesee | Genesee | Genesee | Genesee | Genesee | Genesee |
| State | Michigan | MI | MI | MI | MI | MI |
| Survey Date | | Sep-26 | Sep-26 | Sep-26 | Sep-26 | Sep-26 |
| Unit Type | 3 Bed/2 Bath | 3 Bed/1.5 Bath TH | 3 Bed/1.5 Bath | 3 Bed/2 Bath | 3 Bed/2 Bath | 3 Bed/1 Bath |
| Average Unit SF | 1,295 | 1,090 | 985 | 1,330 | 1,080 | 900 |
| Average Rent/Mo | $1,272 | $1,420 | $925 | $1,299 | $1,090 | $1,025 |
| Rent/SF | $0.98 | $1.30 | $0.94 | $0.98 | $1.01 | $1.14 |
| **Average Rent/Month** | | **$1,420** | **$925** | **$1,299** | **$1,090** | **$1,025** |
| Utilities Adjustment | | | | | | |
| $ Adjustment | | -$20 | -$20 | – | $45 | -$60 |
| Size Adjustment | | | | | | |
| $/SF Adjustment | $0.30 | | | | | |
| $ Adjustment | | $62 | $93 | -$11 | $65 | $119 |
| **Cumulative Adjusted Rent** | | **$1,462** | **$998** | **$1,289** | **$1,200** | **$1,084** |
| Location | | – | – | -$50 | -$50 | -$50 |
| Age/Condition | | – | – | – | – | $100 |
| DW/Microwave | | – | – | – | – | – |
| In-Unit Laundry | | – | $50 | – | – | $50 |
| Project Amenities | | – | – | -$25 | – | – |
| Bathrooms | | $25 | $25 | – | – | $50 |
| Parking | | -$75 | $25 | – | $25 | $25 |
| Basement | | – | – | – | – | – |
| Net $ Adjustment | | -$50 | $100 | -$75 | -$25 | $175 |
| Net % Adjustment | | -3% | 10% | -6% | -2% | 16% |
| **Final Adjusted Price** | | **$1,412** | **$1,098** | **$1,214** | **$1,175** | **$1,259** |
| Overall Adjustment | | -1% | 19% | -7% | 8% | 23% |

| **Summary Indicators** | **Range** | **Average** | **Average/SF** |
|---|---|---|---|
| Comparables - Adjusted | $1,098 - $1,412 | $1,231 | – |
| Subject Contract Rents | $1,236 - $1,236 | $1,236 | $0.95 |
| Subject Asking Rent | $1,272 - $1,272 | $1,272 | $0.98 |
| **Concluded Market Rent** | **$1,250 ($0.97/SF)** | | |

## Market Rent Conclusion

Based on the preceding analysis of comparable rentals and trends evident in the market, market rent is estimated for each unit type as shown in the table that follows.

**Market Rent Conclusions**

| Unit Type | Total Units | Avg. Unit Size | Average Contract Rent | Average Asking Rent | Market Rent/ Month | Market Rent/SF |
|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 4 | 835 | $940 | $856 | $900 | $1.08 |
| 2 Bed/2 Bath | 56 | 1,065 | $1,050 | $1,033 | $1,100 | $1.03 |
| 3 Bed/2 Bath | 24 | 1,295 | $1,236 | $1,272 | $1,250 | $0.97 |
| Total/Avg. | 84 | 1,120 | $1,078 | $1,093 | $1,133 | $1.01 |

## Stabilized Income and Expenses

### Potential Gross Rent

The following table summarizes the potential gross rent of the subject based on contract rent from leased units plus market rent applied to vacant units. The total of these amounts is compared to the potential rent that would be generated if the entire property were leased at market rates.

**Potential Gross Rent**

| Unit Type | Total Units | Potential Rent at Contract (1) | Avg. Contract Rent/Unit | Market Rent/Unit | Potential Rent at Market | Contract As % of Market |
|---|---|---|---|---|---|---|
| **Leased Units** | | | | | | |
| 1 Bed/1 Bath | 1 | $11,280 | $940 | $900 | $10,800 | 104% |
| 2 Bed/2 Bath | 18 | $226,800 | $1,050 | $1,100 | $237,600 | 95% |
| 3 Bed/2 Bath | 4 | $59,328 | $1,236 | $1,250 | $60,000 | 99% |
| Total Leased | 23 | $297,408 | $1,078 | $1,117 | $308,400 | 96% |
| **Vacant Units** | | | | | | |
| 1 Bed/1 Bath | 3 | $32,400 | $900 | $900 | $32,400 | 100% |
| 2 Bed/2 Bath | 38 | $501,600 | $1,100 | $1,100 | $501,600 | 100% |
| 3 Bed/2 Bath | 20 | $300,000 | $1,250 | $1,250 | $300,000 | 100% |
| Total Vacant | 61 | $834,000 | $1,139 | $1,139 | $834,000 | 100% |
| Grand Total | 84 | $1,131,408 | $1,122 | $1,133 | $1,142,400 | 99% |

1 Contract rent for leased units; vacant and employee/model units, if any, at market.

In our stabilized income projection for the subject, rental income is based on market rent. Income is projected for the 12-month period following the effective date of the appraisal.

### Employee/Model Units

Market rent is assigned to employee and model units in our income projections. Rent loss attributable to these units is then deducted as an expense.

### Vacancy & Collection Loss

Stabilized vacancy and collection loss is estimated at 8.0%. This estimate considers the submarket vacancy rate and vacancy rates at competing properties.

### Concessions

Rent concessions are not customary at the subject or typical in the market; therefore, no deductions are made.

### Parking Income

Parking spaces are provided to tenants at no additional charge; therefore, no revenues are generated from parking.

**Expense Reimbursements**

As leases do not provide for any tenant reimbursements of expenses, no expense recovery income is estimated.

**Other Income**

The other income category includes any other income from the property including revenues from application fees, pet fees, late fees, broken lease fees, short-term lease premiums and miscellaneous sources. Total other income is projected at $300 per unit per annum or $25,200, net of vacancy and rent loss, based on the subject's historical receipts.

**Other Income Comparables**

| Property | Location | No. Units | Yr. | $/Unit |
|---|---|---|---|---|
| Carolina Flatz | Lansing | 117 | 2025 | $595 |
| Center Court | Lowell | 40 | 2026 T-12 | $591 |
| Green Acres Pines | Burton | 162 | 2024 | $353 |
| Southridge | Jackson | 116 | 2025 | $285 |
| Meadowood | Jackson | 142 | 2024 | $307 |
| Ashby Preserve | Harrison Township | 75 | 2024 | $346 |

**Expenses**

Operating expenses are estimated based on the developer's budget with support by comparable properties.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 89 of 174

## Operating History and Projections

| | Budget 2027 | IRR Projection |
|---|---|---|
| **Income** | | |
| Rental Income | $1,101,600 | $1,142,400 |
| Vacancy & Collection Loss @ 8.0% | -$77,112 | -91,392 |
| Other Income | 0 | 25,200 |
| Effective Gross Income | $1,024,488 | $1,076,208 |
| **Expenses** | | |
| Real Estate Taxes | $25,000 | $54,000 |
| Insurance | 30,000 | 67,200 |
| Utilities | 84,000 | 84,000 |
| Repairs/Maintenance | 56,400 | 46,200 |
| Painting & Decorating | 0 | 16,800 |
| Payroll/Benefits | 45,000 | 84,000 |
| Advertising & Marketing | 0 | 4,200 |
| General/Administrative | 15,600 | 21,000 |
| Management | 40,261 | 53,810 |
| Replacement Reserves | 25,200 | 25,200 |
| Total Expenses | $321,461 | $456,410 |
| **Net Operating Income** | **$703,027** | **$619,798** |
| Operating Expense Ratio | 28.9% | 40.1% |
| **Income per Unit** | | |
| Rental Income | $13,114 | $13,600 |
| Vacancy & Collection Loss @ 8.0% | -$918 | -$1,088 |
| Other Income | 0 | 300 |
| Effective Gross Income per Unit | $12,196 | $12,812 |
| **Expenses per Unit** | | |
| Real Estate Taxes | $298 | $643 |
| Insurance | 357 | 800 |
| Utilities | 1,000 | 1,000 |
| Repairs/Maintenance | 671 | 550 |
| Painting & Decorating | 0 | 200 |
| Payroll/Benefits | 536 | 1,000 |
| Advertising & Marketing | 0 | 50 |
| General/Administrative | 186 | 250 |
| Management | 479 | 641 |
| Replacement Reserves | 300 | 300 |
| Total Expenses per Unit | $3,827 | $5,433 |
| NOI per Unit | **$8,369** | **$7,379** |
| Number of Units | 84 | 84 |

*IRR projected income is the total potential income attributable to the property before deduction of vacancy and collection loss.

**Expense Analysis per Unit**

| | Comp Data* | | | | Subject | |
|---|---|---|---|---|---|---|
| | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Projected Expenses | |
| Year Built | 1971 | 1950 | 1972-73 | 1968 | 1971 | |
| Number of Units | 124 | 69 | 334 | 48 | 84 | |
| Operating Data Type | In Place | In Place | In Place | In Place | Budget | IRR |
| Year | 2024 | 2024 | 2024 | 2024 | 2027 | Projection |
| EGI/Unit | $10,040 | $10,772 | $8,033 | $10,004 | $12,196 | $12,812 |
| Real Estate Taxes | $1,441 | $1,143 | $603 | $1,038 | $298 | $643 |
| Insurance | $291 | $404 | $896 | $340 | $357 | $800 |
| Utilities | $1,715 | $1,196 | $1,257 | $955 | $1,000 | $1,000 |
| Repairs/Maintenance | $388 | $637 | $973 | $431 | $671 | $550 |
| Painting & Decorating | $90 | $85 | $227 | $154 | $0 | $200 |
| Payroll/Benefits | $1,641 | $1,775 | $916 | $1,819 | $536 | $1,000 |
| Advertising & Marketing | $42 | $9 | $25 | $163 | $0 | $50 |
| General/Administrative | $189 | $844 | $259 | $918 | $186 | $250 |
| Management | $507 | $539 | $437 | $500 | $479 | $641 |
| Replacement Reserves | $0 | $0 | $0 | $0 | $300 | $300 |
| Total | $6,304 | $6,631 | $5,594 | $6,317 | $3,827 | $5,433 |
| Operating Expense Ratio | 62.8% | 61.6% | 69.6% | 63.1% | 28.9% | 40.1% |

*Comp 1: Conventional, Flushing, MI
Comp 2: Conventional, Grand Blanc, MI
Comp 3: Conventional, Flint Township, MI
Comp 4: Conventional, Grand Blanc, MI

### Operating Expense Analysis by Category

Discussions of our operating expense projections are presented in the following paragraphs.

### Real Estate Taxes

This expense category includes all local, county, and state property tax levies, including special assessments. Our projection is based on the stabilized property assessment and tax rate for the subject, as discussed previously in the Real Estate Tax Analysis.

**Real Estate Taxes Expense**

| | Comp 1 | Comp 2 | Comp 3 | Comp 4 | | IRR |
|---|---|---|---|---|---|---|
| | 2024 | 2024 | 2024 | 2024 | Budget | Projection |
| % of EGI | 14.4% | 10.6% | 7.5% | 10.4% | 2.4% | 5.0% |
| $/Unit | $1,441 | $1,143 | $603 | $1,038 | $298 | $643 |

### Insurance

Insurance expense includes property and casualty insurance for the subject.

| Insurance Expense | Comp 1 2024 | Comp 2 2024 | Comp 3 2024 | Comp 4 2024 | Budget | IRR Projection |
|---|---|---|---|---|---|---|
| % of EGI | 2.9% | 3.7% | 11.2% | 3.4% | 2.9% | 6.2% |
| $/Unit | $291 | $404 | $896 | $340 | $357 | $800 |

### Utilities

Utilities expenses typically include heating fuel, electric, gas, water, sewer, and trash removal.

| Utilities Expense | Comp 1 2024 | Comp 2 2024 | Comp 3 2024 | Comp 4 2024 | Budget | IRR Projection |
|---|---|---|---|---|---|---|
| % of EGI | 17.1% | 11.1% | 15.7% | 9.5% | 8.2% | 7.8% |
| $/Unit | $1,715 | $1,196 | $1,257 | $955 | $1,000 | $1,000 |

### Repairs/Maintenance

Repairs and maintenance includes expenditures to repair and maintain building mechanical systems and structural components, and also the grounds. This category includes supplies and independent contractor charges but excludes payroll costs. Also excluded are painting and decorating costs. Major replacements and building alterations are not included because they are considered capital costs.

| Repairs/Maintenance Expense | Comp 1 2024 | Comp 2 2024 | Comp 3 2024 | Comp 4 2024 | Budget | IRR Projection |
|---|---|---|---|---|---|---|
| % of EGI | 3.9% | 5.9% | 12.1% | 4.3% | 5.5% | 4.3% |
| $/Unit | $388 | $637 | $973 | $431 | $671 | $550 |

### Painting/Decorating

This category includes painting, decorating and cleaning costs associated with the turnover of units. It includes supplies and independent contractor charges but excludes payroll costs.

| Painting & Decorating Expense | Comp 1 2024 | Comp 2 2024 | Comp 3 2024 | Comp 4 2024 | Budget | IRR Projection |
|---|---|---|---|---|---|---|
| % of EGI | 0.9% | 0.8% | 2.8% | 1.5% | – | 1.6% |
| $/Unit | $90 | $85 | $227 | $154 | – | $200 |

**Payroll/Benefits**

Payroll and benefits expenses pertain to onsite personnel including maintenance workers, porters, and resident superintendent, if any.

**Payroll/Benefits Expense**

| | Comp 1 2024 | Comp 2 2024 | Comp 3 2024 | Comp 4 2024 | Budget | IRR Projection |
|---|---|---|---|---|---|---|
| % of EGI | 16.3% | 16.5% | 11.4% | 18.2% | 4.4% | 7.8% |
| $/Unit | $1,641 | $1,775 | $916 | $1,819 | $536 | $1,000 |

**Advertising/Marketing**

This category includes costs of all advertising and promotional activities as well as leasing fees and referral fees.

**Advertising & Marketing Expense**

| | Comp 1 2024 | Comp 2 2024 | Comp 3 2024 | Comp 4 2024 | Budget | IRR Projection |
|---|---|---|---|---|---|---|
| % of EGI | 0.4% | 0.1% | 0.3% | 1.6% | – | 0.4% |
| $/Unit | $42 | $9 | $25 | $163 | – | $50 |

**General/Administrative**

General and administrative expenses consist of general office expenses for onsite personnel, legal and accounting fees, and license fees.

**General/Administrative Expense**

| | Comp 1 2024 | Comp 2 2024 | Comp 3 2024 | Comp 4 2024 | Budget | IRR Projection |
|---|---|---|---|---|---|---|
| % of EGI | 1.9% | 7.8% | 3.2% | 9.2% | 1.5% | 2.0% |
| $/Unit | $189 | $844 | $259 | $918 | $186 | $250 |

**Management**

Management charges are typically a percentage of collected revenues and cover the supervision of rent collections, leasing, property maintenance, and bookkeeping, but exclude payroll and benefits costs of onsite personnel. We project an overall management fee of 5.0% of effective gross income.

**Management Expense**

| | Comp 1 2024 | Comp 2 2024 | Comp 3 2024 | Comp 4 2024 | Budget | IRR Projection |
|---|---|---|---|---|---|---|
| % of EGI | 5.1% | 5.0% | 5.4% | 5.0% | 3.9% | 5.0% |
| $/Unit | $507 | $539 | $437 | $500 | $479 | $641 |


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 93 of 174

### Replacement Reserves

Buyers in the multifamily market tend to include replacement reserves in an income and expense pro forma to reflect costs of replacing short-lived items such as appliances, carpet and vinyl floor coverings, window coverings and mechanical systems, such as hot water heaters and HVAC units. Reserves also consider short-lived building components such as the roof and parking lot paving. An estimate of $300 per unit is considered reasonable.

## Capitalization Rate Selection

A capitalization rate is used to convert net income into an indication of value. Selection of an appropriate capitalization rate considers the future income pattern of the property and investment risk associated with ownership. We consider the following data in selecting a capitalization rate for the subject.

**Capitalization Rate Comparables**

| No. | Property Name | City | Year Built | Sale Date | No. Units | Effective Price/Unit | Cap Rate |
|---|---|---|---|---|---|---|---|
| 1 | Lux of Saginaw Apartments | Saginaw | 1968 | 9/28/2023 | 84 | $79,607 | 9.71% |
| 2 | Colonial Apartments | Flushing | 1970 | 6/18/2026 | 32 | $68,750 | 6.75% |
| 3 | Residences at Grand Blanc | Grand Blanc Township | 1971-77 | 8/12/2026 | 455 | $63,736 | 7.50% |
| 4 | Pinehurst Apartments | Argentine Township | 1977-92 | 12/10/2025 | 33 | $83,939 | 8.18% |
| 5 | Mill Creek Apartments | Clio | 1973 | 10/28/2024 | 174 | $53,000 | 5.55% |
| 6 | Pine Creek Apartments | Vienna Township | 1974/78 | 10/28/2024 | 232 | $53,228 | 5.43% |
| | Indicated Cap Rate Range: | | | | | | 5.43% - 9.71% |
| | Average (Mean) Cap Rate: | | | | | | 7.19% |

Sales 5 and 6 were value-add purchases with the overall rate based on in-place income. The remaining sales indicate a range of 7.50% to 9.71%.

