**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:
DISCOUNT WAREHOUSES, LP,
Debtor.
_______________________________/

Chapter 11
Case No. 26-31510-mar
Hon. Mark A. Randon

# 364 CAPITAL, LLC'S CONCURRENCE IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF FINAL DIP FINANCING ORDER AND IN OPPOSITION TO CHURCHILL MRA FUNDING I, LLC'S OBJECTION

364 Capital, LLC ("364 Capital" or the "DIP Lender") submits this concurrence in support of the Motion of Discount Warehouses, LP (the "Debtor") for Entry of a Final Order Authorizing Debtor-in-Possession Financing (ECF No. 63) (the "DIP Motion") and in opposition to the objection of Churchill MRA Funding I, LLC ("Churchill") (ECF No. 85) (the "Objection"). The Churchill Objection relies on an appraisal prepared by Integra Realty Resources ("IRR"). (ECF No. 85 at 17-172 (the "IRR Appraisal").) The Churchill Objection should be overruled and the revised proposed Final Order entered. A redline of the revised order against the original proposed order is attached as Concurrence Exhibit A. The Debtor's response (ECF No. 89) attaches a supplemental declaration of Barry Cohen (ECF No. 89-1) and an updated appraisal of the Property (ECF Nos. 89-2 to 89-5) (the "Bowery Appraisal").

## SUMMARY

The Debtor owns an 84-unit apartment complex at 6914 Clio Court/Clio Road in Flint, Michigan (the "Property"). Some of the units have been renovated and are

rented. The rest are unfinished and produce no income. The Debtor asks to borrow up to $1.655 million from 364 Capital (the "DIP Loan"), secured by a lien senior to Churchill's, to finish the remaining units and bring them online.

Section 364(d)(1) allows a priming lien when (A) the debtor cannot obtain the credit otherwise and (B) the existing lienholder's interest is adequately protected. The record establishes both. This Court should grant the relief requested for the following 4 reasons:

**First, the Debtor could not get this money any other way.** Barry Cohen, the Debtor's controlling partner, states in his declarations that he contacted 25 lenders, identified each by name and approximate date of contact, and could not obtain the financing on more favorable terms. Only four of those lenders considered offering any financing, and each was no longer available or offered worse terms than 364 Capital. (ECF No. 89-1 at 1-2, ¶¶ 3-4; ECF No. 63-4 at 2, ¶ 7.)

**Second, Churchill is adequately protected.** Churchill argues otherwise only by (1) measuring its collateral at a 60-day forced-liquidation value that has nothing to do with how the Property will actually be used, and (2) relying on an IRR as-is value that deducts far more than the actual cost to finish the work. Once those two problems are corrected, both appraisals show value above Churchill's stated claim plus the entire DIP Loan ($4,657,045):

- Churchill's own appraiser values the completed, stabilized Property at $6,552,000 under the sales approach and $6,886,640 under the income approach. Those figures exceed Churchill's claim plus the full DIP Loan by more than $1.89 million. **<u>IRR's stabilized income value is actually higher than the Debtor's appraiser's stabilized value</u>**.

- IRR's as-is value, corrected only for the cost to complete shown in the filed DIP budget, is $4,854,989 on the 10% discount IRR used in its own calculation tables. That is about $197,944 above Churchill's claim plus the full DIP Loan.

- The Debtor's appraiser, Bowery Valuation ("Bowery"), concludes to a $4.9 million as-is value after deducting the full renovation budget, rent loss, a leasing commission, and entrepreneurial profit. That is about $242,955 above the same combined debt.

- Once the DIP Loan has paid for the remaining work, the appraisers' deduction for that work no longer belongs in the calculation. With that deduction added back, the cushion over Churchill's claim plus the full DIP Loan is $562,955 to $1,312,955 on IRR's figures (depending on which of IRR's two discounts is used) and about $1,206,761 on Bowery's appraisal.

**Third, no separate valuation evidentiary hearing is needed.** The dispute turns on arithmetic applied to two written appraisals and a filed budget. The Court can resolve it on the papers.

**Fourth, Churchill's objections to the form of order are aimed at an earlier draft.** The revised order removes or narrows each of the provisions Churchill challenged. (Part VI.)

Without new money, the unfinished units will stay unfinished, will produce no rent, and will not support Churchill's debt or anyone else's. Flint needs good, affordable rental housing. IRR forecasts submarket vacancy of 13.0% to 13.3% through 2030, against 8.0% for the completed Property, and reports that six local housing agencies had contacted the Property about placing residents. (ECF No. 85 at 28, 48-49.) The DIP Loan lets the Debtor finish the Property, lease it up, and reorganize around the income it produces.

| THE KEY NUMBERS AT A GLANCE | | |
|---|---|---|
| **Question** | **Churchill's position** | **What the record shows** |
| 1. Which value standard applies? | A 60-day liquidation value of $2.73 million. (ECF No. 85 at 99-100.) | Market value for the proposed use: continued operation, completion, and lease-up. 11 U.S.C. § 506(a)(1). No liquidation is proposed. |

| THE KEY NUMBERS AT A GLANCE | | |
|---|---|---|
| **Question** | **Churchill's position** | **What the record shows** |
| 2. What is IRR's as-is value? | $3.4 million. | IRR's report gives two answers: $3.4 million in its narrative (20% discount) and $4.15 million in its calculation tables (10% discount). (ECF No. 85 at 26, 78, 97, 99.) |
| 3. What will it cost to finish? | About $1.9 million (ECF No. 85 at 3-4, 11); IRR deducts $1.82 million. | The budget shows $865,011 of hard and soft costs to complete. Adding the full contingency and critical-vendor lines gives $1,115,011, which is $704,989 less than IRR's deduction. (ECF No. 63-1 at 20-23.) |
| 4. Is there a cushion today? | No. | Yes. IRR corrected (10% discount): $4,854,989. Bowery: $4.9 million. Both exceed Churchill's claim plus the full DIP Loan ($4,657,045). |
| 5. Is there a cushion once the work is done? | Counts the DIP Loan as debt but not the improvements it pays for. | Yes. With the renovation deduction added back, the cushion is $562,955 to $1,312,955 on IRR's figures (20% and 10% discounts) and $1,206,761 on Bowery's. |

## RELEVANT FACTS

### A. The Property, Churchill's claim, and the DIP Loan.

1. Churchill asserts a secured claim of $3,002,045.43, excluding attorneys' fees, costs, and postpetition interest. (ECF No. 85 at 2.) The Debtor seeks authority to borrow up to $1.655 million from 364 Capital at 12.5% non-default interest.

(ECF No. 63; ECF No. 63-1.) Churchill's claim plus the full DIP Loan is $4,657,045.43.

2. Part of the Property is already finished and leased. According to Cohen, as reported by IRR, Building 6914 (20 units) has been renovated and is fully occupied, and Building 6918 is nearly complete, with 13 units occupied or ready for occupancy. Cohen estimated the remaining work at 90 days. IRR did not adopt that estimate and assumed six months instead. (ECF No. 85 at 28, 49.) IRR reports the Property as 27% leased, and Bowery reports that 25 of the 84 units have been renovated and that current occupancy is 29%. (ECF No. 85 at 26, 28; ECF No. 89-2 at 5-6.)