Discussions were held with various market participants that are actively involved in the regional multifamily segment of the real estate market. These market participants were surveyed as to what a stabilized overall capitalization rate would be in the Flint market for a property that was stabilized and recently renovated. The results are as follows.

**Market Participant Survey - Capitalization Rates**

| Respondent | Cap Rate | Comments |
|---|---|---|
| Greg Coulter - IPO | 9.00% | Mr. Coulter indicated a minimum of 9% would be expected by investors |
| Cary Belovicz - GREA | 8.50% - 9.50% | |
| Charley Henneghan - Signature | 7.75% - 8.75% | |
| Indicated Cap Rate Range | 7.75% - 9.50% | |

## Apartments: Hi-Rise/Urban Townhouse

| Item | Input | | | | | OAR |
|---|---|---|---|---|---|---|
| **Minimum** | | | | | | |
| Spread Over 10-Year Treasury | 0.74% | DCR Technique | 1.25 | 0.063469 | 0.75 | 5.95 |
| Debt Coverage Ratio | 1.25 | Band of Investment Technique | | | | |
| Interest Rate | 4.87% | Mortgage | 75% | 0.063469 | 0.047601 | |
| Amortization | 30 | Equity | 25% | 0.045973 | 0.011493 | |
| Mortgage Constant | 0.063469 | OAR | | | | 5.91 |
| Loan-to-Value Ratio | 75% | Surveyed Rates | | | | 5.55 |
| Equity Dividend Rate | 4.60% | | | | | |
| **Maximum** | | | | | | |
| Spread Over 10-Year Treasury | 4.80% | DCR Technique | 1.85 | 0.121213 | 0.55 | 12.33 |
| Debt Coverage Ratio | 1.85 | Band of Investment Technique | | | | |
| Interest Rate | 8.93% | Mortgage | 55% | 0.121213 | 0.066667 | |
| Amortization | 15 | Equity | 45% | 0.135079 | 0.060786 | |
| Mortgage Constant | 0.121213 | OAR | | | | 12.75 |
| Loan-to-Value Ratio | 55% | Surveyed Rates | | | | 11.98 |
| Equity Dividend Rate | 13.51% | | | | | |
| **Average** | | | | | | |
| Spread Over 10-Year Treasury | 2.77% | DCR Technique | 1.55 | 0.087637 | 0.70 | 9.51 |
| Debt Coverage Ratio | 1.55 | Band of Investment Technique | | | | |
| Interest Rate | 6.90% | Mortgage | 70% | 0.087637 | 0.061346 | |
| Amortization | 23 | Equity | 30% | 0.086070 | 0.025821 | |
| Mortgage Constant | 0.087637 | OAR | | | | 8.72 |
| Loan-to-Value Ratio | 70% | Surveyed Rates | | | | 8.35 |
| Equity Dividend Rate | 8.61% | | | | | |

*1st Quarter 2026 Data

Realty Rates Investor Survey 2026 Q2

## Band of Investment Method

| | | | | |
|---|---|---|---|---|
| **Mortgage/Equity Assumptions** | | | | |
| Loan To Value Ratio | 70% | | | |
| Interest Rate | 7.00% | | | |
| Amortization (Years) | 30 | | | |
| Mortgage Constant | 0.0798 | | | |
| Equity Ratio | 30% | | | |
| Equity Dividend Rate | 10.00% | | | |
| **Weighted Average of Mortgage and Equity Requirements** | | | | |
| Mortgage Requirement | 70% | x | 7.98% = | 5.59% |
| Equity Requirement | 30% | x | 10.00% = | 3.00% |
| **Indicated Capitalization Rate** | | | | **8.59%** |
| **Rounded** | | | | **8.60%** |



26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 95 of 174

To reach a capitalization rate conclusion, we consider each of the following investment risk factors to gauge its impact on the rate. The direction of each arrow in the following table indicates our judgment of an upward, downward, or neutral influence of each factor.

**Capitalization Rate Risk Factors**

| Factor | Issues | Impact on Rate | Comments |
|---|---|---|---|
| Income Characteristics | Stability of occupancy, above/below market rents, rent control | ↔ | Rents are projected at market |
| Competitive Market Position | Construction quality, market appeal, age/condition, functional utility | ↓ | Majority of units full renovated with average finishes; good mix of one- to three-bed units |
| Location | Market area demographics and life cycle trends; proximity issues; access and support services | ↑ | Declining population and households; below average income levels |
| Market | Vacancy rates and trends; rental rate trends; supply and demand | ↔ | Stable rents; vacancy rates higher than the metro market |
| Overall Impact | | ↔ | |

Accordingly, we conclude a capitalization rate as follows:

**Capitalization Rate Conclusion**

| Method | Capitalization Rate Indication |
|---|---|
| Analysis of Comparable Sales | 5.43% - 9.71% |
| RealtyRates Investor Survey | 5.55% - 11.98%; average 8.35% |
| Market Participant Interviews | 7.75% - 9.50% |
| Band of Investment | 8.60% |
| Primary Weight | Comparable Sales and Market Interviews |
| Secondary Weight | BOI and National Surveys |
| Conclusion | 9.00% |

## Direct Capitalization Analysis

Net operating income is divided by the capitalization rate to indicate the stabilized value of the subject. Because the property is not currently at stabilized occupancy, we apply appropriate adjustments to arrive at market value as is which are summarized as follows:

- **Lease-up costs** – the subject will incur rent loss during lease-up which is projected at six months. The determination of the lease-up costs follows this section.

- **Balance of Renovation Costs** – the total renovation costs remaining, including a contingency, is projected at $1,820,000.

- **Unstabilized Discount** – the subject is 27% occupied and requires substantial renovation prior to stabilization. There is considerable effort and risk required to complete the renovation and stabilize the property. Thus, we have applied an unstabilized discount to the indicated stabilized value. This is in recognition of the fact that buyers and lenders view the purchase and/or financing of unstabilized assets as riskier than the purchase and/or financing of stabilized assets. Thus, equity and mortgage rates are higher. Considering the subject's occupancy level and the extensive renovation required, an unstabilized discount of 20% is applied.

## Direct Capitalization Analysis

| | | Annual | $/Unit |
|---|---|---|---|
| INCOME | | | |
| Rental Income | | $1,142,400 | $13,600 |
| Potential Gross Income | | $1,142,400 | $13,600 |
| Vacancy & Collection Loss | 8.00% | -$91,392 | -$1,088 |
| Other Income | | $25,200 | $300 |
| Effective Gross Income | | $1,076,208 | $12,812 |
| EXPENSES | | | |
| Real Estate Taxes | | $54,000 | $643 |
| Insurance | | $67,200 | $800 |
| Utilities | | $84,000 | $1,000 |
| Repairs/Maintenance | | $46,200 | $550 |
| Painting & Decorating | | $16,800 | $200 |
| Payroll/Benefits | | $84,000 | $1,000 |
| Advertising & Marketing | | $4,200 | $50 |
| General/Administrative | | $21,000 | $250 |
| Management | 5.00% | $53,810 | $641 |
| Replacement Reserves | | $25,200 | $300 |
| Total Expenses | | $456,410 | $5,433 |
| NET OPERATING INCOME | | $619,798 | $7,379 |
| Capitalization Rate | | 9.00% | |
| Indicated Value | | $6,886,640 | $81,984 |
| Lease-Up Costs | | -$200,000 | -$2,381 |
| Balance of Renovation Costs | | -$1,820,000 | -$21,667 |
| Unstabilized Discount @ 10% | | -$688,664 | -$8,198 |
| **Stabilized Value Indication** | | $4,177,976 | $49,738 |
| **Rounded** | | **$4,180,000** | **$49,762** |

**Lease-Up Costs**

The following table summarizes our estimate of lease-up costs for the subject's vacant units and utilizing a six month lease up period with a 10% profit applied.

**Lease-Up Costs**

| Unit Type | Vacant Units | Market Rent | Potential Foregone Rent/Mo. | Total Months to Absorb | Avg. Vacancy During Lease-up[1] | Foregone Rent |
|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 3 | $900 | $2,700 | | | |
| 2 Bed/2 Bath | 38 | $1,100 | $41,800 | | | |
| 3 Bed/2 Bath | 20 | $1,250 | $25,000 | | | |
| Total/Average | 61 | $1,139.34 | $69,500 | | | |
| Less Vacant Units at Stabilization | 7 | | | | | |
| Units to be Absorbed | 54 | $1,139.34 | $61,525 | 6 | 50% | $184,574 |
| Profit for Lease-up Risk | 10% | | | | | $18,457 |
| Total Including Profit | | | | | | $203,031 |
| Rounded | | | | | | $200,000 |

1. Pertains to units to be absorbed only. An average vacancy of 50% assumes that units are leased evenly over the absorption period.

## Reconciliation and Conclusion of Value

The values indicated by the preceding analyses are as follows:

| Summary of Value Indications | |
|---|---|
| Cost Approach | Not Used |
| Sales Comparison Approach | $3,900,000 |
| Income Capitalization Approach | $4,180,000 |
| Reconciled | $4,150,000 |

The income capitalization approach is given the greatest weight because it is the most reliable valuation method for the subject. The sales comparison approach is given less weight because it does not directly consider the income characteristics of the property. The cost approach is not applicable to the subject and is not used.

**Liquidation Value** - the client has requested a liquidation value assuming a 60 day marketing period. The expedited selling period typically has a downward impact on the market value as buyers are expected to have a tigher due diligence period. We interviewed several brokers, including the same brokers surveyed for the overall capitalization rates who indicated that a discount of 10% to 20% would be required to expedite a sale in 60 day as the likely buyer would have to pay cash or utilized short term private financing. Thus, a 15% discount is applied to the as is market value resulting in a liquation value of $2,900,000 rounded.

**Net Realizable Value (NRV)** – the NRV is the liquidation value but adjusts for the likely selling costs to dispose of the property. In this analysis, as the seller will receive any rental income during the marketing period, any operating expenses will be paid. Thus, only a sales commission/closing costs and legal costs are deducted. The sales commission is projected at 4% with a legal cost of $25,000 applied. The NRV is determined as follows:

| Net Realizable Value | |
|---|---|
| Liquidation Value | $2,900,000 |
| Deduct: | |
| Legal Costs | -$25,000 |
| Sales Commissions/Closing Costs @ 5% | -$145,000 |
| Total Deductions | -$170,000 |
| Net Realizable Value | $2,730,000 |

The following table summarizes the concluded values.

**Value Conclusions**

| Value Type & Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As Is | Fee Simple | September 11, 2026 | $3,400,000 |
| Liquidation Value | Fee Simple | September 11, 2026 | $2,900,000 |
| Net Realizable Value | Fee Simple | September 11, 2026 | $2,730,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. The as is market value assumes that the total renovation costs do not exceed $1,900,000 and can be completed within six months.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

## Exposure Time

Exposure time is the length of time the subject property would have been exposed for sale in the market had it sold on the effective valuation date at the concluded market value. Based on the concluded market value stated previously, the probable exposure time is 6 - 12 months.

## Marketing Period

Marketing time is an estimate of the amount of time it might take to sell a property at the concluded market value immediately following the effective date of value. The subject's marketing period is estimated at 6 - 12 months.

# Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
4. We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.
5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.
9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
11. Donald L. Selvidge, MAI has made a personal inspection of the property that is the subject of this report. Anthony Sanna, MAI, CRE has not personally inspected the subject.
12. Significant real property appraisal assistance was provided by William J. Kurzawa who has not signed this certification.
13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 101 of 174

14. As of the date of this report, Donald L. Selvidge, MAI and Anthony Sanna, MAI, CRE have completed the continuing education program for Designated Members of the Appraisal Institute.

15. In Michigan, appraisers are required to be licensed/certified and are regulated by the Michigan Department of Licensing and Regulatory Affairs, 611 West Ottawa, P. O. Box 30018, Lansing, Michigan, 48909.

Donald L. Selvidge, MAI
Michigan Certified General Real Estate Appraiser
#1205006537

Anthony Sanna, MAI, CRE
Michigan Certified General Real Estate Appraiser
#1205001324

# Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, except as otherwise noted in the report:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.
2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.
3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.
4. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.
5. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.
2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.
3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.
4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.
5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.
6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 103 of 174

7. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.
8. We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.
9. The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.
10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.
11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.
12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.
13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.
14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.
15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.
16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.
17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during

the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of you, your subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. IRR - Detroit, Integra Realty Resources, Inc., and their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. However, we are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. We are not a building or environmental inspector. The Integra Parties do not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. IRR - Detroit is an independently owned and operated company. The parties hereto agree that Integra shall not be liable for any claim arising out of or relating to any appraisal report or any information or opinions contained therein as such appraisal report is the sole and exclusive responsibility of IRR - Detroit. In addition, it is expressly agreed that in any action which may be brought against the Integra Parties arising out of, relating to, or in any way pertaining to the engagement letter, the appraisal reports or any related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless


26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 105 of 174

the appraisal was fraudulent or prepared with intentional misconduct. It is further expressly agreed that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the assignment (unless the appraisal was fraudulent or prepared with intentional misconduct). It is expressly agreed that the fees charged herein are in reliance upon the foregoing limitations of liability.

25. IRR - Detroit is an independently owned and operated company, which has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

28. The appraisal is also subject to the following:

### Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. The as is market value assumes that the total renovation costs do not exceed $1,900,000 and can be completed within six months.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

# Addendum A

# Appraiser Qualifications

# Donald L. Selvidge, MAI

## Experience

Mr. Selvidge, Senior Managing Director, has been active in appraisal and advisory services since 1995. Mr. Selvidge has a wide and varied knowledge base having worked on complicated properties throughout his career specializing in large mixed-use developments, all types of multifamily housing, land development assignments, and seniors housing. Mr. Selvidge has experience with nearly all types of commercial property including hospitality, single-and multi-tenant retail and office, self-storage, and industrial uses. Mr. Selvidge has extensive knowledge and experience working with nearly all types of lending institutions including conventional lenders, conduits, Freddie Mac, Fannie Mae, and HUD, including 223(f), 202, and 221(d)4 assignments. Mr. Selvidge also completes market studies for various government agencies, developers, and rent comparability studies for HAP renewals. Finally, Mr. Selvidge is a member of the IRR Senior Housing Specialty Practice Group and has extensive experience in preparing appraisals and market studies for independent living, assisted living, memory care, and skilled nursing facilities.



**Integra Realty Resources - Detroit**

400 West Maple Road
Suite 100
Birmingham, MI 48009

T 248.540.0040 Ext. 114
F 248.540.8239

irr.com

## Professional Activities & Affiliations

MAI Designation, Appraisal Institute

## Licenses

Michigan, Certified General Real Estate Appraiser, 1205006537, Expires July 2028

## Education

Bachelor of Science Business Administration, Finance Major Wayne State University, Detroit, Michigan.

Successfully completed numerous real estate related courses and seminars sponsored by the Appraisal Institute, including:

110 Real Estate Appraisal Principles
120 Real Estate Appraisal Procedures
SPPA/SPPB Standards of Professional Practice Part A/B
310 Basic Income Capitalization
320 General Applications
510 Advanced Income Capitalization
520 Highest & Best Use & Market Analysis
530 Advanced Sales Comparison & Cost Approach
540 Report Writing and Valuation Analysis
550 Advanced Applications
Section 8/HUD Rent Comparability Studies and Standards

**dselvidge@irr.com - 248.979.9670**

GRETCHEN WHITMER
GOVERNOR

STATE OF MICHIGAN
DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
BUREAU OF PROFESSIONAL LICENSING
CERTIFIED GENERAL REAL ESTATE APPRAISER LICENSE

DONALD LESLIE SELVIDGE, JR

| LICENSE NO. | ORIGINAL ISSUE DATE | EXPIRATION DATE | |
|---|---|---|---|
| 1205006537 | 04/03/2001 | 07/31/2028 | 26183160744 |

THIS DOCUMENT IS DULY ISSUED UNDER THE LAWS OF THE STATE OF MICHIGAN

# Anthony Sanna, MAI, CRE

## Experience

Mr. Sanna, Executive Director, has actively counseled and advised clients on issues relating to the sale, leasing, valuation, management, and development of commercial real estate assets since 1989. Mr. Sanna served as the Managing Director of IRR Detroit from 2003-2018.

He has a diversified background in real estate with primary emphasis in the areas of valuation for investment property, institutional assets, portfolio asset management and complex real estate issues.  Conversely, Mr. Sanna continually manages a re-occurring volume of traditional mortgage loan appraisal work on all varieties of properties, large and small, focusing on core real estate assets including hotel, office, industrial, retail, and multifamily properties.