3. The DIP budget does not spend $1.655 million on construction. It allocates the facility as follows (ECF No. 63-1 at 20-23; see also ECF No. 85 at 117-119, reproducing the same budget in IRR's addendum):

| **Use of DIP Loan proceeds** | **Amount** |
|---|---:|
| Hard and soft costs to complete | $865,011 |
| Contingency | $100,000 |
| Critical-vendor payments | $150,000 |
| **Construction-related subtotal (counted generously)** | **$1,115,011** |
| Professional fees | $151,550 |
| Interest reserve (one year at 12.5%) | $206,875 |
| Lender fees (commitment $66,200; servicing $16,550; deferred $40,000; application $10,000) | $132,750 |
| Closing costs | $23,814 |
| Real estate taxes and insurance | $25,000 |

| Use of DIP Loan proceeds | Amount |
|---|---|
| **Other uses subtotal** | **$539,989** |
| **Total facility** | **$1,655,000** |

Only the $865,011 line is labeled "Total Hard & Soft Costs to Complete." The Financing Commitment attached to the DIP Motion (the "Commitment") treats the commitment fee, servicing fee, interest reserve, and deferred fee as lender holdbacks. (ECF No. 63-1.) The construction-related subtotal above counts the entire contingency and the entire critical-vendor line as construction cost, which overstates the cost to complete in Churchill's favor.

4. The Objection says the budget has no line item for DIP debt service. (ECF No. 85 at 5.) It does. The $206,875 interest reserve equals one year of interest at 12.5% on the $1.655 million "Maximum Loan Amount," and the Commitment requires that interest be paid first from the interest reserve account. (ECF No. 63-1 at 4-5, 23.) The Commitment also guarantees the lender at least 180 days of interest. (Id. at 5.)

**B. How the appraisers value the Property.**

5. Appraisers of apartment property generally use two approaches: sales comparison (what similar properties sell for, usually stated per unit) and income capitalization (net operating income divided by a capitalization rate). They also report values at different points in time. "Prospective stabilized" value is the value once the property is finished and leased up. "As-is" value is the value today, which

is generally the stabilized value less the cost and risk of getting there. "Net realizable value" in IRR's appraisal is a liquidation figure: what a forced sale on a short marketing period would bring, less selling costs.

6. **IRR (Churchill's appraiser).** IRR's valuation date is September 11, 2026, and it assumes six-month completion. Its stabilized values are $6,552,000 under the sales approach ($78,000 per unit × 84 units) and $6,886,640 under the income approach at a 9.00% capitalization rate. To reach as-is value, IRR deducts $200,000 of lease-up cost, $1.82 million of renovation cost (the entire $1.655 million DIP facility plus 10%), and an "unstabilized discount." (ECF No. 85 at 26-28, 57, 78, 97.) IRR's report is inconsistent about that discount. Its narrative says 20%, which produces about $3.22 million (sales) and $3.5 million (income), reconciled to $3.4 million. Its calculation tables, however, apply 10% ($655,200 and $688,664), which produces $3,876,800 and $4,177,976, reconciled to $4.15 million. (Id. at 26, 78, 97, 99.) Separately, IRR reports a $2.9 million liquidation value and a $2.73 million net realizable value. (Id. at 99-100.)

7. **Bowery (the Debtor's appraiser).** The Bowery Appraisal, dated September 30, 2026, concludes with a $4.9 million as-is value as of August 14, 2026, and a $6.5 million prospective stabilized value as of August 14, 2027. (ECF No. 89-2 at 3; ECF No. 89-3 at 12.) Its income approach applies a 9.00% capitalization rate to reach $6,484,278 stabilized, then deducts the $986,275 remaining renovation budget, $237,022 of rent loss, a $62,100 commission, and

$321,349 of entrepreneurial profit, for an as-is value of $4,877,531. Bowery's sales approach starts from a $6,552,000 stabilized value ($78,000 per unit × 84 units) and, after the same deductions, reaches an as-is value of $4,945,254. (ECF No. 89-3 at 6-7, 11.) Bowery also assumes six-month completion. (ECF No. 89-2 at 3, 7.) Even so, it deducts only three months of lost rent, based on the Property's superior finishes, unit size, amenities, and a reported wait list. (ECF No. 89-3 at 6-7, 11.) Ownership plans to finish and lease the remaining units in stages over those six months, so each unit can be rented as soon as it is completed. (ECF No. 89-2 at 5.)

## ARGUMENT

### I. SECTION 364(d) ASKS A PRACTICAL QUESTION: WHETHER THE FINANCING PRESERVES THE VALUE OF THE EXISTING LIENS.

The Debtor bears the burden on adequate protection. 11 U.S.C. § 364(d)(2). Adequate protection does not mean the absence of all risk. It protects the value of the existing creditor's interest against unjustified loss caused by the financing. The inquiry is practical and depends on the facts of the case. Courts look at the value of the secured interest, the risk that the value will decline, and whether the proposed protection answers that risk. See In re TeVoortwis Dairy, LLC, 605 B.R. 833, 839-40 (Bankr. E.D. Mich. 2019). Nothing in the statute imposes a minimum cushion percentage. The Sixth Circuit has recognized that section 364 supplies court-approved incentives to induce lenders to take on the risks of postpetition

lending. In re Cannonsburg Environmental Associates, Ltd., 72 F.3d 1260, 1267 (6th Cir. 1996).

Value is measured in light of the purpose of the valuation and the proposed use of the property. 11 U.S.C. § 506(a)(1); Assocs. Com. Corp. v. Rash, 520 U.S. 953, 962-63 (1997); see also In re Windsor Hotel, L.L.C., 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) (using current fair market value in a section 364(d) analysis). Rash tells us that the valuation premise must match the proposed use. Here the proposed use is completion, lease-up, and continued operation.

This is the setting where priming financing makes sense: an existing income-producing asset, completed work, a defined remaining scope, leased units, a line-item completion budget, and a lender willing to fund work that will increase the collateral's income and value.

**II. THE DEBTOR CANNOT OBTAIN THIS CREDIT ON OTHER TERMS.**

Churchill relies on In re Stacy Farms, 78 B.R. 494 (Bankr. S.D. Ohio 1987). There, the court found no evidence that the debtor had approached any lender other than the two proposed lenders and no evidence that the proposed terms were the best available. Id. at 498. Even then, the court denied the motions without prejudice. It did not hold that a debtor must produce written rejection letters from

every lender it contacts. Id. at 499.[1] Here, Cohen states that he searched diligently, contacted more than 24 lenders, and could not obtain the financing on more favorable terms. (ECF No. 63-4 at 2, ¶ 7.) His supplemental declaration names each of the 25 lenders, gives the month and year of each contact, and states that the four lenders that considered offering financing were no longer available or offered worse terms than 364 Capital. (ECF No. 89-1 at 1-2, ¶¶ 3-4.) That answers the Objection's complaint that the declaration does not say which lenders were contacted or when. (ECF No. 85 at 7.) That is a broader search than in Stacy Farms, and it explains why financing without a priming lien was not available on terms sufficient to finish the Property.