Mr. Sanna has extensive consulting and valuation experience relating to corporate and private clients on an array of issues pertaining to estate and property trust matters, partnership disputes, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Sanna's experience in these matters provides clients with a well-rounded framework for valuation and consulting solutions.

## Professional Activities & Affiliations

MAI Designation, Appraisal Institute
CRE Designation, Counselors of Real Estate
Board of Director: Integra Realty Resources - 2005-2008; 2012-2017 and 2019-Current
Board of Director: Commercial Board of Real Estate - Michigan Chapter

## Licenses

Michigan, Certified General Real Estate Appraiser, 1205001324, Expires July 2027

## Education

Bachelor of Science (Business Administration) Wayne State University, Detroit, MI

Appraisal Institute Courses:
- Principals of Real Estate Appraisal
- Procedures of Real Estate Appraisal
- Uniform Standards of Professional Practice
- Basic Income Capitalization
- Advanced Income Capitalization
- Report Writing
- Advanced Applications/Case Studies

## Qualified Before Courts & Administrative Bodies

Qualified expert witness before the Michigan Tax Tribunal, various Circuit Courts, planning boards, commissioner hearings and County Tax Boards.

**asanna@irr.com  -  248.979.9663**



**Integra Realty Resources - Detroit**

400 West Maple Road
Suite 100
Birmingham, MI 48009

T 248.540.0040 Ext. 107
F 248.540.8239

irr.com

GRETCHEN WHITMER
GOVERNOR

STATE OF MICHIGAN
DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
BUREAU OF PROFESSIONAL LICENSING
CERTIFIED GENERAL REAL ESTATE APPRAISER LICENSE

ANTHONY SANNA

LICENSE NO.
1205001324

EXPIRATION DATE
07/31/2027

25169150621

THIS DOCUMENT IS DULY ISSUED UNDER THE LAWS OF THE STATE OF MICHIGAN

# About IRR

Integra Realty Resources, Inc. (IRR) provides world-class commercial real estate valuation, counseling, and advisory services. Routinely ranked among leading property valuation and consulting firms, we are now the largest independent firm in our industry in the United States, with local offices coast to coast and in the Caribbean.

IRR offices are led by MAI-designated Senior Managing Directors, industry leaders who have over 25 years, on average, of commercial real estate experience in their local markets. This experience, coupled with our understanding of how national trends affect the local markets, empowers our clients with the unique knowledge, access, and historical perspective they need to make the most informed decisions.

Many of the nation's top financial institutions, developers, corporations, law firms, and government agencies rely on our professional real estate opinions to best understand the value, use, and feasibility of real estate in their market.

*Local Expertise...Nationally!*

**irr.com**

# Addendum B

# IRR Quality Assurance Survey

# IRR Quality Assurance Survey

## We welcome your feedback!

At IRR, providing a quality work product and delivering on time is what we strive to accomplish. Our local offices are determined to meet your expectations. Please reach out to your local office contact so they can resolve any issues.

## Integra Quality Control Team

Integra does have a Quality Control Team that responds to escalated concerns related to a specific assignment as well as general concerns that are unrelated to any specific assignment. We also enjoy hearing from you when we exceed expectations! You can communicate with this team by clicking on the link below. If you would like a follow up call, please provide your contact information and a member of this Quality Control Team will call contact you.

Link to the IRR Quality Assurance Survey: quality.irr.com

# Addendum C

# Financials and Property Information

**Hard & Soft Costs to Complete**

| | |
|---|---|
| **Permits/Site Improvements** | |
| Building Permit | $5,000 |
| Electric Permit | 4,000 |
| Plumbing Permit | 7,000 |
| Temporary Utilities | 12,700 |
| Mechanical Permit | 10,000 |
| ***Total Permits/Site Improvements*** | ***$38,700*** |
| | |
| **Site Improvements** | |
| Asphalt | $40,000 |
| Landscaping | 20,000 |
| ***Total Site Improvements*** | ***$60,000*** |
| | |
| **Exterior** | |
| Windows: Repair/Replace | $3,000 |
| ***Total Exterior*** | ***$3,000*** |
| | |
| **Interior** | |
| Carbon Monoxide Detection | $2,300 |
| Carpet | 55,000 |
| Doors: Interior Hardware | 14,800 |
| Doors: Interior | 48,978 |
| Drywall | 115,000 |
| Electrical: Finish | 25,500 |
| Electrical Outlets | 5,000 |
| Electrical Switches | 2,000 |
| Hot Water Heater | 35,000 |
| HVAC: 220-volt Condenser & Gas Furnace | 20,300 |
| HVAL Install: Finish | 25,500 |
| HVAC Install: Rough | 35,200 |
| Insulation | 25,000 |
| Light Fixtures | 6,500 |
| LVP Flooring | 4,735 |
| Paint Walls/Trim | 40,000 |
| Plumbing: Finish | 25,500 |
| Plumbing: Rough | 3,000 |
| Sewer Jetting | 25,000 |
| Smoke Detectors | 3,100 |

| | |
|---|---|
| ***Total interior*** | ***$517,413*** |
| **Kitchen** | |
| Cabinets | $52,685 |
| Counters | 19,314 |
| Dishwasher | 17,220 |
| Floors | 8,235 |
| Garbage Disposal | 4,000 |
| Microwave / Hood Vent | 5,100 |
| Refrigerator | 35,700 |
| Sink / Faucet | 10,200 |
| Stove | 28,000 |
| ***Total interior*** | ***$180,454*** |
| **Bath 1** | |
| Bathtub/Shower | $4,000 |
| Floors | 1,207 |
| Hardware | 5,100 |
| Toilet | 3,300 |
| Vanity & Top | 5,257 |
| ***Total Bath 1*** | ***$18,864*** |
| **Bath 2** | |
| Bathtub/Shower | $4,000 |
| Floors | 5,000 |
| Hardware | 5,000 |
| Toilet | 3,300 |
| Vanity & Top | 10,200 |
| ***Total Bath 2*** | ***$27,500*** |
| **Miscellaneous** | |
| Mirrors | $4,080 |
| Miscellaneous | 15,000 |
| ***Total Bath 2*** | ***$19,080*** |
| **Total Hard & Soft Costs to Complete** | **$865,011** |
| **Professional Fees** | |
| Legal, Debtor | $50,000 |
| Legal, DIP Lender | 50,000 |

| | |
|---|---|
| U.S. Trustee | 25,000 |
| Appraiser | 10,000 |
| Broker Fee | 16,550 |
| **Total Professional Fees** | **$151,550** |
| | |
| **Other** | |
| Critical Vendor Payments | $150,000 |
| Real Estate Taxes | 10,000 |
| Insurance | 15,000 |
| Application Fee | 10,000 |
| Deferred Fee | 40,000 |
| Closing Costs | 23,814 |
| Contingency | 100,000 |
| ***Total Professional Fees*** | ***$348,814*** |
| | |
| **DIP Loan Costs** | |
| Commitment Fee | $66,200 |
| Loan Servicing Fee | 16,550 |
| Interest Reserve (est. 1-year) | 206,875 |
| ***Total Professional Fees*** | ***$288,625*** |
| | |
| **Maximum Loan Amount** | **$1,655,000** |

# Clio Gardens Apartments – Pro Forma

## Income:

| | | |
|---|---|---|
| 4 @ 1BD/1BA @ $ 856 | $ 3,424 | |
| 56 @ 2BD/2BA @ $ 1,033 | $ 57,848 | |
| 24 @ 3BD/2BA @ $ 1,272 | $ 30,528 | |
| Total Scheduled Income | $ 91,800 x 12 | $ 1,101,600 |
| Less: Vacancy (5.0 %): | | ($ 55,080) |
| Concessions/Bad Debt (2%): | | ($ 22,032) |
| Adjusted Annual Rental Income: | | $ 1,024,488 |

## Expenses:

| | |
|---|---|
| Payroll: | $ 45,000 |
| Activities/Supplies: $ 1,000/mo. x 12 | $ 12,000 |
| Repairs/Maintenance Supplies: $ 4,000/mo. x 12 | $ 48,000 |
| Real Estate Taxes: | $ 25,000 |
| Utilities (water/sewer/exterior lighting): | $ 66,000 |
| Property Insurance: | $ 30,000 |
| Telephone: $ 300/mo. x 12 | $ 3,600 |
| Landscape Maintenace: $ 700/mo. x12 | $ 8,400 |
| Property Management (5 % Adj. Income): | $ 40,261 |
| Trash Disposal: | $ 18,000 |
| Replacement Reserve ($ 300 per unit): | $ 25,200 |
| Total Expenses: | $ 321,461 |

**Net Operating Income (NOI): $ 703,027**

**Rent Roll** 5/30/2026 **Clio Gardens Apartments**

| BLDG # | Unit | TENANT | RENT | START | DEPOSIT | Type | Floor |
|---|---|---|---|---|---|---|---|
| 6918 | 101 | Needs renovation (60 days) | | | | 3 Bed - D | 1st |
| 6918 | 102 | Needs renovation (60 days) | | | | 2 Bed - D | 1st |
| 6918 | 103 | Needs renovation (60 days) | | | | 2 Bed - D | 1st |
| 6918 | 104 | Needs renovation (60 days) | | | | 2 Bed - E | 1st |
| 6918 | 105 | Needs renovation (60 days) | | | | 2 Bed - E | 1st |
| 6918 | 106 | Needs renovation (60 days) | | | | 2 Bed - D | 1st |
| 6918 | 107 | Needs renovation (60 days) | | | | 2 Bed - D | 1st |
| 6918 | 108 | Needs renovation (60 days) | | | | 3 Bed - D | 1st |
| 6918 | 110 | Needs renovation (60 days) | | | | 3 Bed - D | 1st |
| 6918 | 109 | Needs renovation (60 days) | | | | 2 Bed - C | 1st |
| 6918 | 111 | Needs renovation (60 days) | | | | 2 Bed - D | 1st |
| 6918 | 112 | Needs renovation (60 days) | | | | 2 Bed - D | 1st |
| 6918 | 113 | Needs renovation (60 days) | | | | 2 Bed - D | 1st |
| 6918 | 114 | Needs renovation (60 days) | | | | 2 Bed - D | 1st |
| 6918 | 115 | Needs renovation (60 days) | | | | 3 Bed - D | 1st |
| 6918 | 116 | Needs renovation (60 days) | | | | 3 Bed - C | 1st |
| 6918 | 201 | Needs renovation (30 days) | | | | 3 Bed - D | 2nd |
| 6918 | 202 | Needs renovation (30 days) | | | | 2 Bed - D | 2nd |
| 6918 | 203 | Kennazha McClain & Lotaria Brown | $1,000.00 | 3/15/2026 | $1,000.00 | 2 Bed - D | 2nd |
| 6918 | 204 | Lease pending | | | | 2 Bed - E | 2nd |
| 6918 | 205 | Brian P O'Dherty | $940.00 | 3/1/2025 | $940.00 | 2 Bed - E | 2nd |
| 6918 | 206 | Lorann D Tucker | $967.00 | 3/1/2025 | $967.00 | 2 Bed - D | 2nd |
| 6918 | 207 | Devon Brown | $975.00 | 2/5/2026 | $975.00 | 2 Bed - D | 2nd |
| 6918 | 208 | Needs renovation (30 days) | | | | 3 Bed - D | 2nd |
| 6918 | 209 | Lease pending | | | | 2 Bed - C | 2nd |
| 6918 | 210 | Ashanti Reeves | $1,200.00 | 3/4/2026 | $1,200.00 | 3 Bed - D | 2nd |
| 6918 | 211 | Shelena Roland | $1,020.00 | 5/1/2025 | $1,020.00 | 2 Bed - D | 2nd |
| 6918 | 212 | Sarah Mushatt | $981.00 | 4/1/2025 | $981.00 | 2 Bed - D | 2nd |
| 6918 | 213 | Needs renovation (30 days) | | | | 2 Bed - D | 2nd |
| 6918 | 214 | Greg Miller | $1,166.00 | 12/1/2024 | $1,166.00 | 2 Bed - D | 2nd |
| 6918 | 215 | Needs renovation (30 days) | | | | 3 Bed - D | 2nd |
| 6918 | 216 | Needs renovation (30 days) | | | | 3 Bed - C | 2nd |
| 6914 | 117 | Barbara Everette | $1,020.00 | 8/1/2025 | $1,020.00 | 2 Bed - D | 1st |
| 6914 | 118 | Richard Strick | $1,166.00 | 9/16/2024 | $1,166.00 | 2 Bed - D | 1st |
| 6914 | 119 | George F Jensen | $1,166.00 | 9/1/2024 | $1,166.00 | 2 Bed - D | 1st |
| 6914 | 121A | Gregory Williams | $600.00 | 09/01/24 | $700.00 | 3 Bed - B | 1st |
| 6914 | 121B | Karaya Williams (Daughter / Caretaker-amputee) | $650.00 | 11/01/24 | $650.00 | | |
| 6914 | 120 | Marcus Stanley | $1,073.00 | 6/1/2026 | $1,073.00 | 3 Bed -AB | 1st |
| 6914 | | | | | | | |
| 6914 | 122 | Needs renovation (30 days) | | | | 1 Bed - B | 1st |
| 6914 | 123 | Deborah Washington | $1,000.00 | 6/15/2024 | $1,166.00 | 2 Bed - C | 1st |
| 6914 | 124 | Donna Terry | $940.00 | 6/10/2024 | $940.00 | Bed - AD | 1st |
| 6914 | 125 | Larry & Stacy Cristle | $1,166.00 | 8/1/2024 | $1,166.00 | 2 Bed - B | 1st |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6914 | 126 | Kelvin James | $940.00 | 9/1/2024 | $940.00 | 2 Bed - D | 1st |
| 6914 | 217 | Trashonda Alexander | $1,020.00 | 4/10/2025 | $1,020.00 | 2 Bed - D | 2nd |
| 6914 | 218 | Howard Wright | $1,166.00 | 4/1/2025 | $1,166.00 | 2 Bed - D | 2nd |
| 6914 | 219 | Robert Stemp | $1,166.00 | 11/1/2024 | $1,166.00 | 2 Bed - D | 2nd |
| 6914 | 220 | Needs renovation (30 days) | | | | 3 Bed – B | 2nd |
| 6914 | 221 | Needs renovation (30 days) | $1,320.00 | 9/1/2024 | $1,320.00 | 3 Bed - B | 2nd |
| 6914 | 222 | Edward Jackson | $940.00 | 9/15/2024 | $940.00 | 1 Bed - B | 2nd |
| 6914 | 223 | Needs renovation (30 days) | | | | 2 Bed - C | 2nd |
| 6914 | 224 | Needs renovation (30 days) | | | | 1 Bed - A | 2nd |
| 6914 | 225 | Crystal Stubbs | $938.00 | 8/25/2025 | $938.00 | 2 Bed - A | 2nd |
| 6914 | 226 | Rashuun A Douglas | $1,166.00 | 11/1/2024 | $1,166.00 | 2 Bed - D | 2nd |
| 6910 | 127 | Needs renovation (90 days) | | | | 3 Bed - D | 1st |
| 6910 | 128 | Needs renovation (90 days) | | | | 2 Bed - D | 1st |
| 6910 | 129 | Needs renovation (90 days) | | | | 2 Bed - D | 1st |
| 6910 | 130 | Needs renovation (90 days) | | | | 2 Bed - E | 1st |
| 6910 | 131 | Needs renovation (90 days) | | | | 2 Bed - E | 1st |
| 6910 | 132 | Needs renovation (90 days) | | | | 2 Bed - D | 1st |
| 6910 | 133 | Needs renovation (90 days) | | | | 2 Bed - D | 1st |
| 6910 | 134 | Needs renovation (90 days) | | | | 3 Bed - D | 1st |
| 6910 | 135 | Needs renovation (90 days) | | | | 2 Bed - C | 1st |
| 6910 | 136 | Needs renovation (90 days) | | | | 3 Bed - D | 1st |
| 6910 | 137 | Needs renovation (90 days) | | | | 2 Bed - D | 1st |
| 6910 | 138 | Needs renovation (90 days) | | | | 2 Bed - D | 1st |
| 6910 | 139 | Needs renovation (90 days) | | | | 2 Bed - D | 1st |
| 6910 | 140 | Needs renovation (90 days) | | | | 2 Bed - D | 1st |
| 6910 | 141 | Needs renovation (90 days) | | | | 3 Bed - D | 1st |
| 6910 | 142 | Needs renovation (90 days) | | | | 3 Bed - C | 1st |
| 6910 | 227 | Needs renovation (75 days) | | | | 3 Bed - D | 2nd |
| 6910 | 228 | Needs renovation (75 days) | | | | 2 Bed - D | 2nd |
| 6910 | 229 | Needs renovation (75 days) | | | | 2 Bed - D | 2nd |
| 6910 | 230 | Needs renovation (75 days) | | | | 2 Bed - E | 2nd |
| 6910 | 231 | Needs renovation (75 days) | | | | 2 Bed - E | 2nd |
| 6910 | 232 | Needs renovation (75 days) | | | | 2 Bed - D | 2nd |
| 6910 | 233 | Needs renovation (75 days) | | | | 2 Bed - D | 2nd |
| 6910 | 234 | Needs renovation (75 days) | | | | 3 Bed - D | 2nd |
| 6910 | 235 | Needs renovation (75 days) | | | | 2 Bed - C | 2nd |
| 6910 | 236 | Needs renovation (75 days) | | | | 3 Bed - D | 2nd |
| 6910 | 237 | Needs renovation (75 days) | | | | 2 Bed - D | 2nd |
| 6910 | 238 | Needs renovation (75 days) | | | | 2 Bed - D | 2nd |
| 6910 | 239 | Needs renovation (75 days) | | | | 2 Bed - D | 2nd |
| 6910 | 240 | Needs renovation (75 days) | | | | 2 Bed - D | 2nd |
| 6910 | 241 | Needs renovation (75 days) | | | | 3 Bed - D | 2nd |
| 6910 | 242 | Needs renovation (75 days) | | | | 3 Bed - C | 2nd |