## III. CHURCHILL IS ADEQUATELY PROTECTED.

### A. A 60-day liquidation value is the wrong measure, and IRR's figure is unreliable anyway.

Churchill's headline claim, a $1.927 million equity deficit, compares the combined debt to IRR's $2.73 million net realizable value. That number assumes a forced sale within 60 days, net of selling costs. (ECF No. 85 at 99-100.) No one

[1] Section 364(d) does not require a written rejection letter from every lender or an exhaustive nationwide search. In re Reading Tube Industries, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987), held that the extent of the search depends on the case and that a debtor need not contact a seemingly infinite number of possible lenders. Bray v. Shenandoah Federal Savings & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986), affirmed a priming loan where the trustee had unsuccessfully approached other institutions in the area. First Security Bank & Trust Co. v. Vegt, 511 B.R. 567, 578-80 (N.D. Iowa 2014), affirmed a finding that credit was unavailable based on testimony of unsuccessful requests to approximately 15 to 20 banks.

proposes to sell the Property in 60 days. The proposed use is completion and continued operation, and section 506(a) ties value to that use. Rash, 520 U.S. at 962-63. A liquidation number answers a question that is not before the Court.

IRR's net realizable value is also internally inconsistent. Its narrative deducts a 4% sales commission plus $25,000 of legal cost. IRR's table reproduced below deducts 5% ($145,000) plus $25,000. (ECF No. 85 at 99.) The Churchill Objection then uses selling costs of $161,000, which matches neither: on IRR's $2.9 million liquidation value, 4% plus $25,000 is $141,000, and 5% plus $25,000 is $170,000. (ECF No. 85 at 9.) It is unclear where the Objection's $161,000 figure came from.

Reconciliation and Conclusion of Value 76

The following table summarizes the concluded values.

**Value Conclusions**

| Value Type & Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As Is | Fee Simple | September 11, 2026 | $3,400,000 |
| Liquidation Value | Fee Simple | September 11, 2026 | $2,900,000 |
| Net Realizable Value | Fee Simple | September 11, 2026 | $2,730,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. The as is market value assumes that the total renovation costs do not exceed $1,900,000 and can be completed within six months.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

*Figure 1. IRR conclusion page (ECF No. 85 at 100): $3.4 million as-is value, $2.73 million net realizable value, and IRR's "extraordinary assumption" that the renovation will cost no more than $1.9 million and will be finished within six months.*

**B. IRR deducted the entire DIP Loan as if it were construction cost.**

IRR calls the "remaining balance of costs" $1.655 million, treats that entire amount as renovation cost, and adds a 10% contingency to reach a $1.82 million deduction. (ECF No. 85 at 28, 57.) Churchill goes further and describes about $1.9 million as the cost to finish, so that the DIP Loan is supposedly about $245,000 short. (ECF No. 85 at 3-4, 11.)

Debtor's filed budget shows otherwise. As Fact ¶ 3 above shows, only $865,011 is construction cost. The rest of the facility pays professional fees, taxes, insurance, lender fees, closing costs, and an interest reserve. The same budget appears in IRR's own addendum, including the line "Total Hard & Soft Costs to Complete" of $865,011. (ECF No. 85 at 117-119.) Even counting the entire $100,000 contingency and the entire $150,000 critical-vendor line as construction, the cost to complete is $1,115,011. IRR's $1.82 million deduction overstates that figure by $704,989. If the critical-vendor line is excluded, the overstatement is $854,989.

IRR also counts contingency twice. The budget already contains a $100,000 contingency, yet IRR took the whole facility, contingency included, and added another 10%. (ECF No. 63-1 at 23; ECF No. 85 at 28, 119.) Elsewhere IRR describes its $1.9 million figure as including a 15% contingency, so its own contingency assumption somehow shifts between 10% and 15%. (ECF No. 85 at 27.)

### C. IRR's report uses two different discounts and reaches two different as-is values.

IRR's $3.4 million as-is conclusion depends on the **<u>20%</u>** unstabilized discount described in its narrative. But IRR's calculation tables apply **<u>10%</u>** and reconcile to $4.15 million. (ECF No. 85 at 26, 78, 97, 99.) The two cannot both be right. If IRR meant the 10% it actually applied in its tables, $4.15 million is its result. If it meant 20%, its own tables do not show the work. Figures 2 and 3 show the inconsistency on the face of the report.

- **Balance of Renovation Costs** – the total renovation costs remaining, including a contingency, is projected at $1,820,000.
- **Unstabilized Discount** – the subject is 27% occupied and requires substantial renovation prior to stabilization. There is considerable effort and risk required to complete the renovation and stabilize the property. Thus, we have applied an unstabilized discount to the indicated stabilized value. This is in recognition of the fact that buyers and lenders view the purchase and/or financing of unstabilized assets as riskier than the purchase and/or financing of stabilized assets. Thus, equity and mortgage rates are higher. Considering the subject's occupancy level and the extensive renovation required, an unstabilized discount of 20% is applied.

**Value Indication by Sales Comparison**

| | |
|---|---|
| Indicated Value per Unit | $78,000 |
| Subject Units | 84 |
| Indicated Value | $6,552,000 |
| Adjustments | |
| Lease-Up Costs | -$200,000 |
| Balance of Renovation Costs | -$1,820,000 |
| Unstabilized Discount @ 10% | -$655,200 |
| Total Adjustments | -$2,675,200 |
| Indicated Value | $3,876,800 |
| Rounded | $3,900,000 |

*Figure 2. IRR sales-comparison page (ECF No. 85 at 78): the narrative states a 20% unstabilized discount, but the table directly below applies 10% and deducts $1.82 million of renovation cost.*

**Reconciliation and Conclusion of Value**

The values indicated by the preceding analyses are as follows:

| Summary of Value Indications | |
|---|---|
| Cost Approach | Not Used |
| Sales Comparison Approach | $3,900,000 |
| Income Capitalization Approach | $4,180,000 |
| Reconciled | $4,150,000 |

**Net Realizable Value (NRV)** – the NRV is the liquidation value but adjusts for the likely selling costs to dispose of the property. In this analysis, as the seller will receive any rental income during the marketing period, any operating expenses will be paid. Thus, only a sales commission/closing costs and legal costs are deducted. The sales commission is projected at 4% with a legal cost of $25,000 applied. The NRV is determined as follows:

| Net Realizable Value | |
|---|---|
| Liquidation Value | $2,900,000 |
| Deduct: | |
| Legal Costs | -$25,000 |
| Sales Commissions/Closing Costs @ 5% | -$145,000 |
| Total Deductions | -$170,000 |
| Net Realizable Value | $2.730.000 |