West Carpenter Road
Banbury Place
Woodlin Drive
Fleming Road
Orange Lane
Colonial Drive
Sally Court
Janice Drive
Alison Drive
Valerie Lane
Karen Drive
Chateau Drive
Bellcreek Drive
Chatham Drive
Barbara Drive
West Home Avenue
Faith


Zoning Districts
Residential
GN-1 Green Neighborhood
GN-2 Green Neighborhood
TN-1 Traditional Neighborhood
TN-2 Traditional Neighborhood
MR-1 Mixed Residential
MR-2 Mixed Residential
MR-3 Mixed Residential
Institutional
UC University Core
IC Institutional Campus
Commercial
NC Neighborhood Center
CC City Corridor
DE Downtown Edge
DC Downtown Core
Employment
CE Commerce & Employment
PC Production Center
GI-1 Green Innovation
GI-2 Green Innovation
Open Space
OS Open Space

## Section 50-19 TN-2 Traditional Neighborhood-Medium Density: Purpose and Intent

The TN-2 Traditional Neighborhood-Medium Density district is intended to accommodate neighborhoods of moderate density, where single-family homes are located upon lots comparable in dimension to those typically found in the community's older established neighborhoods. Single-family homes are the predominant use, but two-family and single-family attached development is also permitted. Various non-residential uses that complement the traditional neighborhood including schools, community centers, religious institutions, and parks are permitted on a limited scale.

## Section 50-20 MR-1 Mixed Residential-Low Density: Purpose and Intent

The MR-1 Mixed Residential-Low Density district is intended to accommodate neighborhoods with small-lot single-family detached housing, duplexes, or townhouses. Various non-residential uses that complement the traditional neighborhood including schools, community centers, religious institutions, and parks are permitted on a limited basis.

## Section 50-21 MR-2 Mixed Residential-Medium Density: Purpose and Intent

The MR-2 Mixed Residential-Medium Density district is intended to accommodate a higher density development primarily consisting of one or two-story multi-family structures. In many cases, this may include multi-family developments with several structures making up a "campus" with internal circulation, common open space, and other shared amenities. Limited commercial uses may be permitted that support the day-to-day needs of residents. Various non-residential uses that complement the mixed residential neighborhood including schools, community centers, religious institutions, and parks are permitted on a limited scale.

## Section 50-22 MR-3 Mixed Residential-High Density: Purpose and Intent

The MR-3 Mixed Residential-High Density district is intended to accommodate neighborhoods of the highest density within the community. Mixed-use, multi-family structures of three or more stories are the primary use. This district is concentrated in areas surrounding the downtown and in areas with significant access to alternative modes of transportation and transit-oriented development is encouraged. This district can also serve as a transition between less intense residential development and more intense commercial and employment districts. These areas may include smaller retailers and service providers that cluster at key intersections in the district or locate on the ground floor within more prominent multi-family buildings. Various non-residential uses that complement the mixed residential neighborhood including schools, community centers, religious institutions, and parks are permitted on a limited scale.

## Section 50-23 Permitted Uses

Article 16 Definitions shall be referred to for clarity on the uses as listed.

A. Land Uses. Uses are allowed in residential Zone Districts in accordance with Table 50-23 Uses: Residential Zone Districts. The following key is to be used in conjunction with the Use Table.

   1. Permitted Uses. Uses permitted by right in the Zone District, subject to compliance with all other applicable requirements of this Chapter. These uses are identified with a "P."

2. Special Land Uses. Uses which may be allowed subject to review and approval by the Planning Commission in accordance with Article 17 and with all other applicable requirements of this Chapter. These uses are identified with an "S."

3. Additionally Regulated Uses. Uses which may be allowed subject to review and approval by the Planning Commission in accordance with Article 17 and with all other applicable requirements of this Chapter, including limiting conditions specified in Article 9. These uses are identified with "ARU".

4. Accessory Uses. Uses which are permitted by right, assuming they are not the primary use on the sight and that they are in compliance with all other applicable requirements of this Chapter. These uses are identified with an "A."

5. Uses Not Allowed. A cell which is left blank indicates that the listed use is not allowed in that Zone District.

6. Use Regulations. Many allowed uses, whether permitted by right or as a Special Land Use, are subject to compliance with Article 9.

7. Unlisted Uses. In general unlisted uses are prohibited. However, if an application is submitted for a use not listed, the Zoning Coordinator shall make a determination as to the proper Zone District and use classification for the new or unlisted use. If the unlisted use is similar to an existing permitted use in the same Zone District and fits the intent of the Zone District, the Zoning Coordinator may determine that the unlisted use is permitted.

8. Parking Standards. Parking requirements are located in Article 12 Parking, Loading and Circulation.

9. Level of Review for Mixed-Use Projects. The level of review for a project with multiple uses being developed simultaneously shall be the same as the highest level of review of the individual uses.

Allowed Uses Table.

**Table 50-23 Uses: Residential Zone Districts**

| | GN-1 | GN-2 | TN-1 | TN-2 | MR-1 | MR-2 | MR-3 | Reference |
|---|---|---|---|---|---|---|---|---|
| **RESIDENTIAL** | | | | | | | | |
| **Household Living** | | | | | | | | |
| Single-Family Detached Dwelling | P | P | P | P | P | S | | 50-50 |
| Two-Family Dwelling (duplex) | S | S | S | S | P | P | | 50-85 |
| Single-Family Attached Dwelling | | S | | S | P | P | P | 50-85 |
| Multi-Family Dwelling (all floors) | | | | | S | P | P | 50-104 |
| Multi-Family Dwelling (above first floor) | | | | | | P | P | 50-104 |
| Manufactured Housing Communities | | | | S | | | | 50-102 |
| Accessory Dwelling Unit | A | A | A | A | A | A | | 50-79 |
| Mixed-Use | | | | | | P | P | |
| **Group Living** | | | | | | | | |
| State Licensed Residential Facility (1-6 residents) | P | P | P | P | P | P | P | |
| Family Child Care Home (1-7 children) | P | P | P | P | P | P | P | 50-90 |
| Group Child Care Home (7-14 children) | P | P | P | P | P | P | P | 50-90 |
| Convalescent or Nursing Home | | | | | S | S | S | |
| Boarding House | S | S | S | S | S | S | | 50-112 |
| Transitional or Emergency Shelter | | | | | | S | S | 50-119 |
| Residential Rehab Center (1-6) | S | S | S | S | S | | | 50-111 |
| Residential Rehab Center (7-20) | | | | | | S | S | 50-111 |
| Adult Foster Care Small Group Home (7-12) | S | S | S | S | S | P | P | 50-81 |

| | | GN-1 | GN-2 | TN-1 | TN-2 | MR-1 | MR-2 | MR-3 | Reference |
|---|---|---|---|---|---|---|---|---|---|
| Adult Foster Care Large Group Home (13-20) | | | | | | S | S | P | 50-81 |
| **RECREATIONAL** | | | | | | | | | |
| Community Center | | P | P | P | P | P | P | S | |
| **AGRICULTURAL** | | | | | | | | | |
| Aquaculture | | A | A | A | A | A | | | 50-84 |
| Aquaponics | | A | A | A | A | A | | | 50-84 |
| Produce Stand | | A | A | A | A | A | A | A | 50-109 |
| Farmers' Market (Temporary) | | | | | | | P | P | 50-118 |
| Greenhouse | | A | A | A | A | A | A | A | 50-98 |
| Hoophouse | | A | A | | A | | | | 50-100 |
| Hydroponics | | A | A | A | A | A | A | | |
| Apiary/Beekeeping | | A | A | A | A | A | A | | 50-88 |
| Chicken Keeping | | A | A | | A | | | | 50-89 |
| Urban Agriculture | | P | P | | P | | | | 50-120 |
| Community Garden | | P | P | P | P | A | A | A | 50-91 |
| **INSTITUTIONAL AND CULTURAL** | | | | | | | | | |
| **Religious** | | | | | | | | | |
| Place of Worship | | S | S | S | S | S | P | | |
| Cemetery | | P | S | | S | | | | |
| **Government and Educational** | | | | | | | | | |
| Elementary/Middle School | | P | P | | P | P | S | S | |
| High School | | P | P | | S | S | S | S | |
| College or University or Vocational Training | | | | | | | | P | |
| Other Governmental Use or Facility | | | | | | P | P | P | |
| **Other Institutional, and Cultural** | | | | | | | | | |
| Social Service Facility (w/o residential care) | (In MR-2 and MR-3: permitted only as part of a mixed-use development with residential units and only on the ground floor) | | | | S | S | P | P | |
| Civil or Charitable Organization | | | | | S | S | P | P | |
| Art Gallery | | | | | | S | P | P | |
| Library | | | P | | P | P | P | P | |
| Museum | | | | | | S | P | P | |
| **COMMERCIAL** | | | | | | | | | |
| **Temporary Lodging** | | | | | | | | | |
| Bed and Breakfast | | | S | S | S | S | P | | 50-87 |
| Hotel | | | | | | | | S | |
| **Offices** | | | | | | | | | |
| Financial Services | (In MR-2: permitted only as part of a mixed-use development with residential units and only on the ground floor) | | | | | | P | P | |
| Physician or Dentist Office or Medical Clinic | | | | | | | P | P | |
| General or Professional Office | | | | | | | P | P | |
| Copying, Mailing, Courier Services, Parcel Receiving, Shipping Station | | | | | | | P | P | |
| Film Production, Photography, Radio, TV Studio | | | | | | | P | P | |
| Live/Work Unit | | | S | | | | P | S | 50-101 |
| **Personal Service Establishments** | | | | | | | | | |
| Personal Service Establishments | (In MR-2: permitted only | | | | | | P | P | |

| | | GN-1 | GN-2 | TN-1 | TN-2 | MR-1 | MR-2 | MR-3 | Reference |
|---|---|---|---|---|---|---|---|---|---|
| Gym or Fitness Center | as part of a mixed-use development with residential units and only on the ground floor) | | | | | | P | P | |
| **Day Care Services** | | | | | | | | | |
| Adult Day Care or Day Services Center | | | | | | S | S | S | 50-81 |
| Child Care Center | (In MR-2: Special Land Use only as part of a mixed-use development with residential units and only on the ground floor) | | | | | S | S | P | 50-90 |
| **Retail and Service** | | | | | | | | | |
| Restaurant without Alcohol | (In MR-2: permitted only as part of a mixed-use development with residential units and only on the ground floor) | | | | | | P | P | |
| Retail Sales, General | | | | | | | P | P | |
| Grocery Store | | | | | | | P | P | |
| Convenience Store | | | | | | | P | P | 50-83 |
| Commercial Art Gallery | | | | | | | | P | |
| Restaurant with Alcohol | (In MR-2: Special Land Use permitted only as part of a mixed-use development with residential units and only on the ground floor) | | | | | | S | S | 50-83 |
| Bar, Tavern, Taproom, or Tasting Room | | | | | | | S | S | 50-83 |
| Brewpub | | | | | | | S | S | 50-83 |
| Craft Winery/Distillery | | | | | | | S | S | 50-83 |
| Instruction Studio | | | | | | | S | P | |
| Catering Business | | | | | | | | P | |
| **Automotive Services** | | | | | | | | | |
| Vehicle Fuel Station (without vehicle repair, may include 1,000 sq. ft. convenience-store) | | | | | | | | S | 50-121 |
| **Entertainment and Hospitality** | | | | | | | | | |
| Bowling Alley, Skating Rink | | | | | | | S | S | |
| Dance Club, Night Club | | | | | | | | S | 50-94 |
| Entertainment, Live (Not including ARUs) | | | | | | | S | S | |
| **INDUSTRIAL** | | | | | | | | | |
| **Transportation** | | | | | | | | | |
| Stand Alone Parking, Surface Lots | | | | | | S | S | | |
| **Utilities** | | | | | | | | | |
| Electrical Substations and Private Utilities | | S | S | S | S | S | S | S | 50-93 |
| Wireless Communication Facilities – Collocated on Existing Towers | | P | P | P | P | P | P | P | 50-126 |
| Small-Scale Solar Energy Production | | A | A | A | A | A | A | A | 50-117 |
| Small-Scale Wind Energy Production | | A | A | A | A | A | A | A | 50-125 |
| **Additionally Regulated Uses** | | | | | | | | | |
| Tattoo Establishment | | | | | | | | ARU | 50-80 |

City of Flint | Zoning Code | December 7, 2025
Article 3 – Page 5

**Table 50-24B Bulk and Site Standards: TN Districts**

| District | Max. Height | Lot Area | | | Max Impervious Lot Coverage | Min. Front Setback (F) | Min. Corner Side Setback (C) | Min. Interior Side Setback | | Min. Rear Setback (R) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Min. Lot Width (W) | Min. Lot Area | Min. Lot Area Per Dwelling Unit | | | | Width of Smaller Side Yard (S1) | Aggregate Width of Both Side Yards (S1+S2) | |
| TN-1 | 2½ stories /35' | 70' | 9,000 sq. ft. | 4,500 sq. ft. | 45% | 30' | 15' | 10' | 20' | 35' |
| TN-2 | 2½ stories /35' | 40' | 4,500 sq. ft. | 2,250 sq. ft. | 60% | 20' | 10' | 5' | 15' | 25' |

Residential Zone Bulk Standards

*TN-1, TN-2 Districts*




TN-1 TN-2

**Table 50-24C Bulk and Site Standards: MR-1 District**

| District | Max. Height | Lot Area | | | Max. Impervious Lot Coverage | Min. Front Setback (F) | Min. Corner Side Setback (C) | Min. Interior Side Setback | | Min. Rear Setback (R) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Min. Lot Width (W) | Min. Lot Area | Min. Lot Area Per Dwelling Unit | | | | Width of Smaller Side Yard (S1) | Aggregate Width of Both Side Yards (S1+S2) | |
| **MR-1** | | | | | | | | | | |
| ***Detached Single-Family or Two-family Dwelling*** | 2½ stories /35' | 25' | 3,000 sq. ft. | 1,500 sq. ft. | 70% | 20' | 5' | 2' | 7' | 25' |
| ***Attached Residential*** | 2½ stories /35' | 18' | 1,500 sq. ft. | 1,500 sq. ft. | 70% | 20' | 5' | 0' | 0" | 25' |

City of Flint | Zoning Code | December 7, 2025
Article 3 – Page 7

| Table 50-144.E-2 Off-Street Parking Requirements | | |
|---|---|---|
| **Use Categories** | **Use Types** | **General Requirement (GFA = Gross Floor Area)** |
| **Residential Uses** | | |
| **Household living** | Single-family dwellings | 2 spaces per unit |
| | Two-family, multiple-family dwellings, or upper story residential | 1.5 spaces per efficiency or one bedroom unit<br>2 spaces per 2 or more bedroom units |
| | Accessory Dwelling Unit | 1 space per unit |
| **Group living** | Nursing home | 1 space per 5 beds |
| | Assisted living facility not having individual dwelling units | 1 space per 4 beds |
| | All other group living uses | 1 space per 2 beds |
| **Public and Civic Uses** | | |
| **Community service** | All community service uses | 15 spaces, plus one space for each 400 GFA |
| **Day care** | All day care | 1 space per employee |
| **Educational facilities** | High school | 1 space per 4 seats in main assembly area, but not less than 5 per classroom |
| | All other educational facilities | 1 space per 4 seats in main assembly area, but not less than 1 per classroom |
| **Government facilities** | All government facilities | 1 space per employee |
| **Medical Facilities** | Hospitals | 1 space per 2 beds |
| **Museums** | Museums and similar institutions | 1 space per 400 GFA |
| **Parks and open space** | All parks and open space uses | Determined by Zoning Coordinator |
| **Passenger terminals and services** | All passenger terminals and services | 1 space per 400 feet passenger terminal area |
| **Religious institution** | All religious institutions | 1 space per 4 seats in main assembly area |
| **Utilities, minor** | All minor utilities | None |
| **Utilities, major** | All major utilities | Determined by Zoning Coordinator |
| **Commercial Uses** | | |
| **Eating and drinking establishments** | Fast Food | 1 space per 100 GFA |
| | All other eating and drinking establishments | 1 space per 150 GFA |
| **Entertainment, indoor** | Adult entertainment | 1 space per 100 GFA |
| | Bowling alleys | 3 spaces per lane |
| | Theaters, auditoriums | 1 space per 4 seats |
| | All other indoor entertainment | 1 space per 300 GFA |
| **Entertainment, outdoor** | Arenas and stadiums | 1 space per 4 seats |
| | Fairgrounds | Determined by Zoning Coordinator |
| | Driving ranges | 1 space per tee box |
| | Miniature golf courses | 1 space per hole |
| | All other entertainment outdoor | Determined by Zoning Coordinator |
| **Funeral Homes** | Funeral Homes/Mortuaries | One space per 50 square feet of floor area used for viewing or services. Site must provide a separately designated off-street assembly area for the lead car, hearse and family vehicle to be used in funeral processions so that these vehicles do not interfere with off-site traffic or access to required parking spaces |
| **Offices** | Medical or dental clinics | 1 space per 250 GFA |

# ARTICLE 11 NONCONFORMING LOTS, BUILDINGS, STRUCTURES AND USES

## Table Of Contents

Section 50-135 Purpose and Intent ..... 1
Section 50-136 In General ..... 1
Section 50-137 Nonconforming Uses ..... 2
Section 50-138 Nonconforming Lots of Record ..... 5
Section 50-139 Nonconforming Site Requirements ..... 5
Section 50-140 Nonconforming Structures ..... 6

## Section 50-135 Purpose and Intent

The purpose of this chapter is to provide for the control, improvement and termination of uses or structures which do not conform to the regulations of this title for the district in which they are located, while recognizing and encouraging adaptive reuse of important historic structures in the City. Adaptive reuse preserves the important physical attributes of a historic resource for future generations by allowing the structure to be used in a manner that is consistent with the Zoning Ordinance, although it may be a different use than that for which it was originally constructed.