*Figure 3. IRR reconciliation page (ECF No. 85 at 99): the indications reconcile to $4.15 million, and the NRV narrative (4%) and table (5%) use different commissions.*

### D. Correcting the one cost input moves IRR's as-is value above Churchill's claim plus the full DIP Loan.

The table below changes only one number in IRR's own calculation tables: the $1.82 million renovation deduction, replaced by the $1,115,011 construction-related figure from the budget. IRR's stabilized values, $200,000 lease-up cost, 10% discounts, and reconciliation method are left as IRR wrote them.

| IRR component | IRR as printed | Cost input corrected |
|---|---|---|
| Sales approach: stabilized value | $6,552,000 | $6,552,000 |
| Less lease-up cost | ($200,000) | ($200,000) |
| Less renovation cost | ($1,820,000) | ($1,115,011) |
| Less 10% unstabilized discount | ($655,200) | ($655,200) |
| **Sales approach: as-is** | **$3,876,800** | **$4,581,789** |
| Income approach: stabilized value | $6,886,640 | $6,886,640 |
| Less lease-up cost | ($200,000) | ($200,000) |

| IRR component | IRR as printed | Cost input corrected |
|---|---|---|
| Less renovation cost | ($1,820,000) | ($1,115,011) |
| Less 10% unstabilized discount | ($688,664) | ($688,664) |
| **Income approach: as-is** | **$4,177,976 (ECF 85 at p. 97)** | **$4,882,965** |
| **IRR reconciled as-is value using sales and income approaches** | **$4,150,000 (ECF 85 at p. 99)** | **$4,854,989** |

The correction is the same $704,989 under both approaches, so it carries dollar for dollar into IRR's reconciled value: $4,150,000 plus $704,989 is $4,854,989. That is about $197,944 more than Churchill's stated claim plus the entire DIP Loan ($4,657,045.43), before any additional allowed accruals. Applying the same correction to IRR's 20% figure gives $4,104,989. That figure is below the combined debt, but only because of a timing mismatch addressed next.

**E. Debt and value must be measured at the same point in time.**

Churchill counts the full $1.655 million DIP Loan as debt today while valuing the Property as if none of that money had been spent on it. That is not a fair comparison. In other words, it is not proper to add the $1.655 million of debt without counting the improvements that the loan proceeds pay for (or the cash proceeds received by the borrower). A borrower owes the loan, but it also receives the proceeds, and here the proceeds fund the completion work.

IRR deducts the cost of the remaining renovations from as-is value because the work is still unfinished. The DIP Loan will fund that work. After the funded

work is completed, the amount deducted for renovation costs must be added back when comparing the Property's value with the full DIP Loan. Measured that way, IRR's own as-is figures become $5,970,000 (10% discount) and $5,220,000 (20% discount), and both exceed the combined debt. Bowery's figure, adjusted the same way, is about $5,863,806, which also exceeds the combined debt. Interest on the DIP Loan does not change the result. The first year of interest is paid from the $206,875 interest reserve, which is already part of the $1.655 million loan amount counted in the combined debt. Thus, the first year's DIP interest is already accounted for in that comparison.[2]

The table below compares each measure of value with Churchill's claim plus the full DIP Loan. Rows marked "after completion" remove the renovation deduction so that debt and value are measured at the same stage. All other rows are present, as-is values.

| **Valuation basis** | **Property value** | **Claim + full DIP** | **Cushion / (deficit)** |
|---|---|---|---|
| Churchill's liquidation (NRV) comparison | $2,730,000 | $4,657,045 | ($1,927,045) |
| IRR as stated, 20% version | $3,400,000 | $4,657,045 | ($1,257,045) |
| IRR as stated, 10% version | $4,150,000 | $4,657,045 | ($507,045) |
| IRR, 20% version, cost corrected | $4,104,989 | $4,657,045 | ($552,056) |

[2] Churchill also adds roughly $17,240 per month of DIP interest to the debt side. (ECF No. 85 at 11.) That interest is paid first from the $206,875 interest reserve, which is already inside the $1.655 million maximum. (ECF No. 63-1 at 4-5, 23.) Interest paid from the reserve is not additional lien growth on top of the maximum, and counting it again double-counts it.

| Valuation basis | Property value | Claim + full DIP | Cushion / (deficit) |
|---|---|---|---|
| IRR, 10% version, cost corrected | $4,854,989 | $4,657,045 | $197,944 |
| Bowery as-is | $4,900,000 | $4,657,045 | $242,955 |
| IRR, 20% version, after completion | $5,220,000 | $4,657,045 | $562,955 |
| Bowery, after completion | $5,863,806 | $4,657,045 | $1,206,761 |
| IRR, 10% version, after completion | $5,970,000 | $4,657,045 | $1,312,955 |

The only rows showing a deficit are the liquidation measure, which does not apply, and IRR's figures before correcting its cost error or before matching the timing of debt and value. Every measure that values the Property for its actual use, with the correct cost to complete, shows a cushion.

**F. Bowery independently confirms the cushion.**

Bowery supports adequate protection without any correction to IRR. Its $4.9 million as-is value already deducts $986,275 of renovation cost, $237,022 of rent loss, a $62,100 commission, and $321,349 of entrepreneurial profit, and it still exceeds Churchill's claim plus the full DIP Loan by about $242,955. (ECF No. 89-3 at 7, 11.) Once the work is complete, the renovation deduction no longer applies. Adding it back to Bowery's unrounded $4,877,531 income indication gives about $5,863,806, roughly $1,206,761 above the same combined debt. Bowery's capitalization rate is also supported by the market. Of the two brokers Bowery interviewed, Caleb Smith cited cap rates around 8.25% and values in the high $70,000s per unit or above, and Colin Soltis cited 8.75% to 9.00% and $65,000 to

$70,000 per unit, adding that $80,000 per unit would require a Housing Assistance Payments contract. (ECF No. 89-3 at 4.) Bowery's 9.00% rate sits at the conservative end of that range, and Bowery describes it as slightly above the range of the cap rates it surveyed. (ECF No. 89-3 at 5-6.)

Comparable Cap Rates Table

| # | Address | Property Type | No. of Units | Year Built | Sale Date | Capitalization Rate |
|---|---|---|---|---|---|---|
| 1 | 8059 McDermitt Dr., Davison, MI | Multifamily | 123 | 1974 | Listing | 6.39% |
| 2 | 10660 East Holly Road, Springfield Township, MI | Multifamily | 22 | 1975 | 12/4/25 | 6.79% |
| 3 | 201 East Elizabeth Street, Fenton, MI | Multifamily | 65 | 1996 | 10/29/25 | 6.82% |
| 4 | 12911 Fenton Heights Blvd., Fenton, MI | Multifamily | 24 | 1989 | 11/19/24 | 7.15% |
| 5 | 10003 Dixie Hwy., Springfield Township, MI | Multifamily | 9 | 1950 | 11/12/24 | 8.98% |
| 6 | 815 E Maple St., Holly Township, MI | Multifamily | 12 | 1974 | 9/11/24 | 8.00% |
| | | | | | **Avg** | **7.36%** |

Personal Survey

On September 21, 2026, we spoke with Caleb Smith, a broker specializing in multifamily investment sales at Income Property Organization, who indicated that cap rates for multifamily properties comparable to the subject transact in the high 7.00% to low 8.00% range with the subject likely to fall in the 8.25% range given its income as a percentage of market. Additionally, he noted that properties would transact in the high $70,000 per unit range and above with multiple nearby deals transacting in the $80,000+ per unit range in the last couple of years.