## Section 50-136 In General

A. Continuation. Any legally-established nonconformity may be continued in accordance with this section.

B. Types of Nonconformity. There are several types of nonconformities that may exist, as follows:

1. Nonconforming uses
2. Nonconforming lots of record
3. Nonconforming sites
4. Nonconforming structures

C. Registration of Nonconformity. Persons or entities with property that is believed to have non-conforming status are requested, but not obligated, to register with the City. Registration statements shall contain the owner's name, address, specifics regarding the type of business, a site or sketch plan and other information as may be required by the Zoning Coordinator. Based on the submitted information, the Zoning Coordinator shall determine if, in fact, the registrant's use, structure, site or lot has attained legal nonconforming status. The decision of the Zoning Coordinator may be appealed to the zoning board of appeals. The acceptance by the Zoning Coordinator of a certification statement shall not constitute authorization to operate any use other than the specific use on the certificate.

D. Annually the Zoning Coordinator may send to the persons who have registered a nonconforming use or are otherwise known to have legally-established nonconforming uses a questionnaire inquiring as to the operation, status, and other details concerning the nonconforming use. Such questionnaire shall be sent by certified mail to all registrants/owners at the last addresses known to the Zoning Coordinator. Such questionnaire shall be returned, completed, to the Zoning Coordinator within 90 days from the date of receipt of the questionnaire by the registrant/owner.

E. Evidence of Status. Evidence of the status of a nonconforming use shall be supplied by the owner of the property upon request of the Zoning Coordinator.

F. Class A nonconforming structures. Nonconforming structures noted on the List of Historic Structures, and closed school buildings shall be classified as Class A nonconforming structures.

1. In order to qualify as a closed school building Class A nonconforming structure, the structure shall be currently or previously owned by Flint Community Schools and used as an elementary, middle, or high school or administration building.
2. In addition to buildings and structures listed on the National Register of Historic Places, the City of Flint maintains a list of important historic structures that may be updated by the Zoning Coordinator periodically based on a determination that a structure meets one or more of the following standards:
3. The building or site is particularly representative of a distinct architectural period, type, style, or way of life.
4. The building is of a type or style which was once common but is now rare.
5. The building is at least 50 years old.
6. The building or site is connected with a person or event important to local history.
7. The architect or builder is famous or well-recognized.
8. The building's style, construction method, or materials are unusual or significant.
9. The overall effect of the design or building details are beautiful or unusual.
10. The building contains original materials or workmanship of high or unusual value.

G. Class B nonconforming structures. Nonconforming structures not meeting the requirements of Class A nonconforming structures above shall be considered Class B nonconforming structures.

## Section 50-137 Nonconforming Uses

A. Continuation of Use.

1. A lawful use made nonconforming by the adoption of this zoning code or other ordinances may continue only for so long as the area of the use is not expanded, increased or the use is changed.
2. Destruction, Damage, or Obsolescence of Structure. The right to operate and maintain any nonconforming use shall terminate whenever the structure or structures in which the nonconforming use is operated and maintained are damaged, destroyed or become obsolete or substandard to the extent of more than 60 percent of its replacement cost

exclusive of the foundation, using estimates from at least two contractors experienced in undertaking such work.

B. Pre-existing hoophouses. Any hoophouse erected prior to the adoption of this code, even those erected unlawfully, shall be considered a legal use if located in a zone district allowing hoophouses, or a legal non-conforming use if located in a zone district that does not allow hoophouses under the following conditions:

1. The frame and covering of the hoophouse are in good condition; not rusted, cracked, torn, or similarly damaged.

2. The hoophouse is not a safety hazard and will not pose a risk to users or to nearby structures.

C. Change of Use. No use shall be changed to a conforming use until the Zoning Coordinator has determined that the requirements of the applicable district will be met. The Zoning Board of Appeals (ZBA) may approve a change to a different nonconforming use from another nonconforming use, provided such use is deemed by the Board to be less intense than the existing use. No change to a more intense nonconforming use is allowed. The ZBA shall determine whether or not the new nonconforming use will be less intense than the existing one based on a preponderance of the following factors:

1. The new nonconforming use would require lesser parking.

2. The new nonconforming use would utilize the same amount or less of the building or site.

3. The new nonconforming use would generate less nuisances, such as less noise, odor or smoke.

4. The new nonconforming use is closer to the purpose and intent of the use's zoning district as established by this code.

D. Change of Use Increasing Required Parking. Changes of use that require an increase in the number of parking spaces shall be required to provide the difference between the required parking for the prior use and that required for the proposed use in accordance with Article 12. Where this calculation results in the addition of less than five spaces, no additional spaces shall be required. Any additional parking area shall comply with all associated landscaping and drainage requirements of this Chapter.

E. Reversion Prohibited. When a nonconforming use has been changed, in part or in whole to an allowed use, the part of whole that has been made to conform may not be later changed back to a nonconforming use.

F. Abandonment of Use. A nonconforming use that has been determined to be abandoned by the ZBA shall not be reestablished. Any use on the property after that time shall conform with all provisions of this zoning code.

G. Standards for Determining Abandonment. If the Department of Planning and Development identifies a legal nonconforming use that they believe has been abandoned, they shall submit the property to the ZBA for a determination of abandonment. The ZBA shall determine whether or not intent to abandon the nonconforming use was demonstrated based on a preponderance of the following factors:

1. Building has been vacant for two or more years.

2. Reports such as from the Building & Safety Inspections division or a health department indicating the property is or has not been suitable for occupation.

3. Disconnection of utilities.

4. Evidence that the use was relocated to a new site.

5. Evidence of a "going out of business" sale.

6. Signs advertising the business has been removed or gone out of business.

7. The use has been discontinued for one year, except where government action such as road construction has prevented access to the premises or necessitated a temporary discontinuation of use, or where a clear intent to discontinue has not been demonstrated.

8. Removal of the equipment or fixtures necessary for the operation of the nonconforming use.

9. Request by the property owner for changes in their property tax designation inconsistent with the nonconforming use.

10. The property was foreclosed.

11. Other actions by the property owner or lesee that demonstrates an intent to abandon the nonconforming use.

H. Special Standards for Residential Uses. As used in this paragraph, a "nonconforming residential use" is a structure which contains more or less dwellings than allowed by the district or a dwelling located in a district that does not permit residential uses.

1. Abandonment.

   i. A nonconforming single-family dwelling that may meet the standards in subsection G shall not be considered to be abandoned and may be reoccupied at any time, provided the structure has not been changed, legally or illegally, to a nonresidential use or multiple-unit residential use and the owner is actively seeking out a new tenant/owner.

2. Destruction. Nonconforming residential uses that are damaged may be rebuilt in accordance with the following:

   i. All portions of the structure being restored are not and were not on or over a property line;

   ii. The number of dwelling units does not increase;

   iii. All construction is in compliance with current construction codes, such as the fire and building codes;

   iv. A building permit is obtained within one year from the date of the damage; and

   v. The certificate of occupancy (or other final inspection) is issued within two years of the issuance of the building permit.

## Section 50-138 Nonconforming Lots of Record

A. If there are two or more adjacent residential or other lots of record under common ownership they shall be treated as one zoning lot if necessary to comply with the lot size or setback requirements of this code.

B. Residential Lots of Record

1. All undeveloped lots of record in a residential district that were recorded prior to the effective date of this zoning code that do not meet the minimum zoning district lot standards shall be allowed one single-family house if all setback requirements are met.

C. Other Lots of Record. All undeveloped lots of record in a non-residential district that were recorded prior to the effective date of this zoning code that do not meet the minimum zoning district lot standards as to width or area may be used for any purpose permitted in the district provided the use meets all other regulations prescribed for the district.

## Section 50-139 Nonconforming Site Requirements

A. Continuation, Maintenance and Restoration. A developed site existing as of the effective date of this zoning code that is nonconforming due solely to failure to meet the site development standards, such as number of parking spaces or landscaping requirements, of this zoning code may continue to exist as-is and may be maintained or restored provided no change in use as described in subsection B below or expansion of the building, parking or other impervious surfaces as described in subsection C below occurs.

B. Change in Use.

1. Additional Parking. When the use of a developed nonconforming site changes, additional parking facilities must be provided to serve the new use only when the number of parking spaces required for the new use exceeds the number of spaces required for the lawful use that most recently occupied the building, based on the parking standards Article 12. When the number of parking spaces required for the new use exceeds the number of spaces required for the use that most recently occupied the property, additional parking spaces are required only to make up the difference between the amount of parking required for the previous use and the amount of parking required for the new use, based on the standards Article 12.

2. Additional Landscaping. When the use of a developed nonconforming site changes, the site conditions shall determine the degree to which the site must conform with Article 13 of this Chapter as follows:

   i. Sites with multiple tenants with shared parking: if there is a change in use in a development with multiple tenants, the development is only required to conform with the landscaping requirements of Article 13 if it is a change to different broad use class, e.g. commercial to industrial.

   ii. A change in use request is eligible for a waiver from landscaping requirements, granted by the Planning Commission. See Section 50-150 D.

C. Expansion. Additions to structures, additional principal structures, additional paving, or parking on nonconforming sites shall require correction of existing nonconforming parking, landscaping and screening.

1. Expansions or new principal structures that result in at least a 25 percent or 2000 square feet increase, whichever is greater, of the gross square footage of the existing principal structure(s) require the entire property to meet all of the applicable landscaping and screening requirements of this Chapter.

2. Expansions that require an increase in the number of parking spaces shall be required to provide the required parking spaces for the total floor area in accordance with this zoning code. The additional parking area shall comply with all associated landscaping and drainage requirements of this zoning code.

3. Expansion of a parking lot by at least 25 percent or 2000 square feet, whichever is greater, that currently contains or will contain after expansion, 10 or more spaces shall be required to meet all the applicable landscaping and screening requirements of this Chapter.

4. The Zoning Coordinator may grant an Administrative Departure of no more than 20 percent of the required improvements in this provision upon demonstration by the applicant that the property is physically constrained and the applicant is complying to the maximum extent practicable.

## Section 50-140 Nonconforming Structures

A. Continuation. A lawful structure existing as of the effective date of this zoning code or any amendment to this zoning code may continue to be used for any purposes permitted in the district provided it is in conformance with the provisions of this section.

B. Maintenance and Restoration. Nonconforming structures may be maintained or restored provided no expansion of the nonconformity occurs, unless authorized in subsection C below.

C. Alteration and Expansion.

1. Class A Nonconforming structures: Any proposed changes or modifications of a Class A nonconforming structures, including but not limited to, change of use, increasing the intensity of the use, or previously approved site plan associated with the nonconforming use, shall require site plan approval.

2. Class B Nonconforming structures: Class B nonconforming structures shall not be altered or expanded, unless it meets one or more of the exceptions below and provided that the expansion does not increase the nonconformity.

Exceptions allowing for expansion of Class B nonconforming structures:

i. The structure is a single-family home.

ii. When the current or proposed use is permitted within the zone district, a nonconforming Class B structure may be altered or expanded so long as the nonconformity is not increased and no new nonconformity is created.

iii. Expansions/alterations are permitted if said expansion/alteration brings the structure back into conformity with the form regulations of this Chapter.

D. Destruction

1. Class A nonconforming structures and nonconforming single- or two-family residential structures which are damaged may be restored within the existing footprint provided that all portions of the structure being restored are not and were not on or over a property line; all construction is in compliance with current construction codes, such as the Fire and Building Codes; a building permit is obtained within one year from the date of the damage; and the certificate of occupancy (or other final inspection) is issued within two years of the issuance of the building permit.

2. Class B nonconforming structures, except single- or two-family residential structures which are provided for above, which are damaged to 60 percent or less of its replacement cost exclusive of the foundation, using estimates from at least two contractors experienced in undertaking such work, may be restored within the existing footprint provided that all portions of the structure being restored are not and were not over a property line; all construction is in compliance with current construction codes, such as the Fire and Building Codes; a building permit is obtained within one year from the date of the damage; and the certificate of occupancy (or other final inspection) is issued within two years of the issuance of the building permit.

3. Except as otherwise permitted above, if damage exceeds 60 percent or more, restoration or improvement shall not be permitted unless the restoration results in a structure and site conforming to all applicable requirements of this zoning code.

# Addendum D

# Comparable Data

## Improved Sales

# Multifamily Sale Profile

Sale No. 1

## Location & Property Identification

| | |
|---|---|
| Property Name: | Lux of Saginaw Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 2021 Grout St. |
| City/State/Zip: | Saginaw, MI 48602 |
| County: | Saginaw |
| Submarket: | Saginaw-Midland-Bay City |
| Market Orientation: | Suburban |
| Property Location: | W/S of Grout St., S. of Arthur St. |
| IRR Event ID: | 3072211 |



## Sale Information

| | |
|---|---|
| Sale Price: | $6,687,000 |
| Effective Sale Price: | $6,687,000 |
| Sale Date: | 09/28/2023 |
| Sale Status: | Closed |
| $/SF GBA: | $97.40 |
| $/SF NRA: | $97.40 |
| $/Unit: | $79,607 /Apt. Unit |
| Grantor/Seller: | Saginaw 74, LLC |
| Grantee/Buyer: | ID Lux, LLC |
| Property Rights: | Leased Fee |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Subsidized/Restricted: | No |
| Verified By: | Donald L. Selvidge, MAI |
| Verification Date: | 11/20/2023 |
| Confirmation Source: | Matthew Seeley (IPO) 248-932-0300 |
| Verification Type: | Confirmed-Seller Broker |

## Operating Data and Key Indicators

| | |
|---|---|
| Effective Gross Income: | $1,114,412 |
| Operating Expenses: | $464,864 |
| Net Operating Income: | $ 649,548 |
| Expense Ratio: | 41.71% |
| Reserves Included: | Yes |
| Management Included: | Yes |
| Cap Rate - Derived: | 9.71% |
| EGIM - Derived: | 6.00 |

## Occupancy

| | |
|---|---|
| Occupancy at Time of Sale: | 61.00% |

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | 19-2246-00300 |
| GBA-SF: | 68,655 |
| NRA-SF: | 68,655 |
| Acres(Usable/Gross): | 3.03/3.03 |
| Land-SF(Usable/Gross): | 131,987/131,987 |
| Usable/Gross Ratio: | 1.00 |
| Year Built: | 1968 |
| Most Recent Renovation: | 2022 |
| Improvements Cond.: | Average |
| Construction Desc.: | Wood frame buildings with a brick veneer/vinyl siding exterior |
| No. of Buildings/Stories: | 6/3 |
| No. of Units/Unit Type: | 84/Apt. Units |
| Roof,Heating,AC Comm.: | Electric baseboard heat Sleeve a/c units |
| Shape: | Rectangular |
| Topography: | Level |

## Improvement and Site Data (Cont'd)

| | |
|---|---|
| Density-Unit/Gross Acre: | 27.72 |
| Density-Unit/Usable Acre: | 27.72 |
| Bldg. to Land Ratio FAR: | 0.52 |
| Land to Building Ratio: | 1.92 |
| Utilities Desc.: | All available |
| Source of Land Info.: | Public Records |

## Unit Mix

| No. of Bed-rooms | No. of Bath-rooms | No. of Units | Approx. Units SF | Total Units SF | % of Total |
|---|---|---|---|---|---|
| 1.00 | 1.00 | 24 | 470 | 11,280 | 16.4% |
| 1.00 | 1.00 | 7 | 750 | 5,250 | 7.6% |
| 2.00 | 1.00 | 47 | 975 | 45,825 | 66.7% |
| 2.00 | 1.00 | 6 | 1,050 | 6,300 | 9.2% |
| | | 84 | | 68,655 | |

## Project & Unit Amenities

| | |
|---|---|
| Common Laundry | Dishwasher |
| Covered Parking | Granite/Quartz Counters |
| | Microwave |
| | Patio/Balcony/Deck |
| | Stainless Steel Appliances |
| | Vinyl Plank Floors (LVT/LVP) |

## Comments

Income and expenses are based on the broker's pro-forma which is based on their projected market rent and market expenses including an uncapping of the real estate taxes, $300/unit in reserves, and a 4% management fee. The property was sold at the end of the renovation process and as part of purchase agreement, the sellers had to finish renovating the remaining units. The overall capitalization rate reflects the added risk taken on by the buyer to get all the rents up to market rent.