On September 22, 2026, we spoke with Colin Soltis, Managing Director specializing in multifamily investment sales at GREA, who noted that for this particular deal, he believed the capitalization rate would fall in the 8.75% to 9.00% range, which would imply value closer to approximately $65,000 to $70,000 per unit. In his view, a price of $80,000 per unit would only be achievable if the property were backed by a HAP contract, given the rising ten-year treasury rate.

*Figure 4. Bowery cap-rate data and broker interviews (ECF No. 89-3 at 4).*

Value Opinion Via the Income Capitalization Approach

| | Date of Value | Value | Final Value (RD) |
|---|---|---|---|
| NOI | | $583,585 | - |
| Cap Rate | | 9.00% | - |
| **Prospective Market Value As Stabilized** | **August 14, 2027** | **$6,484,278** | **$6,500,000** |
| Less Renovation Budget | | ($986,275) | - |
| Residential Rent Loss (3 months) | | ($237,022) | - |
| Commission Fee | | ($62,100) | - |
| Entrepreneurial Profit (25%) | | ($321,349) | - |
| **As Is Market Value Via the Income Capitalization Approach** | **August 14, 2026** | **$4,877,531** | **$4,900,000** |

*Figure 5. Bowery income capitalization (ECF No. 89-3 at 7): 9.00% cap rate, $6,484,278 stabilized, $4,877,531 as-is after deductions.*

## IV. NO SEPARATE EVIDENTIARY VALUATION HEARING IS NECESSARY.

The two appraisals agree on the inputs that matter most. Both use a 9.00% capitalization rate and a six-month completion period, and both use a $6,552,000

stabilized sales value ($78,000 per unit × 84 units). (ECF No. 85 at 26, 28, 78, 97; ECF No. 89-2 at 3, 7; ECF No. 89-3 at 6-7, 11.) Where their stabilized values differ, **IRR's is actually higher**. Their real difference is the as-is deductions, and most of that difference comes from IRR's cost error and its inconsistent discount.

| Metric | Bowery | IRR |
|---|---|---|
| Capitalization rate | 9.00% | 9.00% |
| As-is date | August 14, 2026 | September 11, 2026 |
| Completion period | Six months; three months of rent loss | Six months |
| Stabilized sales value | $6,552,000 | $6,552,000 |
| Stabilized income value | $6,484,278 | $6,886,640 |
| Renovation deduction | $986,275 | $1,820,000 as printed; $1,115,011 corrected |
| Other as-is deductions | $237,022 rent loss; $62,100 commission; $321,349 entrepreneurial profit | $200,000 lease-up; unstabilized discount of 10% (tables) or 20% (narrative) |
| As-is conclusion | $4,900,000 | $3,400,000 (20%); $4,150,000 (10%); $4,854,989 (10%, cost corrected) |

Federal Rule of Bankruptcy Procedure 9014(d) does not require a separate valuation trial. The principal valuation inputs are in the written record: the budget, the IRR appraisal, and the Bowery appraisal. (ECF No. 63-1 at 20-23; ECF No. 85 at 26, 78, 97, 99; ECF No. 89-3 at 4-7, 11-13.) The Court does not need expert testimony to see IRR's internal inconsistencies or to check the arithmetic

above. If the Court wants testimony on a specific Bowery assumption or another disputed fact, it can take limited testimony.

## V. CHURCHILL'S AUTHORITIES DO NOT REQUIRE DENIAL, AND SEVERAL SUPPORT APPROVAL.

### A. Packard Square calls for a case-specific analysis, not a 20% cushion rule.

Churchill quotes In re Packard Square LLC, 574 B.R. 107, 123 (Bankr. E.D. Mich. 2017), for the observation that cushions of 20% or more have often been found sufficient and cushions under 11% often insufficient. Packard Square repeated those observations from other cases, such as Kost v. First Interstate Bank of Greybull (In re Kost), 102 B.R. 829, 831-33 (D. Wyo. 1989), but did not adopt a percentage rule. It stressed that the adequacy of a cushion depends on the case. Id. The projected cushions there, about 3.88% and 5.15% of projected value, were inadequate because they rested on unproven construction-cost and completion assumptions while the existing liens were growing by about $640,273 per month. Id. at 123-26.

This case is different. The Property is operating, with completed and leased units. There is a line-item budget for the remaining work, and IRR itself assumes completion in six months. The first year of DIP interest is prefunded inside the loan amount, so the DIP debt does not grow month by month the way the liens did in Packard Square. And once the work is done, the cushion on Bowery's numbers and on IRR's 10% numbers exceeds 20% of value.

**B. Vander Vegt and Snowshoe both approved priming financing.**

Churchill quotes In re Vander Vegt, 499 B.R. 631, 638 (Bankr. N.D. Iowa 2013), for the point that courts often deny priming when future value is highly speculative. But Vander Vegt conditionally **granted** section 364(d) financing even though the existing lender was undersecured and had no equity cushion, relying on the expected increase in value, a short construction period, and concrete project protections. Id. at 637-39. The district court affirmed. First Security Bank & Trust Co. v. Vegt, 511 B.R. 567 (N.D. Iowa 2014). Snowshoe likewise **affirmed** a priming lien supported by an equity cushion and detailed, data-based projections. 789 F.2d at 1088-90. Neither a fixed percentage nor the fact of priming decides these cases. The question is whether the existing creditor's value is unjustifiably put at risk in light of the actual risks and protections.

**C. First South and YL West turned on facts not present here.**

In re First South Savings Ass'n, 820 F.2d 700 (5th Cir. 1987), was a mandamus proceeding on the denial of a stay pending appeal, not a merits review of a financing order. The court found a strong likelihood of success because the projections depended on an unproven combined hotel, office, and garage operation and on completion assumptions with no supporting contracts, no completion bond, and no record support. Id. at 710-14. In re YL West 87th Holdings I LLC, 423 B.R. 421 (Bankr. S.D.N.Y. 2010), was a stay-relief decision. On that record the court found priming financing not feasible and the construction and value assumptions

too contingent. Id. at 441-45, 454-55. Here, the Property exists, is partly occupied, and has a defined budget and timeline.

**D. Windsor Hotel and Strug-Division are distinguishable on their facts.**

In Windsor Hotel, as-is value was only $2 million against at least $3.5 million of liens, with no cushion, no replacement collateral, 18% occupancy, and postpetition operating losses. Only $130,000 of the proposed $500,000 loan would have improved the real estate; the other $370,000 was operating capital. 295 B.R. at 311-14. Here, IRR's stabilized values exceed $6.5 million, and the DIP Loan funds more than $865,000 of completion work.