The property was renovated in 2022/23. Building renovations include new roofs, balconies, sliding doors, siding, etc. Unit renovations include stainless steel appliances, vinyl plank flooring, plumbing, electrical, drywall, etc. Tenants pay direct for electric (heat) and reimburse the landlord for water/sewer via a RUBS system.

# Multifamily Sale Profile

# Sale No. 2

## Location & Property Identification

| | |
|---|---|
| Property Name: | Colonial Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 726 E. Main St. |
| City/State/Zip: | Flushing, MI 48433 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Rural |
| Property Location: | S/S of E. Main Street, E. of McKinley Road |
| IRR Event ID: | 3535205 |



## Sale Information

| | |
|---|---|
| Sale Price: | $2,200,000 |
| Effective Sale Price: | $2,200,000 |
| Sale Date: | 06/18/2026 |
| Sale Status: | Closed |
| $/SF GBA: | $60.29 |
| $/SF NRA: | $110.00 |
| $/Unit: | $68,750 /Apt. Unit |
| Grantor/Seller: | Colonial Apartments |
| Grantee/Buyer: | Flushing Apartments, LLC |
| Property Rights: | Leased Fee |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Subsidized/Restricted: | No |
| Verified By: | Donald L. Selvidge, MAI |
| Verification Date: | 08/10/2026 |
| Confirmation Source: | Mark Piper (Piper Realty) 810-600-4002 |
| Verification Type: | Confirmed-Seller Broker |
| Secondary Verific. Source: | Municipal records |

## Operating Data and Key Indicators

| | |
|---|---|
| Net Operating Income: | $ 148,500 |
| Cap Rate - Derived: | 6.75% |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Flint, MI Metropolitan Statistical Area |
| Legal/Tax/Parcel ID: | 55-26-576-007 |
| GBA-SF: | 36,488 |
| NRA-SF: | 20,000 |
| Acres(Gross): | 6.14 |
| Land-SF(Gross): | 267,458 |
| Year Built: | 1970 |
| Improvements Cond.: | Average |
| Construction Desc.: | Garden apartment buildings with wood frame, brick veneer and common basement foundation. |
| No. of Buildings/Stories: | 3/2 |
| No. of Units/Unit Type: | 32/Apt. Units |
| Air-Conditioning Type: | Gas |
| Roof,Heating,AC Comm.: | Sloped shingled roofing. |
| Shape: | Irregular |
| Density-Unit/Gross Acre: | 5.21 |
| Bldg. to Land Ratio FAR: | 0.14 |
| Land to Building Ratio: | 7.33 |
| Zoning Code: | R-3B |
| Zoning Desc.: | High Density Residential |
| Utilities Desc.: | All available |
| Source of Land Info.: | Public Records |

## Unit Mix

| No. of Bed-rooms | No. of Bath-rooms | No. of Units | Approx. Units SF | Total Units SF | % of Total |
|---|---|---|---|---|---|
| 1.00 | 1.00 | 20 | 550 | 11,000 | 55.0% |
| 2.00 | 1.00 | 12 | 750 | 9,000 | 45.0% |
| | | 32 | | 20,000 | |

## Project & Unit Amenities

Common Laundry

Central AC

Washer/Dryer Hookup

## Comments

Income and expenses were not provided, however the property reportedly sold at a 6.5% to 7.0% overall cap rate with 6.75% utilized. The building and units have had modest renovations in recent years.

Community laundry and tenant storage located in common basements. No covered parking.

# Multifamily Sale Profile

# Sale No. 3

## Location & Property Identification

| | |
|---|---|
| Property Name: | Residences at Grand Blanc |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 5800 Maplebrook Lane |
| City/State/Zip: | Grand Blanc Township, MI 48507 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Suburban |
| Property Location: | S/S of Maple Rd., E. of Fenton Rd. |
| IRR Event ID: | 3512628 |



## Sale Information

| | |
|---|---|
| Sale Price: | $28,000,000 |
| Effective Sale Price: | $29,000,000 |
| Sale Date: | 08/12/2026 |
| Sale Status: | Closed |
| $/SF GBA: | $82.91 |
| $/SF NRA: | $92.06 |
| $/Unit: | $63,736 /Apt. Unit |
| Grantor/Seller: | Maplebrook Owner, LLC |
| Grantee/Buyer: | Monarch Investment & Management Group, LLC |
| Property Rights: | Leased Fee |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Subsidized/Restricted: | No |
| Verified By: | Donald L. Selvidge, MAI |
| Verification Date: | 05/26/2026 |
| Confirmation Source: | Buyer |
| Verification Type: | Confirmed-Buyer |
| Secondary Verific. Source: | Purchase Agreement |

## Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | IRR Projection |
| Effective Gross Income: | $5,859,225 |
| Operating Expenses: | $3,683,702 |
| Net Operating Income: | $ 2,175,523 |
| Expense Ratio: | 62.87% |
| Reserves Included: | Yes |
| Management Included: | Yes |
| Cap Rate - Derived: | 7.50% |
| EGIM - Derived: | 4.95 |

## Sale Analysis

| | |
|---|---|
| Other Adjustment: | $1,000,000 |
| Adjustment Comments: | Deferred maintenance |

## Occupancy

| | |
|---|---|
| Occupancy at Time of Sale: | 89.00% |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Flint, MI Metropolitan Statistical Area |
| Legal/Tax/Parcel ID: | 12-06-100-016 |
| GBA-SF: | 349,786 |
| NRA-SF: | 315,015 |
| Acres(Usable/Gross): | 30.80/30.80 |
| Land-SF(Usable/Gross): | 1,341,728/1,341,728 |
| Usable/Gross Ratio: | 1.00 |
| No. of Units (Potential): | 455 |

## Improvement and Site Data (Cont'd)

| | |
|---|---|
| Year Built: | 1971-77 |
| Most Recent Renovation: | 2022-26 |
| Property Class: | B |
| M&S Class: | D |
| Construction Quality: | Average |
| Improvements Cond.: | Average |
| Exterior Walls: | Brick |
| Construction Desc.: | Garden and townhouse buildings with wood framing, brick and exterior siding. Private basement in townhouse. |
| No. of Buildings/Stories: | 18/3 |
| No. of Units/Unit Type: | 455/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Total Parking Spaces: | 888 |
| Park. Ratio 1000 SF GLA: | 2.82 |
| No. Surface Spaces: | 888 |
| Park. Ratio 1000 SF GBA: | 2.54 |
| Parking Ratio(/Unit): | 1.95 |
| Air-Conditioning Type: | Gas |
| Roof,Heating,AC Comm.: | Pitched asphalt shingled roofs<br>Central a/c<br>GFA- heat |
| Shape: | Irregular |
| Topography: | Rolling |
| Corner Lot: | No |
| Frontage Feet: | 361 |
| Frontage Desc.: | Maple Road |
| Frontage Type: | 2 way, 2 lanes each way |
| Traffic Flow: | Moderate |
| Visibility Rating: | Good |
| Density-Unit/Gross Acre: | 14.77 |
| Density-Unit/Usable Acre: | 14.77 |
| Bldg. to Land Ratio FAR: | 0.26 |
| Land to Building Ratio: | 3.84 |
| Zoning Code: | MDM |
| Zoning Desc.: | Medium Density Multiple-Family Residential |
| Flood Plain: | Yes |
| Flood Zone Designation: | AE |
| Comm. Panel No.: | 26049C0308D |

| | |
|---|---|
| Date: | 09/25/2009 |
| Utilities Desc.: | All Available |
| Source of Land Info.: | Public Records |

## Unit Mix

| No. of Bed-rooms | No. of Bath-rooms | No. of Units | Approx. Units SF | Total Units SF | % of Total |
|---|---|---|---|---|---|
| 0.00 | 1.00 | 6 | 525 | 3,150 | 1.0% |
| 1.00 | 1.00 | 257 | 620 | 159,340 | 50.0% |
| 2.00 | 1.00 | 156 | 759 | 118,404 | 37.1% |
| 2.00 | 1.50 | 12 | 960 | 11,520 | 3.6% |
| 3.00 | 1.50 | 24 | 1,100 | 26,400 | 8.3% |
| | | 455 | | 318,814 | |

## Project & Unit Amenities

| | |
|---|---|
| Recreational Amenities | Carpeting |
| Common Laundry | Central AC |
| Clubhouse Building | Dishwasher |
| Dog Run/Spa | Granite/Quartz Counters |
| | Laminate Counters |
| Common Laundry | Microwave |
| Swimming Pool | Patio/Balcony/Deck |
| BBQ Grill/Picnic Area | Stainless Steel Appliances |
| Business Center | Vinyl Plank Floors (LVT/LVP) |
| Fitness Center | Washer/Dryer In Unit |
| Playground | TH Laundry Hookup |

## Comments

The property was originally under contract for $29,000,000 which was reduced to $28,000,000 to address aluminum electric wiring. As the buyer will be incurring this cost, the effective price is $29,000,000. Income and expenses are based on IRR projections which includes an uncapping of the real estate taxes, a 3% management fee, and $300/unit in reserves.

Site originally originally contained 467 units, however 12 units destroyed by fire in 2006. The townhouses include washer/dryers in individual basements, while the garden units rely on community laundry. Property has 13 garden buildings and 4 townhouse buildings. Site only has surface parking. In 2022 the landlord began renovating units with

## Comments (Cont'd)

new cabinetry, flooring, appliances, lighting, and doors. As of June 2026, all but approximately 50 units have some level of renovation with 236 units fully renovated including new kitchen cabinetry, quartz countertops, stainless steel appliances (w/microwave & dishwasher), mosaic and subway tile backsplash, hard surface flooring, bathroom vanity, and bathtub surround.

# Multifamily Sale Profile
## Sale No. 4

### Location & Property Identification

| | |
|---|---|
| Property Name: | Pinehurst Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 9087 Harper St. |
| City/State/Zip: | Argentine Township, MI 48451 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Rural |
| Property Location: | S/S of Harper, S of Silver Lake Rd, W. of Seymour Rd |
| IRR Event ID: | 3503893 |



### Sale Information

| | |
|---|---|
| Sale Price: | $2,770,000 |
| Effective Sale Price: | $2,770,000 |
| Sale Date: | 12/10/2025 |
| Listing Price: | $3,000,000 |
| Sale Status: | Closed |
| $/SF GBA: | $91.20 |
| $/SF NRA: | $107.65 |
| $/Unit: | $83,939 /Apt. Unit |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Subsidized/Restricted: | No |
| Verified By: | Joseph Del Greco |
| Verification Date: | 05/22/2026 |
| Confirmation Source: | Greg Coulter, IPO RE 586-242-8690 |
| Verification Type: | Confirmed-Seller Broker |

### Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | Pro-forma Broker |
| Potential Gross Income: | $397,200 |
| Vacancy Rate: | 5% |
| Other Income: | $14,642 |
| Effective Gross Income: | $391,982 |
| Operating Expenses: | $165,416 |
| Net Operating Income: | $ 226,566 |
| Expense Ratio: | 42.20% |
| Reserves Included: | Yes |
| Management Included: | Yes |
| Cap Rate - Derived: | 8.18% |
| GRM - Derived: | 6.97 |
| EGIM - Derived: | 7.07 |

### Occupancy

| | |
|---|---|
| Occupancy at Time of Sale: | 97.00% |

### Improvement and Site Data

| | |
|---|---|
| MSA: | Flint, MI Metropolitan Statistical Area |
| Legal/Tax/Parcel ID: | 01-34-527-059 |
| GBA-SF: | 30,372 |
| NRA-SF: | 25,732 |
| Acres(Usable/Gross): | 6.41/6.41 |
| Land-SF(Usable/Gross): | 279,220/279,220 |
| Usable/Gross Ratio: | 1.00 |
| Year Built: | 1977-92 |
| M&S Class: | D |
| Improvements Cond.: | Average |

## Improvement and Site Data (Cont'd)

| | |
|---|---|
| Construction Desc.: | Garden apartments with wood frame and vinyl siding over concrete slab. |
| No. of Buildings/Stories: | 5/2 |
| No. of Units/Unit Type: | 33/Apt. Units |
| Air-Conditioning Type: | Gas |
| Roof,Heating,AC Comm.: | Gas-fired furnaces and central a/c |
| Density-Unit/Gross Acre: | 5.15 |
| Density-Unit/Usable Acre: | 5.15 |
| Bldg. to Land Ratio FAR: | 0.11 |
| Land to Building Ratio: | 9.19 |
| Zoning Code: | RM |
| Zoning Desc.: | Multiple Family Residential |
| Utilities Desc.: | All available |
| Source of Land Info.: | Public Records |

## Unit Mix

| No. of Bed-rooms | No. of Bath-rooms | No. of Units | Approx. Units SF | Total Units SF | % of Total |
|---|---|---|---|---|---|
| 1.00 | 1.00 | 4 | 680 | 2,720 | 10.6% |
| 2.00 | 1.00 | 28 | 800 | 22,400 | 87.1% |
| 1.00 | 1.00 | 1 | 612 | 612 | 2.4% |
| | | 33 | | 25,732 | |

## Project & Unit Amenities

| | |
|---|---|
| | Central AC |
| Common Laundry | Patio/Balcony/Deck |

## Comments

Property was reduced to $3,000,000 before entering into a contract. Income and expenses based on broker's pro forma and includes a 4% management fee, $300/unit in reserves, and an uncapping of the real estate taxes.

The site includes 32 apartments in four buildings, as well as a single-family dwelling, a community laundry building, and a storage building. The house was built in 1977, while the apartments were completed in 1992. Located in Linden Public School District. Site only offers surface parking, but does contain surplus land for future expansion.

# Multifamily Sale Profile

# Sale No. 5

## Location & Property Identification

| | |
|---|---|
| Property Name: | Mill Creek Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 303 Smith Street |
| City/State/Zip: | Clio, MI 48420 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Suburban |
| Property Location: | S. of Vienna St., W. of Clio Rd. |
| IRR Event ID: | 3347496 |



## Sale Information

| | |
|---|---|
| Sale Price: | $9,222,000 |
| Effective Sale Price: | $9,222,000 |
| Sale Date: | 10/28/2024 |
| Sale Status: | Closed |
| $/SF GBA: | $71.16 |
| $/SF NRA: | $79.96 |
| $/Unit: | $53,000 /Apt. Unit |
| Grantor/Seller: | PH Apartments, LLC |
| Grantee/Buyer: | Mill Creek Apartments of Clio, LLC |
| Property Rights: | Leased Fee |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Subsidized/Restricted: | No |
| Verified By: | Donald L. Selvidge, MAI |
| Verification Date: | 04/08/2025 |
| Verification Type: | Confirmed-Confidential |
| Secondary Verific. Source: | CoStar |

## Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | IRR Projection |
| Effective Gross Income: | $1,275,000 |
| Operating Expenses: | $763,500 |
| Net Operating Income: | $ 511,500 |
| Expense Ratio: | 59.88% |
| Reserves Included: | Yes |
| Management Included: | Yes |
| Cap Rate - Derived: | 5.55% |
| EGIM - Derived: | 7.23 |

## Sale Analysis

| | |
|---|---|
| Sale Price Includes FF&E? | Yes |

## Occupancy

| | |
|---|---|
| Occupancy at Time of Sale: | 100.00% |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Flint, MI Metropolitan Statistical Area |
| Legal/Tax/Parcel ID: | 51-22-200-073 |
| GBA-SF: | 129,600 |
| NRA-SF: | 115,326 |
| Acres(Usable/Gross): | 8.10/8.10 |
| Land-SF(Usable/Gross): | 352,836/352,836 |
| Usable/Gross Ratio: | 1.00 |
| Year Built: | 1973 |
| Improvements Cond.: | Average |
| Construction Desc.: | Wood frame with a brick veneer/wood siding exterior. |
| No. of Units/Unit Type: | 174/Apt. Units |

## Improvement and Site Data (Cont'd)

| | |
|---|---|
| Roof,Heating,AC Comm.: | GFA- heat<br>Central A/C |
| Density-Unit/Gross Acre: | 21.48 |
| Density-Unit/Usable Acre: | 21.48 |
| Bldg. to Land Ratio FAR: | 0.37 |
| Land to Building Ratio: | 2.72 |
| Zoning Code: | R-4 |
| Utilities Desc.: | All Available |
| Source of Land Info.: | Public Records |

## Unit Mix

| No. of Bed-rooms | No. of Bath-rooms | No. of Units | Approx. Units SF | Total Units SF | % of Total |
|---|---|---|---|---|---|
| 0.00 | 1.00 | 3 | 450 | 1,350 | 1.2% |
| 1.00 | 1.00 | 99 | 600 | 59,400 | 51.5% |
| 2.00 | 1.00 | 72 | 758 | 54,576 | 47.3% |
| | | 174 | | 115,326 | |

## Project & Unit Amenities

| | |
|---|---|
| Common Laundry | Central AC |
| Clubhouse Building | Dishwasher |
| Swimming Pool | Patio/Balcony/Deck |

## Comments

The sale was an off-market transaction and was purchased along with Pine Creek Apartments (232 units) located in Vienna Township (Clio). The buyer approached the seller directly. The rents at the time of the sale were well-below market with the buyer expected to increase rents and reposition the property. The income and expenses are based on a year 1 pro-forma based on in-place rents increased modestly and market expenses including an uncapping of the real estate taxes, a 4% management fee, and $250/unit in reserves.