In re Strug-Division LLC, 380 B.R. 505, 513-15 (Bankr. N.D. Ill. 2008), involved severe water damage that left only 40 of 110 units rentable, insufficient operating income, uncertainty about what the repairs would cost, and testimony that the work could take 12 to 18 months. Here, according to Cohen as reported by IRR, Building 6914 is renovated and fully occupied and 13 units in Building 6918 are occupied or ready, the remaining work has a line-item budget, and IRR assumes six months to finish. (ECF No. 85 at 28, 49.)[3]

[3] SunTrust Bank v. Den-Mark Construction, Inc., 406 B.R. 683 (E.D.N.C. 2009), and Resolution Trust Corp. v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.), 16 F.3d 552, 564-67 (3d Cir. 1994) (en banc), reject the idea that projected construction value, standing alone and unsupported, is automatically adequate protection. 364 Capital does not rely on that idea. The record here includes current collateral value from two appraisals, a line-item completion budget, completed work, leased units, and lender-controlled disbursement of the loan proceeds.

## VI. THE REVISED PROPOSED ORDER RESOLVES THE NON-VALUATION OBJECTIONS.

The Objection attacks an earlier proposed order. The revised order addresses those objections. Chapter 5 causes of action and their proceeds are excluded from the DIP collateral and the superpriority claim. (Revised Proposed Order ¶¶ 9-10.) No valid tax lien is primed without a separate order entered after notice, a hearing, and a showing under section 364(d). (Id. ¶ 10(b).) The blanket waiver of section 506(c) rights is removed, preserving the rights of the Debtor and any successor estate representative and the DIP Lender's defenses. (Id. ¶ 19.)

The revised order also gives 364 Capital no immediate, unreviewable right to foreclose on an alleged default. Paragraph 21 requires ten days' written notice to the Debtor, the United States Trustee, and counsel for Churchill and Zlur Funding, LLC before any remedy may be exercised after an event of default, and allows any party in interest to request an emergency hearing during that period on whether a default has occurred and is continuing. That answers Churchill's objection to self-executing stay relief.

The remaining protections are ordinary features of DIP financing: a lien securing the actual DIP obligations, a section 364(c)(1) superpriority claim subject to the revised limits and carve-out, and remedies only after notice. 364 Capital is not obligated to fund the loan without these protections. Section 364 permits the Court to approve protections needed to induce a lender to extend credit. If the

Court wants further assurance, it can add conditions to final approval rather than deny the Debtor the capital it needs.

## CONCLUSION

This is not a case in which a debtor asks an existing lender to bear the risk of a speculative new venture. The building exists. Part of the renovation is complete, and those units are leased. The remaining work turns unfinished apartments into rent-producing collateral. Approval rests on the two appraisals, the completion budget, controlled use of the loan proceeds, and the protections in the revised order. Bowery concludes to a $4.9 million as-is value, about $242,955 above Churchill's claim plus the entire DIP Loan, and IRR's own calculations show an equity cushion once its cost input is matched to the filed budget.

364 Capital asks the Court to overrule the Churchill Objection and enter the revised Final Order authorizing the DIP financing under 11 U.S.C. §§ 364(c) and 364(d). No separate evidentiary valuation hearing is needed to resolve IRR's internal inconsistencies or to check its arithmetic. The financing will pay for the improvements that create the cash flow and collateral value from which both 364 Capital and Churchill will be repaid, and it will return much-needed affordable housing to the Flint community.

Respectfully submitted,

/s/ Robert N. Bassel
Robert N. Bassel (P48420)
P.O. Box T
Clinton, MI 49236
(248) 677-1234
bbassel@gmail.com
Counsel for 364 Capital, LLC

Dated: October 1, 2026

# CONCURRENCE EXHIBIT A

## REVISED PROPOSED FINAL DIP ORDER

## (REDLINE)

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 Proceeding |
| Discount Warehouses LP, | ) | |
| | ) | Case No. 26-31510 |
| | ) | |
| Debtor. | ) | Hon. Mark A. Randon |

**FINAL ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) GRANTING ~~SUPERPRIORITY CLAIMS PURSUANT TO SECTIONS 364(c)(1), 364(c)(2) AND 364(d)~~SUPERPRIORITY CLAIMS PURSUANT TO SECTION 364(c)(1) AND LIENS PURSUANT TO SECTIONS 364(c)(2) AND 364(d) OF THE BANKRUPTCY CODE, AND (III) GRANTING RELATED RELIEF**

This matter coming before the Court on the motion (the "Motion") filed by the above-captioned debtor and debtor in possession (the "Debtor") seeking, pursuant to sections 105, 361, 362, 363, 364, 507 and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001-2 of the Local Bankruptcy Rules for the Eastern District of Michigan (the "Local Rules"), the entry of an order providing, among other things:

A. Authorizing the Debtor to obtain senior secured post-petition super priority financing (the "DIP Loan") pursuant to the terms and conditions of the certain Financing Commitment for a Chapter 11 Debtor-in-Possession Loan in the Maximum Loan Amount of One Million Six Hundred Fifty-Five Thousand Dollars ($1,655,000), by and between the Debtor and 364 Capital, LLC. (including any assignee or designee, the "DIP Lender"), attached to the Motion as Exhibit 1 (the "DIP Commitment Letter"), and all agreements, documents, instruments and certificates executed, delivered, filed or entered into in connection with the DIP Loan and DIP Commitment Letter (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, collectively, the "DIP Loan Documents"),

B. Providing for the borrowing of loans in accordance with the Approved Budget (attached as Exhibit A to the DIP Commitment Letter) in an aggregate maximum principal amount not to exceed $1,655,000.00 (the "DIP Loan"),

C. Authorizing the Debtor to execute, enter into and deliver to the DIP Lender all documentation for the DIP Loan and any associated security documents in form and

substance satisfactory to the DIP Lender and to perform such other and further acts as may be required in furtherance of the DIP Loan and the DIP Loan Documents,

D. Authorizing the Debtor to use the proceeds of the DIP Loan to pay for the remaining costs related to the construction and development of the Project, the costs of administration of the Chapter 11 Case and such other costs as expressly agreed to by the DIP Lender, in accordance with the DIP Loan Documents and the Approved Budget;

E. Deeming the Prepetition Lenders (as defined herein) adequately protected on account of the Prepetition Liens (as defined herein) being primed;

F. Granting allowed superpriority administrative expense claim status in the Chapter 11 Case for all obligations of the Debtor to the DIP Lender arising under the DIP Loan (collectively, the "DIP Obligations");

G. Granting the DIP Lender automatically perfected first-priority security interests in and liens on all of the DIP Collateral (as defined herein) to secure all of the DIP Obligations, which liens and security interests shall be subject only to Permitted Liens (as defined below) and the Carve-Out (as defined below);

H. Modifying the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Order;

and the Court having considered the Motion, the exhibits attached to the Motion, and due and appropriate notice of the Motion, the relief requested therein and having been given in accordance with Bankruptcy Rules 2002, 4001 and 9014; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and the relief requested being fair and reasonable and in the best interests of the Debtor, its estate, its creditors, and essential for the Debtor's reorganization efforts and the continued operation of the Debtor's business through the period covered by the current Approved Budget (or any subsequent Approved Budget); and it further appearing that the Debtor is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or to obtain credit secured solely by the Debtor's unencumbered assets or by junior liens on previously-encumbered assets; and upon the record before the Court with respect to the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED, that:**

1. Financing Approved. The Motion is granted in accordance with the terms of this Order. The Debtor is authorized to obtain advances in an aggregate amount not to exceed $1,655,000 from the

DIP Lender pursuant to the terms and conditions set forth in the executed DIP Loan Documents. All objections to the Motion, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.