The property includes a 1,140 SF clubhouse and 720 SF storage building.

# Multifamily Sale Profile

# Sale No. 6

## Location & Property Identification

| | |
|---|---|
| Property Name: | Pine Creek Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 11650 Plaza Drive |
| City/State/Zip: | Vienna Township, MI 48420 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Suburban |
| Property Location: | S. of Vienna Rd., W. of Saginaw Rd. |
| IRR Event ID: | 3347492 |



## Sale Information

| | |
|---|---|
| Sale Price: | $12,349,000 |
| Effective Sale Price: | $12,349,000 |
| Sale Date: | 10/28/2024 |
| Sale Status: | Closed |
| $/SF GBA: | $65.67 |
| $/SF NRA: | $80.52 |
| $/Unit: | $53,228 /Apt. Unit |
| Grantor/Seller: | PH Apartments, LLC |
| Grantee/Buyer: | Pine Creek Apartments of Clio, LLC |
| Property Rights: | Leased Fee |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Subsidized/Restricted: | No |
| Verified By: | Donald L. Selvidge, MAI |
| Verification Date: | 04/08/2025 |
| Verification Type: | Confirmed-Confidential |
| Secondary Verific. Source: | CoStar |

## Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | IRR Projection |
| Effective Gross Income: | $1,600,000 |
| Operating Expenses: | $930,000 |
| Net Operating Income: | $ 670,000 |
| Expense Ratio: | 58.13% |
| Reserves Included: | Yes |
| Management Included: | Yes |
| Cap Rate - Derived: | 5.43% |
| EGIM - Derived: | 7.72 |

## Occupancy

| | |
|---|---|
| Occupancy at Time of Sale: | 100.00% |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Flint, MI |
| Legal/Tax/Parcel ID: | 18-23-200-010 & -024 |
| GBA-SF: | 188,050 |
| NRA-SF: | 153,357 |
| Acres(Gross): | 17.00 |
| Land-SF(Gross): | 740,520 |
| Year Built: | 1974/78 |
| Construction Quality: | Average |
| Improvements Cond.: | Average |
| Exterior Walls: | Brick |
| Construction Desc.: | Wood frame construction with brick and painted wood siding with pitched roof and asphalt shingles. |
| No. of Buildings/Stories: | 7/3 |
| No. of Units/Unit Type: | 232/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |

## Improvement and Site Data (Cont'd)

| | |
|---|---|
| Total Parking Spaces: | 466 |
| Park. Ratio 1000 SF GLA: | 3.04 |
| No. Surface Spaces: | 466 |
| Park. Ratio 1000 SF GBA: | 2.48 |
| Parking Ratio(/Unit): | 2.01 |
| Shape: | Irregular |
| Topography: | Level |
| Corner Lot: | No |
| AccessibilityRating: | Average |
| Visibility Rating: | Average |
| Density-Unit/Gross Acre: | 13.65 |
| Bldg. to Land Ratio FAR: | 0.25 |
| Land to Building Ratio: | 3.94 |
| Zoning Code: | RM |
| Zoning Desc.: | Multifamily |
| Utilities Desc.: | All available |
| Bldg. Phy. Info. Source: | Public Records |
| Source of Land Info.: | Public Records |

## Unit Mix

| No. of Bed-rooms | No. of Bath-rooms | No. of Units | Approx. Units SF | Total Units SF | % of Total |
|---|---|---|---|---|---|
| 1.00 | 1.00 | 19 | 504 | 9,576 | 6.3% |
| 1.00 | 1.00 | 36 | 546 | 19,656 | 12.9% |
| 2.00 | 1.00 | 57 | 621 | 35,397 | 23.2% |
| 2.00 | 1.00 | 120 | 734 | 88,080 | 57.7% |
| | | 232 | | 152,709 | |

## Project & Unit Amenities

Swimming Pool

Common Laundry

Basketball Court

Central AC

Patio/Balcony/Deck

## Comments

The sale was an off-market transaction and was purchased along with Mill Creek Apartments (174 units) located in Clio. The buyer approached the seller directly. The in-place rents at time of sale were well-below market. The buyer is proposing to increase rents and reposition the property. The income and expenses are based on a year 1 projection including an increase in the in-place rents and market operating expenses including an uncapping of the real estate taxes, a 4% management fee, and $250/unit in reserves.

## Rent Surveys

## Location & Property Identification

| | |
|---|---|
| Property Name: | Avon Park |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 1330 Avon Park Dr. |
| City/State/Zip: | Flint, MI 48503 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Suburban |
| Property Location: | W/S of Lapeer Rd., N. of I-69 |
| IRR Event ID: | 3551913 |



## Property Data

| | |
|---|---|
| Survey Date: | 09/16/2026 |
| No. of Units/Unit Type: | 56/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Vacancy @ Survey: | 5.00% |
| Yr. Built/Yr. Renov.: | 1995/2025 |
| Construction Type: | Garden and townhouse build of wood frame with vinyl siding. No basements. |
| Land Size (Ac.): | 0.00 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Playground |
| Unit Amenities: | Dishwasher, Patio/Balcony/Deck, Washer/Dryer Hookup, Central AC |
| Landlord Pays: | Trash, Sewer, Cold Water, Hot Water |
| Tenant Pays: | In-Unit Electric, Electric Cooking, Gas Heat |
| Survey Comp./Contact: | Maureen 810-767-0657/ |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 2 Bed/1 Bath | 4/2/1.0 | | INA | 788 | $1185 | $1.50 | |
| 2 Bed/2 Bath | 4/2/2.0 | | INA | 890 | $1255 | $1.41 | |
| 3 Bed/1.5 Bath TH | 5/3/1.5 | | INA | 1,090 | $1420 | $1.30 | |

## Comments

No concessions. Garage parking is included in rent.

Previously the property was a tax-credit property but are all market-rate units now. Each apartment comes with attached one-car garage. Management is renovating units during unit turnover.

# Multifamily Rent Survey Profile

# Rent Survey No. 2

## Location & Property Identification

| | |
|---|---|
| Property Name: | Schafer Square Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 883 Floyd J. McCree Dr. |
| City/State/Zip: | Flint, MI 48503 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Suburban |
| Property Location: | N. of E. 5th Ave., E. of Saginaw St. |
| IRR Event ID: | 3551870 |



## Property Data

| | |
|---|---|
| Survey Date: | 09/16/2026 |
| No. of Buildings/Stories: | 12/2 |
| No. of Units/Unit Type: | 91/Apt. Units |
| Vacancy @ Survey: | 1.00% |
| Yr. Built/Yr. Renov.: | 1978/ |
| Construction Type: | Wood frame with a brick veneer and wood/vinyl trim exterior. |
| Land Size (Ac.): | 6.69 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Common Laundry, Playground, Swimming Pool, One-Car Attached Garage |
| Unit Amenities: | Dishwasher, Patio/Balcony/Deck, Central AC |
| Landlord Pays: | Trash, Sewer, Cold Water |
| Tenant Pays: | In-Unit Electric, Hot Water, Gas Heat |
| Survey Comp./Contact: | Leo Leasing- 810-767-1515/ |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 1 Bed/1 Bath DN | 3/1/1.0 | 18 | INA | 697 | $950 | $1.36 | |
| 1 Bed/1 Bath UP | 3/1/1.0 | 18 | INA | 697 | $895 | $1.28 | |
| 2 Bed/1 Bath | 4/2/1.0 | 1 | INA | 1,000 | $1275 | $1.28 | |
| 2 Bed/2.5 Bath TH | 4/2/2.5 | 54 | INA | 1,051 | $1275 | $1.21 | |

## Comments

One-car attached garages- included. No concessions.

All 1 bed lower units and 2 bedroom units have private basements with washer/dryer hook-ups. The upper 1 bed units rely on community laundry. Each unit includes a security system monitored by the landlord.



26-31510-mar Doc 85 Filed 09/23/26 Entered 09/23/26 15:35:00 Page 154 of 174

# Multifamily Rent Survey Profile



## Location & Property Identification




| | |
|---|---|
| Property Name: | Savory Village Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 3901 Hammerberg Rd. |
| City/State/Zip: | Flint, MI 48507 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Suburban |
| Property Location: | E/S of Hammerberg Rd, S. of Atherton Rd |
| IRR Event ID: | 3545432 |

## Property Data

| | |
|---|---|
| Survey Date: | 09/01/2026 |
| No. of Buildings/Stories: | 11/3 |
| No. of Units/Unit Type: | 132/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Vacancy @ Survey: | 3.00% |
| Yr. Built/Yr. Renov.: | 1963/2020 |
| Construction Type: | Garden apartments constructed of brick and exterior siding. |
| Land Size (Ac.): | 5.35 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Common Laundry |
| Unit Amenities: | Patio/Balcony/Deck, Window/Sleeve AC, Vinyl Plank Floors (LVT/LVP) |
| Landlord Pays: | Trash, Sewer, Cold Water, Hot Water |
| Tenant Pays: | In-Unit Electric, Gas Heat |
| Survey Comp./Contact: | Tay 810-644-8447/ |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 3/1/1.0 | 12 | INA | 527 | $750 | $1.42 | |
| 2 Bed/1 Bath | 4/2/1.0 | 118 | INA | 763 | $823 | $1.08 | 795-850 |
| 3 Bed/1.5 Bath | 5/3/1.5 | 2 | INA | 985 | $925 | $0.94 | |

## Comments

The units have been renovated with new cabinetry/countertops and vinyl plank flooring.
Formerly known as Park West Apartments, Westgate Terrace, and Pines of Hammerburg Apartments.

# Multifamily Rent Survey Profile

# Rent Survey No. 4

## Location & Property Identification



| | |
|---|---|
| Property Name: | Miller West Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 3100 Miller Rd. |
| City/State/Zip: | Flint Township, MI 48507 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Urban |
| Property Location: | N/S of Miller Rd., West of Ballenger Hwy. |
| IRR Event ID: | 3545541 |

## Property Data

| | |
|---|---|
| Survey Date: | 09/01/2026 |
| No. of Units/Unit Type: | 136/Apt. Units |
| Vacancy @ Survey: | 3.00% |
| Yr. Built/Yr. Renov.: | 1964/ |
| Construction Type: | Garden buildings constructed of wood frame, brick and vinyl exterior. All units have private basement. |
| Land Size (Ac.): | 0.00 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Swimming Pool, Extra Storage Area, Covered Parking |
| Unit Amenities: | Patio/Balcony/Deck, Dishwasher, Washer/Dryer Hookup, Central AC, Range - Electric |
| Landlord Pays: | Trash, Sewer, Cold Water |
| Tenant Pays: | In-Unit Electric, Hot Water, Electric Cooking, Gas Heat |
| Survey Comp./Contact: | Veronica 810-425-1543/ |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 3/1/1.0 | 37 | 2 | 820 | $982 | $1.20 | $939-1024 |
| 2 Bed/1 Bath | 4/2/1.0 | 12 | 0 | 900 | $1029 | $1.14 | |
| 2 Bed/1.5 Bath | 4/2/1.5 | 71 | 2 | 1,027 | $1103 | $1.07 | $1078-1128 |
| 2 Bed/2 Bath | 4/2/2.0 | 4 | 0 | 1,163 | $1195 | $1.03 | |
| 3 Bed/2 Bath | 5/3/2.0 | 12 | 0 | 1,330 | $1299 | $0.98 | |

## Comments

Carport included in rent. No concessions.

Each unit has a private basement area with laundry hook-ups. Site has surface and carport parking.

## Location & Property Identification



| | |
|---|---|
| Property Name: | Morris Square Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 750 Jefferson St. |
| City/State/Zip: | Mount Morris, MI 48458 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Small Town - Non Metro |
| Property Location: | E/S of Saginaw Rd., N of Mt. Morris Rd. |
| IRR Event ID: | 3545548 |

## Property Data

| | |
|---|---|
| Survey Date: | 09/01/2026 |
| No. of Buildings/Stories: | 12/2 |
| No. of Units/Unit Type: | 96/Apt. Units |
| Multi-Tenant/Condo.: | No/No |
| Vacancy @ Survey: | 5.00% |
| Yr. Built/Yr. Renov.: | 1988/ |
| Construction Type: | Garden apartments with wood frame, brick and vinyl siding. |
| Land Size (Ac.): | 10.04 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Covered Parking, Common Laundry, Swimming Pool, Playground |
| Unit Amenities: | Central AC, Dishwasher, Patio/Balcony/Deck, Range - Electric |
| Tenant Pays: | Trash, In-Unit Electric, Sewer, Cold Water, Hot Water, Electric Cooking, Gas Heat |
| Survey Comp./Contact: | Lisa 947-333-9793/ |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 3/1/1.0 | 10 | 1 | 636 | $900 | $1.42 | |
| 2 Bed/1.5 Bath | 4/2/1.5 | 54 | 3 | 908 | $980 | $1.08 | |
| 2 Bed/2 Bath | 4/2/2.0 | 24 | 2 | 1,020 | $1035 | $1.01 | |
| 3 Bed/2 Bath | 5/3/2.0 | 8 | 0 | 1,080 | $1090 | $1.01 | |

## Comments

Gas and electric are separately metered. Cold water, sewer and trash billed back to the residents at $45/month. Carports available for additional fee. Select premium units include laundry hook-ups.

## Location & Property Identification

| | |
|---|---|
| Property Name: | Pine Ridge Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 526 Pine St. |
| City/State/Zip: | Clio, MI 48420 |
| County: | Genesee |
| Submarket: | Flint MSA |
| Market Orientation: | Suburban |
| Property Location: | E. of Haven St., W. of Old St. |
| IRR Event ID: | 3545403 |




## Property Data

| | |
|---|---|
| Survey Date: | 09/01/2026 |
| No. of Buildings/Stories: | 4/3 |
| No. of Units/Unit Type: | 44/Apt. Units |
| Vacancy @ Survey: | 5.00% |
| Yr. Built/Yr. Renov.: | 1965/ |
| Construction Type: | Three-story buildings constructed w/ wood frame and brick exterior. Hot water baseboard heat. |
| Land Size (Ac.): | 1.89 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Common Laundry |
| Unit Amenities: | Window/Sleeve AC, Patio/Balcony/Deck |
| Landlord Pays: | Trash, Sewer, Cold Water, Hot Water, Gas Heat |
| Tenant Pays: | In-Unit Electric |
| Survey Comp./Contact: | Gerald Leasing: 810-687-5500/ |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 1 Bed/1 Bath | 3/1/1.0 | 16 | INA | 600 | $800 | $1.33 | |
| 2 Bed/1 Bath | 4/2/1.0 | 16 | INA | 750 | $900 | $1.20 | |
| 3 Bed/1 Bath | 5/3/1.0 | 12 | INA | 900 | $1025 | $1.14 | |

## Addendum E

## Engagement Letter

Integra Realty Resources
www.irr.com

NAVC | Detroit

400 W. Maple
Suite 100
Birmingham, MI 48009

T (248) 540-0040
F (248) 540-8239

July 15, 2026

Kimberly Ross Clayson via email: kclayson@taftlaw.com
Taft Law Firm
Partner
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248-727-1635

**SUBJECT: Proposal/Authorization for Valuation and Consulting Services**
**Clio Woods Apartments**
**6914 Clio Court**
**Flint, Michigan**

Dear Ms. Clayson:

Integra Realty Resources – Detroit ("Integra – Detroit"), appreciates the opportunity to provide this proposal for valuation and counseling services for the above-captioned Property. The client for this appraisal will be Churchill MRA Funding I, LLC, represented by the Taft Law firm.