2. Jurisdiction. This Court has core jurisdiction over the Chapter 11 Case, the Motion, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and

1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. Findings Regarding the DIP Loan.

(a) Cause. Good cause has been shown for entry of this Order.

(b) Need for DIP Loan. Without the financing proposed by the Motion, the Debtor does not have the funds necessary to continue the renovation of the Project through the period set forth in the current Approved Budget (or any subsequent Approved Budget as contemplated by the terms of this Order). The Debtor's ability to complete construction of the Project and pay the costs of administration of its estate depends on obtaining access to the DIP Loan. The access of the Debtor to sufficient construction financing through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital for preserving and maximizing the value of the Debtor's estate for the benefit of its creditors. Failure to obtain the relief requested in the Motion will harm the Debtor, its estate, and creditors.

(c) No Credit Available on More Favorable Terms. The Debtor is unable to obtain financing on terms more favorable than those offered by the DIP Lender under the DIP Loan. The Debtor is unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit under Sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those offered by the DIP Lender under the DIP Loan. The Debtor has made an adequate showing of its efforts to obtain financing on more favorable terms for the purposes of the relief granted herein. A credit facility in the amount and on the terms provided by the DIP Loan is not available from the DIP Lender without the Debtor granting to the DIP Lender (i) the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein), and (ii) the other protections set forth in this Order.

(d) Use of Proceeds of the DIP Loan. As a condition to the extension of credit under the DIP Loan, the DIP Lender and the Debtor have agreed that proceeds under the DIP Loan shall be used exclusively in a manner consistent with the terms of the DIP Loan and the Approved Budget.

(e) Business Judgment and Good Faith Pursuant to Section 364(e). The terms and conditions of the DIP Loan and the DIP Loan Documents are fair, reasonable, and the best available to the Debtor under the circumstances, reflect the exercise of prudent business judgment by the Debtor consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Loan was negotiated without collusion, in good faith and at arms' length between the Debtor and the DIP Lender. Use of credit to be extended under the DIP Loan shall be deemed to have been so allowed, advanced, made, used or extended in good faith, within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance on the protections offered by Section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the full protections and benefits of Section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

4. Relief. Absent the relief provided by this Order, the Debtor, its estate, and its creditors will be harmed. Consummation of the DIP Loan in accordance with the DIP Loan Documents is therefore in the best interests of the Debtor and its estate and is consistent with its fiduciary duties. Authorization of the DIP Loan and DIP Loan Terms. The Debtor is expressly and immediately authorized to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Order and the DIP Loan Documents. The Debtor further is authorized to pay to the DIP Lender all fees set forth in the DIP Commitment Letter. The DIP Obligations shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and its estate in accordance with their terms. Notwithstanding (a) any other provision of this Order which may appear to the contrary or (b) any provision of the DIP Loan Documents, to the extent of any conflict between any of the DIP Loan Documents and any provision of this Order, this Order shall control and govern.

5. Authorization to Perform Under DIP Loan Documents. Subject to the terms of this Order, the Debtor is hereby authorized to execute, enter into, and deliver the DIP Loan Documents and all instruments and documents which may be required or reasonably necessary for the performance by the Debtor under the DIP Loan and the creation and perfection of the DIP Liens as described in and provided for by this Order and the DIP Loan Documents. This Order and the DIP Loan Documents shall evidence the validity and binding effect of the DIP Obligations and shall govern the financial accommodations to be provided to the Debtor by the DIP Lender. This Order approves the DIP Loan based upon the terms of the DIP Commitment Letter. The Debtor and the DIP Lender intend to enter into the DIP Loan Documents prior to any extension of credit under the DIP Loan and will

file copies of the DIP Loan Documents with this Court. The DIP Loan Documents shall be consistent, in all material respects, with the DIP Commitment Letter and upon the filing of such signed DIP Loan Documents with the Court, such DIP Loan Documents shall be deemed approved by this Order.

6. Authorization to Borrow. Subject to the terms, conditions, limitations on availability set forth in the DIP Loan Documents and this Order, the Debtor is hereby authorized to borrow up to $1,655,000.00 from the DIP Lender in compliance with the DIP Loan Documents.

7. No Obligation to Extend Credit. The DIP Lender shall have no obligation to make any loan or advance under the DIP Loan Documents or this Order, unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Order have been satisfied in full or have been waived by the DIP Lender in its sole and absolute discretion.

8. Use of DIP Loan Proceeds; From and after the Petition Date, the Debtor shall use the DIP Loan only for the purposes and line items specifically set forth in this Order and the other DIP Loan Documents, and in compliance with the Approved Budget.

9. Superpriority Claims. Pursuant to Section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtor (the "DIP Superpriority Claims") with priority over ~~any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtor or its estate in the Chapter 11 Case, at any time existing or arising, of any kind or nature whatsoever, including without limitation, administrative expenses, such as the proceeds of avoidance actions and of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code as provided under Section 364(c)(1) of the Bankruptcy Code; and which claims shall at all times be senior to the rights of the Debtor and its estate, any successor trustee or other estate representative and any creditor or other party in interest to the extent permitted by law.~~administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carve-Out. Notwithstanding the foregoing, the DIP Superpriority Claims shall not extend to, be satisfied from, or otherwise confer upon the DIP Lender any interest in any claims or causes of action arising under Chapter 5 of the Bankruptcy Code or the proceeds thereof, and nothing in this Order shall alter the priority of any allowed priority tax claim under Section 507(a)(8) of the Bankruptcy Code.