It is our mutual understanding that the purpose of this appraisal is to provide an opinion of the market value of the fee simple estate in the Subject Property as of a current, and that the intended use of the report is for litigation support purposes.

The property consists of multi-family property with the secured creditor, Chruchill Funding I LLC being represented by your firm. It is understanding that the property is currently 67% occupied but this will be confirmed during our due diligence and valuation process.

To report the assignment results, we use the Appraisal Report option of Standards Rule 2-2(a) of USPAP. As USPAP gives appraisers the flexibility to vary the level of information in an Appraisal Report depending on the intended use and intended users of the appraisal, we adhere to the Integra Realty Resources internal standards for an Appraisal Report – Standard Format. This format summarizes the information analyzed, the appraisal methods employed, and the reasoning that supports the analyses, opinions, and conclusions.

The appraisal will be in conformance with and subject to, the Standards of Professional Practice and Code of Ethics of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice

Kimberly Ross Clayson
July 15, 2026
Page 2 of 13

(USPAP) developed by the Appraisal Standards Board of the Appraisal Foundation. The appraisal is also prepared in accordance with the appraisal regulations issued in connection with the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA).

The appraisal will consider all applicable approaches to value as determined during the course of our research, analysis and reporting.

Our fee for this assignment will be $6,850. The retainer for this assignment will be $4,000. It is our understanding the Churchill MRA Funding will be responsible for the payment of all fees relating to these appraisal services. The report will be completed and delivered to you within 2 weeks from our receipt of this fully executed engagement letter and the information requested in **ATTACHMENT II**.

Additional fees will be charged on an hourly basis for any work which exceeds the scope of this proposal, including performing additional valuation scenarios, and/or additional research.

The terms of **ATTACHMENT I** which apply to this engagement are hereby incorporated by reference.

In order to complete this assignment in the designated time, we will require as much of the available information as possible, as identified in **ATTACHMENT II**, within five business days after the execution of this engagement letter. Further, the inspection of the property has to occur within a reasonable period of time. Any delays in the receipt of this information or in the access to the Property will automatically extend the final delivery date of the reports as proposed. Furthermore, the appraisal reports and conclusions therein will be predicated upon the accuracy and completeness of the information provided by the Client and set forth in Attachment II. In the absence of some of this information, the appraisers will attempt to obtain this information from other sources and/or may require the use of Extraordinary Limiting Conditions and Assumptions within the appraisal reports.

The appraisal report will be limited by our standard Assumptions and Limiting Conditions and any Extraordinary Assumptions and Limiting Conditions, which become apparent or necessary during the course of the assignment. A copy of the standard Assumptions and Limiting Conditions is set forth in **ATTACHMENT III**.

The purpose of the appraisal report is to estimate the market value of the Subject Property on behalf of the Client as the intended user of the appraisal report. The intended use of the appraisal report is to assist the Client in evaluating the Subject Property for estate planning purposes. Without first obtaining our prior written consent, the use of the appraisal report by anyone other than the Client is prohibited. Accordingly, the appraisal report will be addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report (or any part thereof including,

Kimberly Ross Clayson
July 15, 2026
Page 3 of 13

without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal reports (even if their reliance was foreseeable).In the event the Client provides a copy of this appraisal to, or permits reliance thereon by, any person or entity not authorized by Integra – Detroit, the Client agrees to indemnify and hold harmless Integra – Detroit, its affiliates and its shareholders, directors, officers and employees, from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the review appraisal by any such unauthorized person or entity.

If the appraisal is referred to or included in any offering material or prospectus, the appraisal shall be deemed referred to or included for informational purposes only and Integra – Detroit, its employees and the appraisers have no liability to such recipients. Integra – Detroit disclaims any and all liability to any party other than the Client which retained Integra – Detroit to prepare the appraisal.

If this proposal is acceptable, please authorize us to proceed by executing this letter agreement where noted below, initial all attachments where indicated in the lower right-hand corner, and returning one copy to the undersigned. Thank you for considering us for this assignment and we look forward to working with you. Please call if you wish to discuss this proposal or the assignment any further.

Sincerely,

**Integra Realty Resources – Detroit**

Anthony Sanna, MAI, CRE
Executive Director

**Agreed & Accepted This ______ Day Of ______________________, 2026**

**By:** **Churchill MRA Funding I, LLC**

____________________________________

**Authorized Signature**

____________________________________

**NAME (PRINT)**

Kimberly Ross Clayson
July 15, 2026
Page 5 of 13

**ATTACHMENT I**

**ADDITIONAL TERMS**

This assignment is subject to the following terms:

1. Completion Date Estimate: Integra – Detroit agrees to use reasonable commercial efforts to complete this report as per the attached letter agreement. Said completion date is an estimate and does not take into consideration pre-trial or court time as well as delays beyond the control of Integra – Detroit such as illness, lack of specific necessary data and/or Acts of God.
2. Database/Marketing: Both parties acknowledge that real estate appraisal requires current and historical market data to competently analyze the Subject Property. Accordingly, the Client agrees that: (i) the data collected by Integra – Detroit in this assignment will remain the property of Integra – Detroit; and (ii) with respect to any data provided by the Client, Integra – Detroit and its partner companies may utilize, sell and include such data (either in the aggregate or individually), in their marketing materials, the Integra database and derivative products, including the identity of the Client and the Subject Property. The Client agrees that all data already in the public domain may be utilized on an unrestricted basis.
3. Litigation: In the event Integra – Detroit is called upon to provide testimony or receives a subpoena concerning any suit or proceeding or otherwise become involved in any litigation relating to this engagement or assignment, in which Integra – Detroit is not a party, Integra – Detroit will make every reasonable effort to assist the Client and give such testimony. The Client agrees to compensate Integra – Detroit at its then current rates, on an hourly basis, plus reimbursement for all expenses incurred as a result of said litigation. In addition to the foregoing, the following terms are applicable:

   (a) Review and trial preparation (if applicable) in-office, will be billed at standard hourly rates; outside office rates may apply to conferences, depositions and testimony. Our current in-office rates are as follows:

   | | |
   |---|---|
   | Managing Directors | $350 per hour |
   | Directors or Principals *(Other MAIs, CPAs, CFAs, and Real Estate Brokers)* | $175–$250 per hour |
   | Senior Analyst | $150-$250 per hour |
   | Analyst | $100–$175 per hour |

   (b) All reports for which testimony is required must be disclosed prior to report authorization.

   (c) All fees for reports, conferences and depositions must be paid prior to hearings and trial.

   (d) Scheduling of casework and appearances will be made with due consideration for the time of all persons involved. Every effort to comply with reasonable requests for appearances will be made. Once an appointment, deposition or appearance is scheduled,

Initials

Kimberly Ross Clayson
July 15, 2026
Page 6 of 13

that time is set aside. Therefore, if the appearance is canceled, or the reserved time is abandoned for whatever reason, the following cancellation charges will apply:

| | |
|---|---|
| 1. More than one week | No Charge |
| 2. 48 Hours prior | $250.00 |
| 3. Less than 48 Hours prior | $600.00 |
| 4. A Stand-by Charge of | $250.00 per day |

(e) Due to the difficulty associated with accurately forecasting the number of hours which may be required with the research, hearing and/or trial preparation, deposition time, client/expert conferences, etc., we will maintain contemporaneous time and expense records and will provide you invoices on a 30 day billing cycle. The Client agrees to pay Integra – Detroit at the time the invoice is submitted and acknowledges payment to Integra – Detroit is not contingent upon any set outcome, result or award to the Client.

4. Limitations of Liability: It is expressly agreed that in any action which may be brought against Integra – Detroit, Integra Realty Resources, Inc. or their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, or any estimates or information contained therein, the Integra Parties shall not be responsible or liable for an incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with gross negligence. It is further agreed that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal reports unless the appraisal was fraudulent or prepared with gross negligence. Finally, it is agreed that the fees charged herein are in reliance upon the foregoing limitations of liability.

   In the event the Client provides our work or permits reliance thereon by, any person or entity not authorized by Integra – Detroit in writing to use or rely thereon, Client hereby agrees to indemnify and hold Integra – Detroit, its affiliates and the respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon our work by any such unauthorized person or entity.

   You acknowledge that any opinions and conclusions expressed by professionals employed by Integra – Detroit during this assignment are representations made as them as employees and not as individuals. Our responsibility is limited to you as Client, and use of our product by third parties shall be solely at the risk of you and/or third parties.

5. Late Fees; Etc.: Unless arrangements are made otherwise, a late charge of 15% per annum, commencing thirty (30) days after the receipt of invoice will be charged on any balance not paid; however, in no event shall this delinquency rate of interest exceed the maximum rate permitted by law. We shall also be entitled to recover our costs (including attorneys' fees), associated with collecting any amounts owed or otherwise incurred in connection with this engagement. Upon

Initials

Kimberly Ross Clayson
July 15, 2026
Page 7 of 13

default, we shall be permitted to file a lien against the Subject Property for any amounts owed pursuant to this engagement.

6. Cancellation: In the event the assignment is canceled prior to completion, an invoice will be prepared reflecting the percentage of work completed as of that date plus $350 for file setup and soft costs. Any credits to the Client will be promptly refunded or any remaining balances to Integra – Detroit will be indicated on the invoice.
7. Responding to Review: We agree to respond to your review of our reports within five (5) business days of your communication to us. Correspondingly, you will have twenty-one (21) days from receipt of our reports to communicate your review. We reserve the right to bill you for responding to your review beyond this time period.
8. Special Experts: Any out-of-pocket expenses incurred during this assignment will be billed at cost and included on the invoice. Should the Client request the assistance of Integra – Detroit in hiring a special expert to contribute to this assignment (including but not limited to, a surveyor, environmental consultant, land planner, architect, engineer, business, personal property, machinery and equipment appraiser, among others), the Client agrees to perform their own due diligence to qualify said special expert. The Client agrees and acknowledges it is solely responsible in paying for the services of said special expert. Furthermore, the Client acknowledges that Integra – Detroit is not responsible for the actions and findings of the special expert and agrees to hold Integra – Detroit harmless from any and all damages that may arise out of the Client's reliance on the special expert.
9. Duration of Quote: This proposal and fees quoted are valid for a period of fourteen (14) calendar days from the date hereof. If not retained by the Client, the fact that we made the foregoing proposal of professional services will not preclude us from performing professional services for another client on the Property.
10. Marketpoint/Template: The Client acknowledges that IRR-Marketpoint, our appraisal templates and DataPoint software is proprietary and confidential. Accordingly, the Client agrees not to use such software or make such software available for the use of any third party.
11. Arbitration: The parties agree that any dispute relating to this letter agreement or the appraisal reports shall be submitted to, and resolved exclusively pursuant to arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall take place in Oakland County and shall be subject to the substantive laws of the state of Michigan. Decisions pursuant to such arbitration shall be final, conclusive and binding on the parties. Upon the conclusion of the arbitration, the parties may apply to any appropriate court to enforce the decision of such arbitration.

_______
Initials

Kimberly Ross Clayson
July 15, 2026
Page 8 of 13

**ATTACHMENT II**

**REQUEST FOR PROPERTY INFORMATION**

Current Rent Roll
Year End Operating Statements for trailing three years
Current YTD Operating Statements
List of Capital repairs made over past 36 months
List of necessary Capital repairs anticipated for next 36 months
Rental Delinquency report

________
Initials

Kimberly Ross Clayson
July 15, 2026
Page 9 of 13

**ATTACHMENT III**

**ASSUMPTIONS & LIMITING CONDITIONS**

The appraisals are based on the following assumptions, except as otherwise noted in the reports.

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The Property are under responsible ownership and competent management and are available for its highest and best use.
2. There are no existing judgments or pending or threatened litigation that could affect the value of the Property.
3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the Property more or less valuable. Furthermore, there is no asbestos in the Property.
4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.
5. The Property are in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.
6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

These appraisals are subject to the following limiting conditions, except as otherwise noted in the reports.

1. An appraisal is inherently subjective and represents our opinion as to the value of the Property appraised.
2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.
3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.
4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.
5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the Property without compensation relative to such additional employment.
6. We have made no survey of the Property and assume no responsibility in connection with such matters. Any sketch or survey of the Property included in this report is for illustrative

Initials

Kimberly Ross Clayson
July 15, 2026
Page 10 of 13

purposes only and should not be considered to be scaled accurately for size. The appraisal covers the Property as described in this report, and the areas and dimensions set forth are assumed to be correct.

7. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the Property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.
8. We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations, such as soils and seismic stability, and civil, mechanical, electrical, structural and other engineering and environmental matters.
9. The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the Property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal reports shall be considered only in its entirety. No part of the appraisal reports shall be utilized separately or out of context.
10. Neither all nor any part of the contents of this reports (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the person signing the reports.
11. Information, estimates and opinions contained in the reports, obtained from third-party sources are assumed to be reliable and have not been independently verified.
12. Any income and expense estimates contained in the appraisal reports are used only for the purpose of estimating value and do not constitute predictions of future operating results.
13. If the Property are subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised Property at the time these leases expire or otherwise terminate.
14. No consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

Initials

Kimberly Ross Clayson
July 15, 2026
Page 11 of 13

15. The current purchasing power of the dollar is the basis for the value stated in our appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.
16. The value found herein is subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.
17. The analyses contained in the reports necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our analysis will vary from our estimates, and the variations may be material.
18. The *Americans with Disabilities Act (ADA)* became effective January 26, 1992. We have not made a specific survey or analysis of any property to determine whether the physical aspects of the improvements meet the *ADA* accessibility guidelines. In as much as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, we cannot comment on compliance to *ADA*. Given that compliance can change with each owner's financial ability to cure non-accessibility, the value of the subject does not consider possible non-compliance. A specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.
19. The appraisal reports are prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the reports without our written consent do so at their own risk.
20. No studies have been provided to us indicating the presence or absence of hazardous materials on the Subject Property or in the improvements, and our valuation is predicated upon the assumption that the Subject Property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the Subject Property and the person signing the reports shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal reports cannot be considered as an environmental assessment of the Subject Property.
21. The person signing the reports may have reviewed available flood maps and may have noted in the appraisal reports whether the Subject Property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of

Initials

Kimberly Ross Clayson
July 15, 2026
Page 12 of 13

the Property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra is not a building or environmental inspector. Integra does not guarantee that the Subject Property is free of defects or environmental problems. Mold may be present in the Subject Property and a professional inspection is recommended.

23. The appraisal reports and value conclusion for an appraisal assumes the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. IRR – Detroit is an independently owned and operated company. The parties hereto agree that Integra Realty Resources, Inc. ("Integra") shall not be liable for any claim arising out of or relating to any appraisal report or any information or opinions contained therein as such appraisal report is the sole and exclusive responsibility of IRR – Detroit. In addition, it is expressly agreed that in any action which may be brought against IRR – Detroit and/or any of its officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), arising out of, relating to, or in any way pertaining to this engagement letter, the appraisal reports or any related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further expressly agreed that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the assignment (unless the appraisal was fraudulent or prepared with intentional misconduct). It is expressly agreed that the fees charged herein are in reliance upon the foregoing limitations of liability.

25. Integra – Detroit, an independently owned and operated company shall prepare the appraisal for the specific purpose so stated elsewhere in this proposal. The intended use of the appraisal is stated in the General Information section of the reports. The use of the appraisal reports by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal reports will be addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal reports (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal reports (even if their reliance was foreseeable).

26. The conclusions of these reports are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public record, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties and the undersigned are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable

Initials

Kimberly Ross Clayson
July 15, 2026
Page 13 of 13

based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of these Property.

27. All prospective value estimates presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

As will be determined during the course of the assignment, additional extraordinary or hypothetical conditions may be required in order to complete the assignment. The appraisal shall also be subject to those assumptions.

Initials

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Case No. 26-31510-mar<br>Chapter 11 |
| Discount Warehouses, LP, | |
| Debtor. | Hon. Mark A. Randon |

______________________________________

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2026, my office electronically filed the *Objection of Churchill MRA Funding, LLC to Debtor's Motion for Entry of Final Order (I) Authorizing Debtor to Obtain Post-Petition Financing Secured By Liens on Property of the Estate, (II) Granting Super Priority Claims, and (III) Granting Certain Related Relief* with the Clerk of the Court which sends notices by operation of the Court's electronic filing service to all ECF participants registered to receive notice in the above-captioned matter.

Dated: September 23, 2026

Respectfully Submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

By: /s/ Kimberly Ross Clayson
Kimberly Ross Clayson (P69804)
Ethan Holtz (P71884)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Telephone: (248) 351-3000
kclayson@taftlaw.com
eholtz@taftlaw.com

*Counsel to Creditor, Churchill MRA Funding I LLC*