10. DIP Liens. As security for the DIP Obligations, effective and perfected upon the date of entry of this Order and without the necessity of the execution, recordation of filings by the Debtor

of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender or its agents over any Collateral, the following security interests and liens are hereby granted to the DIP Lender (the "DIP Liens"), subject only to any Permitted Liens and the Carve-Out:

(a) pursuant to Section 364(c)(2) of the Bankruptcy Code, to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date, a perfected first-priority security interest in and lien on all currently-owned or hereafter acquired assets and property, including without limitation all of its real and personal property and assets, whether tangible or intangible, and whether now owned or hereafter acquired, or in which it now has or at any time in the future may acquire any right, title, or interest, including, without limitation: certain real property located at 6914 Clio Court, Flint, Michigan, together with all buildings, structures, and other improvements now or hereafter located on the land as well as all furniture, fixtures, and equipment, as well as all permits and licenses, accounts receivable, leasehold rights, third-party contracts, plans and specifications for the Real Property, and any other asset of the Borrower not in the form of real property and any and all assets described in the commitment letter; provided, however, that notwithstanding anything to the contrary in this Order, the DIP Commitment Letter, or the DIP Loan Documents, the DIP Collateral shall not include any claims or causes of action arising under Chapter 5 of the Bankruptcy Code or any proceeds thereof; and

(b) pursuant to Section 364(d) of the Bankruptcy Code, a perfected first-priority security interest in and lien on all Collateral to the extent such Collateral is subject to the Prepetition Liens, which Prepetition Liens shall be primed by the DIP Liens. The primed DIP Liens shall not be subject to being treated pari passu with or subordinated to any other liens or security interests (whether currently existing or hereafter created), subject only to permitted exceptions to be expressly agreed upon in writing by the DIP Lender in its discretion or imposed by applicable non-bankruptcy law (the "Permitted Liens"). For the avoidance of doubt, nothing in this Order shall prime, subordinate, or otherwise alter the priority of any valid tax lien, except pursuant to a separate order of the Court entered after notice and a hearing and satisfaction of the requirements of Section 364(d) of the Bankruptcy Code.

(c) Insurance Proceeds. During the pendency of the Chapter 11 Case, any insurance proceeds payable as a result of any loss, casualty, or damage to the DIP Collateral shall be paid directly into the Debtor's debtor-in-possession operating account. The deposit of any such proceeds shall not alter the validity, extent, or priority of any lien or security interest in such

proceeds, and all such liens and security interests shall attach to the proceeds with the same validity, extent, and relative priority that existed immediately before the loss, casualty, or damage. The Debtor shall use such proceeds only in accordance with this Order, the DIP Loan Documents, the Approved Budget, and applicable law, or pursuant to further order of the Court.

11. Marshalling. Entry of this Order does not determine whether tThe DIP Lender could shall not be required to marshal the Collaterall, and does not determine shall be authorized to foreclose on and liquidate any of the Collateral as consistent with the DIP Loan Documents, in any manner or order in the DIP Lender's sole and absolute discretion.

12. Perfection of DIP Liens. This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any lockbox or deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Lender to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender is authorized to file, at its sole discretion, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices, other documents, and approvals shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The Debtor is authorized and directed to execute and deliver promptly upon demand to the DIP Lender all such financing statements, mortgages, notices and other documents as the DIP Lender reasonably requests. The DIP Lender in its discretion may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

13. Use of Prepetition Collateral. Subject to the terms and conditions of this Order, the Debtor is authorized, pursuant to Section 363 of the Bankruptcy Code, to use the Prepetition Collateral.

14. The Prepetition Lenders Are Adequately Protected. Based on the Debtor's Appraisal, the Court finds that Churchill MRA Funding I, LLC ("Churchill") and Zlur Funding, LLC ("Zlur," and together with Churchill, the "Prepetition Lenders") are adequately protected, even after their

Prepetition Liens are primed by the DIP Liens, and, therefore, are not entitled to any form of adequate protection or adequate protection payments.

15. Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order. The terms and conditions of the DIP Loan and the DIP Loan Documents are fair, reasonable, and the best available to the Debtor under the circumstances, reflect the exercise of prudent business judgment by the Debtor consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Loan was negotiated without collusion, in good faith and at arms' length between the Debtor and the DIP Lender. The DIP Lender has acted in good faith in connection with this Order, and its reliance on this Order is in good faith

16. Proofs of Claim. The DIP Lender will not be required to file a proof of claim in the Chapter 11 Case for any claim allowed herein in relation to the DIP Loan.

17. Modification of Automatic Stay. The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to authorize the Debtor and DIP Lender to take any action necessary to implement and effectuate the terms and provisions of this Order and the DIP Loan Documents.

18. Carve-Out. "Carve-Out" means, collectively, ~~(a) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930 and to the Clerk of the Court, and (b) allowed fees and expenses~~ (a) fees payable to the Clerk of the Court, and (b) allowed fees and expenses of professionals retained by the Debtor's estate that are incurred prior to delivery of a notice of an Event of Default (as defined below), in an aggregate amount not to exceed the amounts set forth in the Budget, plus $10,000.00 for such fees and expenses incurred after delivery of such notice. Notwithstanding anything to the contrary in this Order, all quarterly fees due and payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid in full in the ordinary course as they become due and shall not be subject to the Carve-Out, the foregoing cap, or any other cap or separate allocation requirement.

19. ~~Waiver of~~ Sections 506(c) and 552(b); Marshaling. ~~Subject to entry of this Order, no costs or expenses of administration shall be charged against the DIP Lender or the DIP Collateral under section 506(c) of the Bankruptcy Code without the DIP Lender's prior written consent;~~ Nothing in this Order constitutes a waiver of any rights of the Debtor or any successor estate representative under Section 506(c) of the Bankruptcy Code, and nothing herein prejudices any defenses of the DIP Lender to any request for relief under Section 506(c); the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender; and the doctrine of marshaling shall not apply to the DIP Collateral.

20. Fees and Expenses. All fees, costs and expenses of the DIP Lender in connection with the DIP Loan and the Chapter 11 Case, including the fees and expenses of its counsel, shall be paid by the Debtor as and when provided in the DIP Loan Documents, shall constitute DIP Obligations secured by the DIP Liens and entitled to superpriority status, and shall be payable without the necessity of filing a fee application or obtaining further order of the Court.

21. Events of Default and Remedies. The DIP Loan Documents contain customary events of default (each, an "Event of Default"). Upon the occurrence and during the continuance of an Event of Default, and following ten (10) calendar days' written notice to the Debtor, the United States Trustee, and counsel for Churchill and Zlur, the automatic stay shall be modified without further order of the Court to permit the DIP Lender to exercise all rights and remedies under the DIP Loan Documents and applicable non-bankruptcy law, subject to the right of any party in interest to request an emergency hearing within that notice period limited to the question whether an Event of Default has occurred and is continuing.

22. Conversion, Dismissal and Plan. The DIP Liens, the DIP Obligations and the superpriority claims granted to the DIP Lender shall survive, and shall not be modified, altered or impaired by, any conversion of the Chapter 11 Case to a case under chapter 7, any dismissal of the Chapter 11 Case, or the confirmation of any plan, and shall be binding upon any trustee appointed in the Chapter 11 Case or in any superseding case.

23. Waiver of Bankruptcy Rules 4001(a)(4) and 6004(h). This Order shall be effective immediately upon entry, and the fourteen-day stay otherwise provided by Bankruptcy Rules 4001(a)(4) and 6004(h) is hereby waived.

24. Bankruptcy Rule 7052. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

25. Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Order according to its terms.